14 CV 9373

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIXED INCOME SHARES: SERIES M; LVS II LLC; PCM FUND, INC.; PIMCO ABSOLUTE RETURN STRATEGY II MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY III OVERLAY MASTER FUND LTD.; PIMCO ABSOLUTE RETURN STRATEGY IV MASTER FUND LDC; PIMCO ABSOLUTE RETURN STRATEGY V MASTER FUND LDC; PIMCO BERMUDA TRUST: PIMCO BERMUDA FOREIGN LOW DURATION FUND; PIMCO BERMUDA TRUST: PIMCO BERMUDA U.S. LOW DURATION FUND; PIMCO CAYMAN SPC LIMITED: PIMCO CAYMAN JAPAN COREPLUS SEGREGATED PORTFOLIO; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL ADVANTAGE BOND FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL AGGREGATE EX-JAPAN (YEN-HEDGED) BOND FUND II; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL AGGREGATE EX-JAPAN (YEN-HEDGED) INCOME FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL AGGREGATE EX-JAPAN BOND FUND; PIMCO CAYMAN TRUST: PIMCO CAYMAN GLOBAL BOND (NZD-HEDGED) FUND; PIMCO DYNAMIC CREDIT INCOME FUND; PIMCO ETF TRUST: PIMCO TOTAL RETURN ACTIVE EXCHANGE-TRADED FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, DIVERSIFIED INCOME FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL BOND FUND; PIMCO FUNDS: GLOBAL INVESTORS SERIES PLC, GLOBAL | Case No.      **JUDGE FURMAN**<br><br>**VERIFIED DERIVATIVE COMPLAINT AND ALTERNATIVE CLASS ACTION AGAINST CITIBANK N.A. FOR BREACH OF CONTRACT; VIOLATION OF THE TRUST INDENTURE ACT OF 1939; BREACH OF FIDUCIARY DUTY; BREACH OF DUTY OF INDEPENDENCE; AND NEGLIGENCE**<br><br>**JURY DEMAND** |





INVESTMENT GRADE CREDIT FUND;
PIMCO FUNDS: GLOBAL INVESTORS
SERIES PLC, INCOME FUND; PIMCO
FUNDS: GLOBAL INVESTORS SERIES
PLC, PIMCO CREDIT ABSOLUTE
RETURN FUND; PIMCO FUNDS:
GLOBAL INVESTORS SERIES PLC,
UNCONSTRAINED BOND FUND;
PIMCO FUNDS: PIMCO
COMMODITIESPLUS® STRATEGY
FUND; PIMCO FUNDS: PIMCO
COMMODITY REAL RETURN
STRATEGY FUND®; PIMCO FUNDS:
PIMCO CREDIT ABSOLUTE RETURN
FUND; PIMCO FUNDS: PIMCO
DIVERSIFIED INCOME FUND; PIMCO
FUNDS: PIMCO FLOATING INCOME
FUND; PIMCO FUNDS: PIMCO
FOREIGN BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO GLOBAL
ADVANTAGE® STRATEGY BOND
FUND; PIMCO FUNDS: PIMCO
GLOBAL BOND FUND (UNHEDGED);
PIMCO FUNDS: PIMCO INCOME
FUND; PIMCO FUNDS: PIMCO
INTERNATIONAL STOCKSPLUS® AR
STRATEGY FUND (U.S. DOLLAR-
HEDGED); PIMCO FUNDS: PIMCO
INVESTMENT GRADE CORPORATE
BOND FUND; PIMCO FUNDS: PIMCO
LOW DURATION FUND; PIMCO
FUNDS: PIMCO LOW DURATION
FUND II; PIMCO FUNDS: PIMCO LOW
DURATION FUND III; PIMCO FUNDS:
PIMCO REAL RETURN FUND; PIMCO
FUNDS: PIMCO SHORT-TERM FUND;
PIMCO FUNDS: PIMCO TOTAL
RETURN FUND; PIMCO FUNDS:
PIMCO UNCONSTRAINED BOND
FUND; PIMCO FUNDS: PIMCO
WORLDWIDE FUNDAMENTAL
ADVANTAGE AR STRATEGY FUND;
PIMCO FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES EMERGING
MARKETS PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT

PORTFOLIO SERIES INTERNATIONAL
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES
MORTGAGE PORTFOLIO; PIMCO
FUNDS: PRIVATE ACCOUNT
PORTFOLIO SERIES SHORT-TERM
PORTFOLIO; PIMCO FUNDS: PRIVATE
ACCOUNT PORTFOLIO SERIES U.S.
GOVERNMENT SECTOR PORTFOLIO;
PIMCO MULTI-SECTOR STRATEGY
FUND LTD.; PIMCO OFFSHORE
FUNDS - PIMCO ABSOLUTE RETURN
STRATEGY IV EFUND; PIMCO
VARIABLE INSURANCE TRUST:
PIMCO GLOBAL ADVANTAGE
STRATEGY BOND PORTFOLIO;
PIMCO VARIABLE INSURANCE
TRUST: PIMCO GLOBAL BOND
PORTFOLIO (UNHEDGED); PIMCO
VARIABLE INSURANCE TRUST:
PIMCO LOW DURATION PORTFOLIO;
CREF BOND MARKET ACCOUNT;
CREF SOCIAL CHOICE ACCOUNT;
TIAA GLOBAL PUBLIC
INVESTMENTS, MBS LLC; TIAA-CREF
BOND FUND; TIAA-CREF BOND PLUS
FUND; TIAA-CREF LIFE INSURANCE
COMPANY; PRUDENTIAL BANK &
TRUST, FSB; PRUDENTIAL
RETIREMENT INSURANCE AND
ANNUITY COMPANY; THE
GIBRALTAR LIFE INSURANCE
COMPANY, LTD.; THE PRUDENTIAL
SERIES FUND; LIICA RE II, INC.;
MONUMENTAL LIFE INSURANCE
COMPANY – MODIFIED SEPARATE
ACCOUNT; TRANSAMERICA LIFE
INSURANCE COMPANY;
TRANSAMERICA PREMIER LIFE
INSURANCE COMPANY; KORE
ADVISORS LP; and SEALINK FUNDING
LIMITED, derivatively, on behalf of the
Trusts Identified in Exhibit 1,

   Plaintiffs,

-against-

CITIBANK N.A.,

Defendant,

-and-

the Trusts Identified in Exhibit 1

Nominal Defendants.

## TABLE OF CONTENTS

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ............................................................ 1

II.    PARTIES ............................................................................................................................. 9

    A.    Plaintiffs ............................................................................................................. 9

        1.    AEGON ............................................................................................... 9

        2.    Kore .................................................................................................... 10

        3.    PIMCO .............................................................................................. 10

        4.    Prudential .......................................................................................... 15

        5.    Sealink ............................................................................................... 16

        6.    TIAA .................................................................................................. 16

    B.    Defendants ........................................................................................................ 17

        1.    Citibank ............................................................................................. 17

        2.    The Nominal Defendant Trusts ....................................................... 18

III.    OVERVIEW OF THE TRUSTS ..................................................................................... 19

IV.    JURISDICTION AND VENUE ...................................................................................... 20

V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED ........................... 20

VI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS ..................................... 21

VII.    BACKGROUND - THE TRUSTEE'S ROLE AS GATEKEEPER IN THE
SECURITIZATION PROCESS ...................................................................................... 24

VIII.    CITIBANK'S CONTRACTUAL OBLIGATIONS ........................................................ 26

    A.    The Mortgage Loan Purchase And Sale Agreement ............................................ 27

    B.    The Pooling And Servicing Agreements .............................................................. 29

        1.    Citibank's Duties And Obligations Under The PSAs ............................ 29

            a)    Duty To Provide Notice Of Breaches And
To Enforce Putback Rights ............................................................. 30

            b)    Citibank's Duties Regarding The Servicers ................................... 31

           c)      Duties Upon Knowledge Of An Event Of
Default ........................................................................32

     2.     The Servicers' Duties And Obligations Under The PSAs ...................... 33

           a)      Duty To Provide Notice Of Breaches And
To Enforce Putback Rights ...............................................33

           b)      Duty To Perform Prudent And Customary
Servicing Practices ..........................................................34

           c)      Duty To Perform Prudent Foreclosure
Practices .........................................................................35

           d)      Duty To Perform Prudent Servicing
Advances .........................................................................35

  C.     The Indentures And Sale Servicing Agreements .................................. 37

IX.   THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF
REPRESENTATIONS AND WARRANTIES BY THE SELLERS ............................. 39

  A.    High Default Rates Of The Mortgage Loans And Plummeting
Credit Ratings Are Indicative Of Massive Seller Breaches ................................ 40

  B.    The Systemic Disregard Of Underwriting Standards Was Pervasive
During The Relevant Period ............................................................. 41

  C.    There Is Evidence Of Widespread Breaches Of Representations
And Warranties By The Specific Originators That Sold Loans To
The Trusts .............................................................................. 44

     1.     American Home ................................................................. 44

     2.     WaMu And Long Beach ....................................................... 46

     3.     SunTrust ......................................................................... 49

     4.     Wells Fargo ..................................................................... 51

  D.    The Systemic Disregard Of Prudent Securitization Standards Was
Pervasive During The Relevant Period ............................................... 53

  E.    There Is Evidence Of Widespread Breaches Of Representations
And Warranties By The Specific Sponsors Of The Trusts ...................... 54

     1.     WaMu ............................................................................ 54

     2.     Lehman ........................................................................... 56

     3.     Goldman Sachs ................................................................. 58

X.     CITIBANK KNEW THAT THE TRUSTS WERE FILLED WITH
       DEFECTIVE LOANS ........................................................................... 61

       A.     The Trusts' Poor Performance ........................................................... 61

       B.     Credit Rating Downgrades Further Demonstrate The Sellers'
              Problems ......................................................................................... 64

       C.     Citibank Discovered Widespread Seller Breaches Of
              Representations And Warranties In Its Capacity As Servicer ............. 65

       D.     Citibank Was Named In RMBS Litigation Involving Common
              Loan Sellers' Systemic Abandonment Of Underwriting Guidelines ... 66

       E.     Citibank And Its Responsible Officers Received Written Notice
              From Certificateholders And Monoline Insurers Of Pervasive And
              Systemic Seller Breaches ................................................................. 68

       F.     Citibank Knew Of Pervasive And Systemic Seller Breaches As A
              Result Of RMBS Litigation Brought By Investors And
              Government Agencies On Deals In Which It Serves As Trustee ......... 73

       G.     Citibank Was Named In RMBS Litigation And Has Agreed To
              Settle RMBS Claims Involving Common Loan Sellers' Systemic
              Abandonment Of Underwriting Guidelines ........................................ 77

XI.    THE TRUSTS ALSO SUFFERED FROM PERVASIVE SERVICER
       VIOLATIONS ................................................................................... 79

       A.     The Servicers Failed To Give Notice Of Seller Breaches Of
              Representations And Warranties And Enforce The Sellers'
              Repurchase Obligations ................................................................... 80

       B.     The Servicers Have Violated Their Prudent Servicing Obligations ..... 83

       C.     The Servicers Have Violated Their Foreclosure Obligations ............. 86

       D.     The Servicers Have Violated Their Modification Obligations ............. 91

       E.     The Servicers Have Abused Their Servicing Advances Obligations .... 92

XII.   CITIBANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING
       THE TRUSTS .................................................................................... 94

       A.     Citibank Itself Was Involved In Government Enforcement Actions
              And Litigation Stemming From The Servicers' Violations ................. 94

       B.     Citibank And Its Responsible Officers Received Written Notice
              From Certificateholders Of Pervasive And Systemic Servicer
              Breaches .......................................................................................... 97

       C.     Citibank Had Knowledge Of The Servicers' Failures Through The
              Monthly Servicer And Remittance Reports ....................................... 98

XIII.   CITIBANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND
        POST-DEFAULT DUTIES ........................................................................ 98

        A.      Failure To Enforce The Trusts' Repurchase Rights ............................... 99

        B.      Failure To Provide Notice To The Servicers Of Events Of Default.................... 99

        C.      Failure To Act Prudently After The Uncured Events Of Default........................ 99

        D.      Failure To Provide Notice To The Certificateholders Of The
                Uncured Events Of Default.................................................................. 100

XIV.    CITIBANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE
        INSOLVENCY OF CERTAIN SPONSORS .................................................. 101

XV.     CITIBANK FAILED TO PROTECT THE TRUSTS DUE TO ITS
        CONFLICTS OF INTEREST ...................................................................... 103

        A.      Citibank Was Economically Beholden To The Mortgage Loan
                Sellers.............................................................................................. 103

        B.      Citibank Was Engaged In The Same Wrongful Servicing Activities................ 104

        C.      Citibank Originated And Sponsored Defective Loans........................................ 106

        D.      Citibank Refused To Discharge Its Duties In Order To Preserve
                Profits............................................................................................... 110

XVI.    CAUSATION .......................................................................................... 112

XVII.   DAMAGES ............................................................................................. 113

XVIII.  CAUSES OF ACTION .............................................................................. 113

FIRST CAUSE OF ACTION  BREACH OF CONTRACT (In The Right Of The
        Trustee And On Behalf Of The Trusts Against Citibank) ............................... 113

SECOND CAUSE OF ACTION  VIOLATION OF THE TRUST INDENTURE
        ACT OF 1939, 53 STAT. 1171 (In The Right Of The Trustee And On
        Behalf Of The Trusts Against Citibank)...................................................... 121

THIRD CAUSE OF ACTION  NEGLIGENCE - BREACH OF PRE-DEFAULT
        DUTY OF INDEPENDENCE (In The Right Of The Trustee And On
        Behalf Of The Trusts Against Citibank)...................................................... 124

FOURTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – DUTY
        OF CARE (In The Right Of The Trustee And On Behalf Of The Trusts
        Against Citibank).................................................................................. 126

FIFTH CAUSE OF ACTION  NEGLIGENCE – DUTY OF CARE (In The Right
        Of The Trustee And On Behalf Of The Trusts Against Citibank)................... 128

SIXTH CAUSE OF ACTION  BREACH OF FIDUCIARY DUTY – BREACH
OF POST-DEFAULT DUTY OF INDEPENDENCE (In The Right Of
The Trustee And On Behalf Of The Trusts Against Citibank).................................... 130

XIX.   CLASS ACTION ALLEGATIONS ............................................................... 132

XX.    RELIEF REQUESTED.................................................................................. 134

XXI.   JURY DEMAND .......................................................................................... 135

Plaintiffs AEGON (as defined herein); Kore Advisors, LP ("Kore"); PIMCO (as defined herein); Prudential (as defined herein); Sealink Funding Limited ("Sealink"); and TIAA (as defined herein) (collectively, "Plaintiffs") by and through their undersigned attorneys, hereby bring this derivative complaint (the "Complaint") in the right of the trustee and on behalf of and for the benefit of the residential mortgage-backed securities ("RMBS") Trusts listed in Exhibit 1 ("Trusts"), against Citibank N.A. ("Citibank" or the "Trustee"), the Trustee for the Trusts to recover losses sustained by the Trusts as a result of Citibank's wrongful conduct.  Alternatively, Plaintiffs bring this action on their own behalf and on behalf of a class of all current owners of certificates in the Trusts (the "Class") to recover for the losses directly suffered by Plaintiffs and the Class as a result of Citibank's wrongful conduct.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Defendant Citibank is a nationally chartered banking association that is the Trustee for over a hundred RMBS trusts originally securitized by more than $69 billion of residential mortgage loans.  Among them are the Trusts at issue in this action: twenty-seven private-label RMBS Trusts securitized between 2004 and 2007 collateralized with loans worth more than $17.4 billion at the time of securitization.  Citibank, as Trustee, is the sole gatekeeper for the protection of the Trusts and their beneficial certificateholders (the "Certificateholders"), and must at all times act in the best interests of the Trusts.  As alleged herein, Citibank failed to discharge its duties and obligations to protect the Trusts. Instead, to protect its own business interests, Citibank ignored pervasive and systemic deficiencies in the underlying loan pools and the servicing of those loans and unreasonably refused to take any action.  This derivative action

seeks to recover billions of dollars in damages to the Trusts caused by Citibank's abdication of responsibility.[1]

2.      RMBS trusts are created to facilitate the securitization and sale of residential mortgage loans to investors.  The trust's assets consist entirely of the underlying loans, and the principal and interest payments on the loans are "passed through" to the certificateholders. Between 2004 and 2008, a handful of large investment banks – including Citibank − dominated the RMBS market and controlled the process from beginning to end.   These banks act as "sponsors" of the RMBS, acquiring the mortgage loans from originators, who often were affiliates of the sponsors, or beholden to them through warehouse lending or other financial arrangements.   Once the loans are originated, acquired and selected for securitization, the sponsor creates a trust where the loans are deposited for the benefit of the Certificateholders. The sponsor also hand-picks the servicer, often an affiliate of the sponsor or originator, to collect payments on the loans.  Finally, a select number of these same banks that originate, securitize and service RMBS also act as trustees on other sponsor's deals.

3.      To ensure the quality of the RMBS and the underlying loans, the Trust documents generally include representations and warranties from the loan sellers attesting to the quality and characteristics of the mortgages as well as an agreement to cure, substitute, or repurchase mortgages that do not comply with those representations and warranties.  Because the risk of non-payment or default on the loans is "passed through" to investors, other than these representations and warranties, the large investment banks and other players in the mortgage

---

[1] This complaint does not allege in any way that the Trustees were or are burdened by conflicts in connection with their negotiation, evaluation, or acceptance of any RMBS settlement, including the $8.5 billion settlement with Bank of America/Countrywide, the $4.5 billion settlement with JPMorgan, or the $1.125 billion settlement with Citibank.

securitization industry have no "skin" in the game once the RMBS are sold to certificateholders. Instead, their profits are principally derived from the spread between the cost to originate or purchase loans, how much they can sell them to investors once packaged as securities, as well as various servicing-related income. Accordingly, volume became the focus, and the quality of the loans was disregarded.

4. The fundamental role of a trustee in an RMBS securitization is to ensure that there is at least one independent party, free from any conflicting self-interest, to protect the trust corpus. Certificateholders have no access to the underlying loan files and other documents necessary to confirm compliance with the representations and warranties, cannot monitor the servicers' conduct and performance, cannot act independently to enforce the trusts' contractual rights, and must rely on the trustee to protect their interests. Citibank, as Trustee, was the sole contractual party in the Trusts' securitization process intended to be independent of the investment banks that sponsored the securitization, the lenders that originated the loans, and the servicers that were often affiliated with either the sponsors or lenders, or both. Certificateholders must rely on the Trustee to protect the rights and interests of the trusts.

5. Citibank knew that the pools of loans backing the Trusts were filled with defective mortgage loans. The abysmal performance of the Trust collateral – including spiraling defaults, delinquencies and foreclosures – is outlined on monthly remittance reports that Citibank, as Trustee, publishes and publicly files with the government. The monthly remittance reports detail how, by January 2009, the Trusts had suffered collateral losses exceeding $389 million. The Trusts' average delinquency rate was over 13%. Moreover, five Trusts had delinquency rates exceeding 30%. By January 2011, the Trusts' total losses had increased more

than **three-fold** to $1.4 billion.  By December 2009, nearly all of the securities issued by the Trusts had experienced multiple downgrades, with most reduced to "junk" status.

6.     A steady stream of public disclosures has linked the abject performance of the Trusts to systemic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors. Highly publicized government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.   Voluminous complaints in these proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios ("LTVs"), owner occupancy status, and borrower credit scores – as well as the completeness of the loan files themselves.

7.     Forensic and loan level reviews have demonstrated staggering levels of breaches of representations and warranties by the sellers of the securitized mortgage loans. In particular, forensic reviews commissioned by government agencies and federal banks in connection with RMBS trusts to which Citibank serves either as trustee or servicer have found pervasive and systemic breaches of representations and warranties by major originators and sponsors to the Trusts (such as Washington Mutual ("WaMu"), Lehman Brothers Holdings Inc. ("Lehman"), Wells Fargo Bank ("Wells Fargo"), Goldman Sachs, and American Home Mortgage Corp. ("American Home").   In one such action, the Federal Housing and Finance Agency's ("FHFA") forensic analysis found that two of the Trusts here at issue had LTV ratios **greater than 100%** when **_no_** such loans were supposed to be included in the pool, and that non-owner occupied properties had been substantially understated.   Through the foregoing litigation involving the

-4-

Trusts at issue in this action or the principal loan sellers to the Trusts (or both), Citibank was informed of specific, systemic and pervasive deficiencies in the Trusts' mortgage collateral.

8.      Citibank was further informed of pervasive and systemic deficiencies infecting the Trusts' collateral through large-scale "putback" initiatives led by many of the world's largest institutional mortgage investors.  These initiatives have targeted Citibank and five other leading sponsors of non-agency RMBS and cover wide swaths of the RMBS market, including entire labels and shelves. These and other certificateholder-led initiatives – several of which have yielded multi-billion dollar settlements – sought to "putback" large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including American Home ($5.5 billion of loans sold to the Trusts), and Wells Fargo ($226.8 billion of loans sold to the Trusts). The initiatives additionally identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $8.3 billion of loans sold to the Trusts).

9.      Citibank also knew of industrywide abandonment of underwriting guidelines and sound securitization practices because Citibank was itself a major mortgage originator, a major RMBS sponsor, and a major servicer.  Indeed, Citibank (or its affiliates) has been named as a defendant in significant RMBS litigation and settlements in its capacity as sponsor and underwriter of Citi-label RMBS filled with loans originated by many of the same originators of loans sold to the Trusts.  For example, in February 2011, the largest publicly-held personal property and casualty insurance company in the United States filed suit against Citibank (and its affiliates) in its capacity as originator, sponsor, underwriter, and depositor for trusts underlying $200 million in Citi-label RMBS the insurer had purchased. The complaint alleged that while the insurer "was made to believe it was buying highly-rated, safe securities backed by pools of loans

with specifically-represented risk profiles, in fact [Citibank] knew the pools were toxic mixes of loans extended to borrowers who could not afford the properties, and thus were highly likely to default." The complaint further alleged that Citibank knew that underwriting standards for the origination or acquisition of the loans "had been systematically ignored," citing among other things, testimony before the Financial Crisis Inquiry Commission ("FCIC") by a former Chief Underwriter for Citigroup, Inc. that: "A decision was made that *'We're going to have to hold our nose and start buying the stated product if we want to stay in business.'"* Notably, the principal originators of the securitizations there at issue included WaMu, Wells Fargo, American Home, and National City Mortgage, Inc. – all significant sellers of loans to the Trusts.

10.     Moreover, early this year, Citibank *agreed* to a *$1.125 billion* settlement in connection with an investor-led initiative covering repurchase and servicing claims on sixty-eight RMBS trusts sponsored by Citibank from 2005 to 2008. Citibank's binding offer of settlement, which is subject to trustee approval, concerns RMBS backed by pools of mortgages loans which, again, were originated by many of the same lenders that sold large quantities of loans to the Trusts, including American Home ($5.8 billion of loans sold to the Trusts) and Wells Fargo ($226.8 million of loans sold to the Trusts).

11.     Finally, as a major player in the RMBS securitization market, Citibank learned of the industrywide servicer violations plaguing the Trusts. Indeed, many of the servicers to the Trusts have faced federal and state regulatory enforcement actions which have led to landmark settlements, including the $25 billion "National Mortgage Settlement" entered into between forty-nine state attorneys general and some of the Trusts' servicers. Notably, without receiving Certificateholder approval, many of these settlement agreements effectively permit the servicers to use trust assets to finance their settlement payments for their own wrongdoing.

12.    Indeed, Citibank itself was the target of government investigations and lawsuits regarding its deficient servicing operations.  For example, during the fourth quarter of 2010, the Federal Reserve, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS") conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at Citibank.  The reviews uncovered significant problems in foreclosure processing at Citibank, including "critical weaknesses in [Citibank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."  Based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve initiated formal enforcement actions requiring Citibank to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  Ultimately, Citibank (and its affiliates) entered into a consent order with the Federal Reserve, which found that it had engaged in "unsafe or unsound practices with respect to the manner in which [Citibank] handled various foreclosure and related activities."

13.    Under the governing Pooling and Servicing Agreements ("PSAs"), upon knowledge of an Event of Default by a servicer, Citibank is obligated to provide written notice of the default to the servicer.  Citibank systematically failed, however, to provide notice to the servicers of their defaults because Citibank did not want to jeopardize its close business relationships with the servicers.  Moreover, Citibank, which also acts as a servicer for billions of dollars of other RMBS, has itself engaged in the same improper and illicit servicing activities that plagued the Trusts.  Similarly, Citibank originated billions of dollars in loans that have been securitized in other RMBS and that contain pervasive breaches of representations and warranties.

Many of the same entities that act as servicers for the Trusts also service these defective Citibank-originated loans.  Thus, Citibank, acting in its own self-interest, refused to provide notice to the servicers of their defaults to avoid scrutiny of its own servicing business and evade liability for its own defective loans.

14.     Further, under the PSAs, within sixty to ninety days after the occurrence of an Event of Default, Citibank is obligated to transmit by mail to all Certificateholders notice of each Event of Default known to Citibank, unless the Event of Default has been cured or waived. Although Events of Default occurred and were not – and have not been – cured or waived, Citibank has similarly failed to provide written notice to the Certificateholders of the Events of Default.  Citibank has covered up the Events of Default for several self-interested reasons. Among other things, as noted above, providing notice of the servicers' default could jeopardize Citibank's business relationships with the servicers and lead to Citibank's own potential liability in its capacity as an originator, sponsor, and servicer to other RMBS Trusts.  Moreover, as discussed in greater detail below, had Citibank provided notice of an Event of Default, it would have greatly increased Citibank's liabilities and duties, but Citibank's compensation under the PSAs would have remained the same.

15.     Finally, after the Events of Default, Citibank failed to exercise its rights under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of its own affairs.  Citibank did nothing to protect the Trusts and Certificateholders, choosing instead to deliberately ignore the egregious Events of Default for its own benefit and to the detriment of the Trusts.

II.     **PARTIES**

    A.     **Plaintiffs**

16.     Each of the plaintiffs identified below (collectively, the "Plaintiffs") is a Certificateholder in the Trusts as identified in Exhibit 1 attached hereto.  Each of the Plaintiffs was a Certificateholder of the respective Trusts at the time of the transactions of which it complains, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

17.     The Plaintiffs hold the economic and beneficial interest in their Certificates and are the true parties in interest.  No other party has an economic or beneficial interest in the Plaintiffs' Certificates in this matter.

    1.     **AEGON**

18.     The following plaintiffs are collectively referred to as "AEGON."

19.     Plaintiff LIICA Re II, Inc. is a corporation organized under the laws of the State of Vermont with its principal place of business in Burlington, Vermont.

20.     Plaintiff Monumental Life Insurance Company – Modified Separate Account is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

21.     Plaintiff Transamerica Life Insurance Company is a corporation organized under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa.

22.     Plaintiff Transamerica Premier Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business at 4333 Edgewood Road NE, Cedar Rapids, Iowa.

### 2.   <u>Kore</u>

23.     Plaintiff Kore is a Delaware Limited Partnership with its principal place of business located at 1501 Corporate Drive, Suite 230, Boynton Beach, Florida.   Kore is the investment manager to Kore Fixed Income Fund Ltd., a private fund formed under the laws of the Cayman Islands and Sunrise Partners Limited Partnership, a private fund formed under the laws of Delaware (collectively, the "Private Funds").   Kore, through the Private Funds, is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.   Kore, through the Private Funds, has been a Certificateholder of these Trusts at the time of the transactions of which it complains, or its interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13–107.

### 3.   <u>PIMCO</u>

24.     The following plaintiffs are collectively referred to as "PIMCO."

25.     Plaintiff Fixed Income SHares: Series M is a Massachusetts business trust.

26.     Plaintiff LVS II LLC is a Delaware limited liability company.

27.     Plaintiff PCM Fund, Inc. is a corporation existing under the laws of Maryland, with its principal place of business located at 1345 Avenue of the Americas, New York, New York.

28.     Plaintiff PIMCO Absolute Return Strategy II Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

29.     Plaintiff PIMCO Absolute Return Strategy III Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

30.     Plaintiff PIMCO Absolute Return Strategy III Overlay Master Fund Ltd. is a limited partnership existing under the laws of the Cayman Islands.

31.     Plaintiff PIMCO Absolute Return Strategy IV Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

32.     Plaintiff PIMCO Absolute Return Strategy V Master Fund LDC is a limited duration company existing under the laws of the Cayman Islands.

33.     Plaintiff PIMCO Bermuda Trust: PIMCO Bermuda Foreign Low Duration Fund is a business trust existing under the laws of the Cayman Islands.

34.     Plaintiff PIMCO Bermuda Trust: PIMCO Bermuda U.S. Low Duration Fund is a business trust existing under the laws of the Cayman Islands.

35.     Plaintiff PIMCO Cayman SPC Limited: PIMCO Cayman Japan CorePLUS Segregated Portfolio is a Cayman Islands business trust.

36.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Advantage Bond Fund is a business trust existing under the laws of the Cayman Islands.

37.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Bond Fund II is a Cayman Islands business trust.

38.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan (Yen-Hedged) Income Fund is a business trust existing under the laws of the Cayman Islands.

39.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Aggregate Ex-Japan Bond Fund is a Cayman Islands business trust.

40.     Plaintiff PIMCO Cayman Trust: PIMCO Cayman Global Bond (NZD-Hedged) Fund is a business trust existing under the laws of the Cayman Islands.

41.     Plaintiff PIMCO Dynamic Credit Income Fund is a business trust existing under the laws of Massachusetts.

42.     Plaintiff PIMCO ETF Trust: PIMCO Total Return Active Exchange-Traded Fund is a statutory trust existing under the laws of Delaware.

43.     Plaintiff PIMCO Funds: Global Investors Series plc, Diversified Income Fund is a Cayman Islands business trust.

44.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Bond Fund is a Cayman Islands business trust.

45.     Plaintiff PIMCO Funds: Global Investors Series plc, Global Investment Grade Credit Fund is a Cayman Islands business trust.

46.     Plaintiff PIMCO Funds: Global Investors Series plc, Income Fund is a corporation organized under the laws of Ireland.

47.     Plaintiff PIMCO Funds: Global Investors Series plc, PIMCO Credit Absolute Return Fund is a Cayman Islands business trust.

48.     Plaintiff PIMCO Funds: Global Investors Series plc, Unconstrained Bond Fund is a corporation organized under the laws of Ireland.

49.     Plaintiff PIMCO Funds: PIMCO CommoditiesPLUS® Strategy Fund is a business trust existing under the laws of Massachusetts.

50.     Plaintiff PIMCO Funds: PIMCO Commodity Real Return Strategy Fund® is a Cayman Islands business trust.

51.     Plaintiff PIMCO Funds: PIMCO Credit Absolute Return Fund is a business trust existing under the laws of Massachusetts.

52.     Plaintiff PIMCO Funds: PIMCO Diversified Income Fund is a business trust existing under the laws of Massachusetts.

53.     Plaintiff PIMCO Funds: PIMCO Floating Income Fund is a business trust existing under the laws of Massachusetts.

54.     Plaintiff PIMCO Funds: PIMCO Foreign Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

55.     Plaintiff PIMCO Funds: PIMCO Global Advantage® Strategy Bond Fund is a business trust existing under the laws of Massachusetts.

56.     Plaintiff PIMCO Funds: PIMCO Global Bond Fund (Unhedged) is a business trust existing under the laws of Massachusetts.

57.     Plaintiff PIMCO Funds: PIMCO Income Fund is a business trust existing under the laws of Massachusetts.

58.     Plaintiff PIMCO Funds: PIMCO International StocksPLUS® AR Strategy Fund (U.S. Dollar-Hedged) is a business trust existing under the laws of Massachusetts.

59.     Plaintiff PIMCO Funds: PIMCO Investment Grade Corporate Bond Fund is a business trust existing under the laws of Massachusetts.

60.     Plaintiff PIMCO Funds: PIMCO Low Duration Fund is a Massachusetts business trust.

61.     Plaintiff PIMCO Funds: PIMCO Low Duration Fund II is a Massachusetts business trust.

62.     Plaintiff PIMCO Funds: PIMCO Low Duration Fund III is a Massachusetts business trust.

63.     Plaintiff PIMCO Funds: PIMCO Real Return Fund is a Massachusetts business trust.

64.     Plaintiff PIMCO Funds: PIMCO Short-Term Fund is a Massachusetts business trust.

65.     Plaintiff PIMCO Funds: PIMCO Total Return Fund is a Massachusetts business trust.

66.     Plaintiff PIMCO Funds: PIMCO Unconstrained Bond Fund is a Massachusetts business trust.

67.     Plaintiff PIMCO Funds: PIMCO Worldwide Fundamental Advantage AR Strategy Fund is a Massachusetts business trust.

68.     Plaintiff PIMCO Funds: Private Account Portfolio Series Emerging Markets Portfolio is a Massachusetts business trust.

69.     Plaintiff PIMCO Funds: Private Account Portfolio Series International Portfolio is a Massachusetts business trust.

70.     Plaintiff PIMCO Funds: Private Account Portfolio Series Mortgage Portfolio is a Massachusetts business trust.

71.     Plaintiff PIMCO Funds: Private Account Portfolio Series Short-Term Portfolio is a Massachusetts business trust.

72.     Plaintiff PIMCO Funds: Private Account Portfolio Series U.S. Government Sector Portfolio is a Massachusetts business trust.

73.     Plaintiff PIMCO Multi-Sector Strategy Fund Ltd. is a Cayman Islands Exempted Company.

74.     Plaintiff PIMCO Offshore Funds - PIMCO Absolute Return Strategy IV eFund is a Cayman Islands business trust.

75.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Advantage Strategy Bond Portfolio is a Delaware business trust.

76.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Global Bond Portfolio (Unhedged) is a Delaware business trust.

77.     Plaintiff PIMCO Variable Insurance Trust: PIMCO Low Duration Portfolio is a Delaware business trust.

### 4.     **Prudential**

78.     The following plaintiffs are collectively referred to as "Prudential."

79.     Plaintiff Prudential Bank & Trust, FSB ("PB&T"), is a federally chartered bank with its principal place of business at 280 Trumbull Street, Hartford, Connecticut 06103. PB&T is a subsidiary of Prudential IBH Holdco., Inc., and ultimately Prudential Financial, Inc.

80.     Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.   PRIAC is a wholly owned subsidiary of The Prudential Insurance Company of America, which is owned by Prudential Holdings, LLC, and ultimately by Prudential Financial, Inc.   PRIAC established and maintains the following open-end, commingled, insurance company separate accounts: Western Asset: Enhanced Cash, Wellington: Investment Grade Fixed Income, the Core Plus Bond Fund / REAMS Fund, Core Plus Bond Pimco Fund, High Grade Bond Fund / GSAM Fund, North Carolina Fixed Income Fund - JP Morgan Chase and Union Carbide I (collectively, the "Separate Accounts").

81.     Plaintiff The Gibraltar Life Insurance Company, Ltd. ("Gibraltar") is a life insurance company formed under the laws of Japan, with its principal place of business at Prudential Tower 2-13-10, Nagatacho, Chiyoda-ku, Tokyo, Japan 100-0014.   Gibraltar is a

wholly owned subsidiary of Prudential Holdings of Japan, Inc., and ultimately Prudential Financial, Inc.

82. Plaintiff The Prudential Series Fund ("PSF"), formerly known as Prudential Series Fund, Inc., is an unincorporated Delaware statutory trust with a principal place of business at Gateway Center Three, 100 Mulberry Street, Newark, New Jersey.  PSF is an open-end management investment company registered with the Securities and Exchange Commission. PSF consists of eighteen series funds, including The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio. PSF, through The Prudential Series Fund-Conservative Balanced Portfolio, The Prudential Series Fund-Diversified Bond Portfolio, The Prudential Series Fund-High Yield Portfolio and The Prudential Series Fund-Flexible Managed Portfolio.

### 5.  Sealink

83. Plaintiff Sealink is a company incorporated under the laws of Ireland with the registered address of Sealink Funding Limited, Fourth Floor, 3 George's Dock, IFSC, Dublin 1, Ireland.

### 6.  TIAA

84. The following plaintiffs are collectively referred to as "TIAA."

85. Plaintiff CREF Bond Market Account is a Delaware mutual fund with its principal place of business in the State of New York.

86. Plaintiff CREF Social Choice Account is a New York investment company with its principal place of business in the State of New York.

87.     Plaintiff TIAA Global Public Investments, MBS LLC, a wholly owned subsidiary of TIAA-CREF Life Insurance Company, is a Delaware limited liability company with its principal place of business in the State of New York.

88.     Plaintiff TIAA-CREF Bond Fund is a Delaware mutual fund with its principal place of business in the State of New York.

89.     Plaintiff TIAA-CREF Bond Plus Fund is a Delaware mutual fund with its principal place of business in the State of New York.

90.     Plaintiff TIAA-CREF Life Insurance Company is a direct wholly-owned subsidiary of Teachers Life Insurance and Annuity Association of America, a legal reserve life insurance company established under the insurance laws of the State of New York.  Through its separate accounts (General Pension Act.; TIAA Stable Value; TIAA-CREF Life Ins. GFA; General Acct PA; T-C Life Ins. PA; TIAA Stable Return Annuity), TIAA-CREF Life Insurance Company is a Certificateholder in the Trusts identified in Exhibit 1 attached hereto.  TIAA-CREF Life Insurance Company, through its managed accounts, has been a Certificateholder of these Trusts at the time of the transactions of which it complaints, or interests therein devolved upon it by operation of law in accordance with New York General Obligations Law § 13-107.

**B.     Defendants**

**1.     Citibank**

91.     Defendant Citibank, N.A. is a national banking association.  It is a wholly owned subsidiary of Citigroup, Inc., a Delaware corporation.  Citibank is a member of the FDIC and its principal executive offices are located at 399 Park Avenue, Front 1, New York, New York 10043.

92.     Defendant Citibank provided corporate trust services offering a full range of agency, fiduciary, tender and exchange, depositary and escrow services.  As of the end of the fourth quarter of 2006, Citibank acted as trustee and/or paying agent on approximately 330

RMBS transactions.  Citibank currently serves as trustee for approximately 115 private-label RMBS Trusts established between 2004 and 2008, which have a total original face amount of more than $69.2 billion.

93.     During the housing boom of the 2000's, Defendant Citibank's parent company, Citigroup, Inc., and its various affiliates ("Citigroup"), were a leading participant in the origination and securitization markets for subprime mortgages.  Citigroup became a top subprime lender through acquisitions and was consistently ranked among the top twelve subprime lenders in the United States from 2004 to 2007.  Citigroup nearly doubled the share of its mortgage business devoted to subprime loans from 10% in 2005 to 19% in 2007, and it also increased the percentage of subprime loans from 10% in 2005 to 19% in 2007, and it also increased the percentage of subprime loans it originated with high-risk features such as low down payments, "piggyback" second mortgages, "stated income" mortgages with little or no documentation of the borrowers' income, and loans made to investors who intended to "flip" the houses they purchased.

94.     In addition to its origination business, Citigroup was heavily involved in the securitization market for subprime mortgages.  Citigroup provided warehouse lines of credit to leading nonbank subprime lenders, including Ameriquest and New Century.  Citigroup also purchased large volumes of subprime and Alt-A loans originated by those and other nonbank lenders, and Citigroup packaged those loans into nonprime RMBS that were sold to investors.

### 2.      The Nominal Defendant Trusts

95.     Each Trust is named herein as a nominal defendant.  Twenty-six of the Trusts are New York common law trusts established under its respective PSA.  The remaining trust, AHM 2004-3, is a Delaware statutory trust established under its respective Indenture and Sale Servicing Agreement ("SSA").   All of the Trusts are governed by the substantive laws of the

State of New York, and are subject to the Trust Indenture Act of 1939 (15 U.S.C. § 77aaa, *et seq*.).

96.     All of the Governing Agreements are substantially similar, and impose the same duties on Citibank as Trustee to the Trusts and Certificateholders.  Accordingly, this Complaint primarily refers to the PSAs when discussing the Trustee's contractual obligations.

## III.   OVERVIEW OF THE TRUSTS

97.     The Trusts in this action, identified in the attached Exhibit 1, are twenty-seven New York common law trusts and one Delaware statutory trust, resulting from non-agency residential mortgage-backed securitizations issued between 2004 and 2007, inclusive.  The Trusts have a total original principal balance of over $17.4 billion and current balance of over $4.4 billion, as of November 1, 2014.  To date, the Trusts have suffered total realized collateral losses of approximately $2.3 billion.  Moreover, as a result of defective mortgage collateral and servicer violations, the Trusts have incurred and will incur substantial losses.

98.     The Trusts have a high concentration of loans originated by five lenders.  Specifically, American Home, WaMu (and related affiliates), SunTrust, Wells Fargo (and affiliates), UBS and Goldman Sachs Mortgage Company (and affiliates) ("Goldman Sachs") collectively originated over $12.5 billion in loans included in the Trusts, representing nearly 75% of the Trusts' original mortgage collateral.

99.     The mortgage loans in the Trusts were underwritten and securitized by eight different sponsors and offered to the public in twenty-seven deals.  A significant portion of loans was sponsored by five entities.  Specifically, approximately $16.7 billion in loans were sold to the Trusts by WaMu, American Home, Lehman (and affiliates), UBS, and Goldman Sachs, representing approximately 96% of the total original face value of the mortgage loans in the Trusts.

-19-

100.    An overwhelming majority of the Trusts' loans is serviced by four entities. Specifically, $16.7 billion in loans are serviced by Wells Fargo, WaMu and Aurora, representing approximately 96% of the total original face value of the mortgage loans in the Trusts.

## IV.    JURISDICTION AND VENUE

101.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the TIA, and supplemental jurisdiction over the remaining claims.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

102.    Venue is proper in this District under 28 U.S.C. § 1391(b).

## V.    COMPLIANCE WITH THE NO ACTION CLAUSE IS EXCUSED

103.    Compliance with the pre-suit requirements of the Trusts' "no action" clause is excused.  For nearly all of the Trusts, the no action clause in the PSA identifies Citibank, as Trustee, as the sole notice party.  If the no action clause's pre-suit requirements for these Trusts were to apply, they would require Plaintiffs to demand that Citibank initiate proceedings against itself and to indemnify Citibank for its own liability to the Trusts, an "absurd" requirement that the parties did not intend.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

104.    Most of the remaining Trusts identify Wells Fargo, in its capacity as Trust Administrator, Securities Administrator or Master Servicer, as a notice party.  For these trusts, it would be similarly absurd for Plaintiffs to demand that Wells Fargo bring the instant suit against Citibank because Wells Fargo also suffers from disabling conflicts, and compliance with such a demand would require Wells Fargo to admit to its wrongdoing.  In connection with these Trusts, Wells Fargo, in its capacity as Master Servicer or primary servicer, defaulted and continues to default on its obligations to the Trusts and has harmed trust beneficiaries by failing to observe and perform covenants and agreements set forth in the PSAs, including by unreasonably refusing to provide notice of seller breaches of representations and warranties, requiring the sellers to

perform their repurchase obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.  Consequently, it would be absurd to demand that Wells Fargo bring claims against Citibank in connection with these Trusts because doing so would require Wells Fargo to allege and prove its own misconduct and liability to the Trusts and may invoke Wells Fargo's indemnity obligations to the Trustee.  Likewise, it would be absurd and contravene the parties' intentions to require Plaintiffs to indemnify Wells Fargo against the costs, expenses, and liabilities incurred in a suit against Citibank.  Moreover, Wells Fargo receives a direct financial benefit from not suing Citibank, because any suit by Wells Fargo against Citibank would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees.  The suit would also interfere with Wells Fargo's business relationships with Citibank, including billions of dollars in servicing fees annually from Citibank.  For example, Wells Fargo serves as Master Servicer to over 35 RMBS trusts issued between 2004 and 2008 with an original face value of over $34 billion for which Citibank serves as trustee.

## VI.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

105.    Plaintiffs bring the claims set forth below derivatively in the right of the Trustee and on behalf of the Trusts.  Plaintiffs have the right to bring this suit derivatively under New York law.  All of Plaintiffs' claims relate to Citibank's breach of common duties owed to the Trusts and Certificateholders through its mismanagement of the Trusts and its failure and unreasonable refusal to act in the best interests of the Trusts, including enforcing the Trusts' rights against those who have harmed the Trusts.  This is common to all holders of interests in the Trusts, not just Plaintiffs, because all Certificateholders are paid from the cash flows generated by the same pool or pools of mortgages in the Trusts.  Accordingly, Plaintiffs' claims

-21-

concern a purported injury to the Trusts as a whole.  *See Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, No. 95 Civ. 9426, 1996 WL 601705, at *2-4 (S.D.N.Y. Oct. 18, 1996).

106.    The terms of the PSAs are consistent with asserting the claims derivatively, as they specifically provide as follows:

> no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided *and for the common benefit of all Certificateholders*.

PSA § 12.07 (emphasis added).

107.    This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

108.    Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all or a large portion of Citibank's wrongful course of conduct alleged herein.  Moreover, under New York General Obligations Law §13-107, the transfer of ownership in the certificates vested in the Plaintiffs the claims or demands alleged herein.

109.    Plaintiffs will adequately and fairly represent the interests of the Trusts and their investors in enforcing and prosecuting the rights that form the subject matter of this action.  At all relevant times, Plaintiffs have acted equitably and in good faith, without any ulterior motive, and in the belief that the Trusts and Certificateholders are entitled to the relief sought on their behalf.

110.    As set forth below, Plaintiffs have not made a demand on Citibank or Wells Fargo to institute this action because such demand would be futile.

111.    Any demand on Citibank to institute this action would be futile because the wrongful acts alleged herein were committed by Citibank and Citibank would not agree to sue itself, particularly since it faces claims for losses by the Trusts in excess of $2.3 billion.   In addition, since Citibank itself committed the wrongdoing complained of herein, and is accused of negligent and misconduct, it therefore is not disinterested and lacks independence to exercise business judgment.   Moreover, Citibank has benefitted from, and continues to benefit from, its wrongdoing as alleged herein, (i.e., its failure to act in the best interest of the Trusts and Certificateholders), as Citibank has maintained and preserved its business relationships with the Sellers and Servicers and thereby continues to derive financial benefits from serving as Trustee to Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

112.    Any demand on Wells Fargo to institute this action on behalf of the remaining Trusts in which it is identified as a notice party under the PSAs' no action clause also would be futile because, as alleged above, Wells Fargo committed wrongdoing in its capacity as Master Servicer or servicer, and any suit brought by Wells Fargo on behalf of the Trusts would expose Wells Fargo's own defaults as Master Servicer or primary servicer, would lead to its termination as servicer to the Trust and loss of servicing fees and could implicate certain indemnity obligations owed to Citibank.   Wells Fargo also has benefitted from, and continues to benefit from, its wrongdoing as alleged herein as it continues to derive financial benefits from serving as Master Servicer or servicer to the Trusts and to many other RMBS trusts for which Citibank acts as Trustee.   Accordingly, Wells Fargo is not disinterested and lacks independence to exercise business judgment.

## VII.   BACKGROUND - THE TRUSTEE'S ROLE
##        AS GATEKEEPER IN THE SECURITIZATION PROCESS

113.    RMBS provide investors with an interest in the income generated by one or more designated pools of residential mortgages.  The securities themselves represent an interest in an "issuing trust" that holds the designated mortgage pools.  The corpus of the trust – like the Trusts at issue here – consists entirely of the underlying mortgage loans.

114.    The TIA requires that a trustee be appointed for all bond issues over $10 million so that the rights of investors are not compromised.  In an RMBS transaction, the "issuer" appoints the trustee, which is the only independent party to the PSAs.  Accordingly, the trustee serves the critical role of an independent party with access to all relevant information, including the mortgage loan files.  Investors reasonably understand that the trustee is under an affirmative duty to take action to protect the interests of the Trusts and their beneficiaries, the certificateholders.  As part of the RMBS transaction, the trustee is assigned "all right, title and interest" in the underlying mortgage loans.  The PSAs require the trustee, or its agent, to take physical possession of the mortgage loans, ensure that each of the mortgage loans was properly conveyed and certify that the documentation for each loan was accurate and complete.

115.    The trustee is contractually responsible for the transactions of the "issuing trust." The trustee is responsible for administering the trust for the benefit of investors, including guaranteeing that the transactions are administered in accordance with the related documentation, following compliance and performance-related matters, and handling cash and information processing for the investors.  The trustee must work closely with the issuer and servicer to protect the welfare of the investors.  In contrast to the roles of issuer or servicer, which can be combined, the trustee's sole purpose is to represent the investor and, therefore, the trustee must be an independent entity without any conflicts-of-interest.  The PSAs contractually obligate the

-24-

trustee to oversee and manage the servicer, including granting the trustee the power to replace the servicer for its failure to act in accordance with the servicer's contractual obligations.

116.    Although the structure and underlying collateral of the mortgages may vary from trust to trust, RMBS Trusts all function similarly: the cash flow from interest and principal payments is passed through to the trust and distributed to certificateholders in the order laid out in the securitization agreements, commonly referred to as the cash-flow "waterfall." Likewise, the duties and responsibilities of the trustee are identical in all RMBS transactions – namely to represent the Trusts and their investors as an independent third party. Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion. Yet, only a handful of major American financial institutions served as trustees for these RMBS and contractually agreed to perform the vitally important gatekeeping functions to protect certificateholders, including Plaintiffs.

117.    The process of securitizing mortgages into RMBS involves a number of steps, each of which is critical to finalize the securitization and sell the RMBS to investors. First, a sponsor creates a loan pool from mortgages the sponsor has originated and purchased from other financial institutions. The sponsor has the right to require the seller to repurchase or replace loans that do not meet represented quality standards after purchasing a mortgage pool.

118.    Second, the sponsor transfers the loans to a "depositor," which segments the cash flows and risks in the loan pool among different levels of investment or "tranches." Generally, cash flows from the loan pool are applied in order of seniority, going first to the most senior tranches. In addition, any losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, are applied in reverse order of seniority, and are generally applied first to the most junior tranches.

119.    Third, the depositor transfers the mortgage pool to the issuing trust so that it can be used as collateral for RMBS that will be issued and sold to investors.  The depositor then passes the RMBS to the underwriters for sale to investors in exchange for payment.

120.    The servicer is appointed by the sponsor and is a party to the PSAs.  The servicer is often an affiliate of the sponsor or an originator of a substantial portion of the loans in the trust.  The servicer collects payments from the underlying borrowers.  After collection, the servicer sends the funds to the trustee, which then makes payments to the Certificateholders.  Mortgage defaults reduce the available principal and interest ("P&I") payments to be paid to the trust and passed through to investors.  Mortgage delinquencies similarly reduce the available P&I to be paid to the trust and distributed to investors.

121.    Accordingly, if an underlying borrower does not timely make the required payments to the servicer, the servicer may have to take action to mitigate or minimize the losses to the trust, including foreclosing on the property and providing property maintenance to maximize the return on the investment to the trust and its beneficial owners – the Certificateholders.  Foreclosures result in higher losses to the trust (and therefore to the RMBS investors) if the value of the collateral is lower than anticipated.  For these reasons, proper loan origination and underwriting of the mortgages underlying the RMBS, and proper and timely loan servicing and oversight are essential to the quality of the RMBS and the timely receipt of P&I payments to the trust for distribution to the Certificateholders.

## VIII.   CITIBANK'S CONTRACTUAL OBLIGATIONS

122.    The Trusts' and Certificateholders' rights and Citibank's contractual duties, as Trustee for the Trusts at issue in this action are set forth in the relevant securitization agreements, including the Mortgage Loan Purchase and Sale Agreements ("MLPAs") (or similar documents) and the Governing Agreements.

123.     Although the Governing Agreements for each of the Trusts are separate agreements that were individually negotiated and differ slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint are substantially similar, if not identical, in all of the Governing Agreements and impose substantially the same, if not identical, duties and obligations on the parties to the Governing Agreements.

### A.     The Mortgage Loan Purchase And Sale Agreement

124.     The MLPA is a contract between either the originator and the sponsor, or the sponsor and the depositor.   The MLPA governs the terms of the sale of the mortgage loans acquired for securitization.   In its capacity as "seller" under the MLPA, the originator or sponsor makes extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans.

125.     The seller's typical representations and warranties in the MLPAs include, *inter alia*, the following: (i) the information in the mortgage loan schedule is true and correct in all material respects; (ii) each loan complies in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (iii) the mortgaged properties are lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (iv) the borrower for each loan is in good standing and not in default; (v) no loan has a LTV ratio of more than 100%; (vi) each mortgaged property was the subject of a valid appraisal; and (vii) each loan was originated in accordance with the underwriting guidelines of the related originator.   To the extent mortgages breach the seller's representations and warranties, the mortgage loans are worth less and are much riskier than represented.

126.     Under the MLPAs, upon discovery or receipt of notice of any breach of the seller's representations and warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders therein, the seller is

obligated to cure the breach in all material respects.  The MLPAs do not specify what constitutes "discovery" of a breach or what evidence must be presented to the seller in providing notice of a breach.

127.   If a breach is not cured within a specified period of time, the seller is obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust.  For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the seller must pay to the Trust the amount of the Repurchase Price that exceeds the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

128.   The repurchase provisions ensure that the Trust need not continue to hold mortgage loans for which the seller breached its representations and warranties. Thus, the repurchase provisions transfer from the Trusts to the sellers the risk of any decline, or further decline, in the value of those mortgage loans.

129.   Under the MLPAs, the demanding party must merely show that the breach has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Certificateholders in the loans.  The seller's cure, substitute and repurchase obligations do not require any showing that the seller's breach of representations caused any realized loss in the related mortgage loan in the form of default or foreclosure, or that the demanding party prove reliance on servicing and origination documents.

130.   Upon the sale of the mortgage loans to the Trust, the rights under MLPAs, including the sellers' representations and warranties concerning the mortgage loans, were

assigned to Citibank, as Trustee for the benefit of the Trust and all the Certificateholders, in accordance with the PSAs.

**B.**     **The Pooling And Servicing Agreements**

131.     The PSAs are contracts between, among others, the depositor, the servicer, and Citibank, as Trustee, which govern the Trusts that issued certificates.  Plaintiffs, as investors in the Trusts, are third party beneficiaries of the PSAs.

132.     The PSAs for each of the Trusts are substantially similar and memorialize (i) the transfer and conveyance of the mortgage loans from the depositor to the Trust; (ii) the Trusts' issuance of beneficial certificates of interests in the Trusts to raise the funds to pay the depositor for the mortgage loans; and (iii) the terms of those certificates.

**1.**     **Citibank's Duties And Obligations Under The PSAs**

133.     The PSAs set forth Citibank's contractual duties and obligations, which are substantially similar for each Trust governed by a PSA.  Further, upon information and belief, Citibank employed the same general set of policies and procedures to oversee and manage the Trusts regardless of variations among the PSAs.

134.     Most importantly, each of the PSAs requires that Citibank acquire and protect the trust corpus for the benefit of Certificateholders.[2]

135.     The PSAs also require Citibank to oversee and enforce the sellers' and the servicers' obligations.  In performing these contractual obligations, Citibank is required to act in the best interests of and for the protection of the Trusts and their Certificateholders. Certificateholders, unlike the trustee, have no direct contact with the sellers and servicers and have no ability to influence or examine the servicers' decisions.  Moreover, under the PSAs,

---

[2] This duty typically is expressed in Section 2.2 of the PSAs.

Certificateholders do not have the right to directly enforce the responsible party's representations and warranties or the servicers' duties, absent satisfaction of the collective action provisions. Thus, Certificateholders must rely on Citibank to protect their interests.

136.    The PSAs require the depositor to deliver to and deposit with, or cause to be delivered to and deposited with, Citibank, the mortgage files, which must at all times be identified in the records of Citibank as being held by or on behalf of the Trust.  Furthermore, the PSAs require Citibank to acknowledge receipt of the mortgage files on behalf of the Trust and to acknowledge that all mortgage pool assets, mortgage files and related documents and property held by it at any time are held by it as trustee of the Trust.

137.    Once the mortgage files are in Citibank's possession, the PSAs require Citibank to ensure that the underlying mortgage loans were properly conveyed to the Trusts, and that the Trusts have perfected enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans.  Citibank is required to review each mortgage file within a certain time period after the "Closing Date" and deliver to the depositor a certification that all documents required have been executed and received.

138.    If Citibank identifies any defect in a mortgage loan file for an underlying mortgage loan contained in a Trust, Citibank must promptly notify either the servicer or depositor, and that party shall promptly notify the applicable seller of the defect and take appropriate steps on behalf of the Trust to enforce such seller's obligation to correct or cure the defect or repurchase or substitute such mortgage loan.

### a)    Duty To Provide Notice Of Breaches And To Enforce Putback Rights

139.    Under the PSAs, Citibank is entrusted to ensure that mortgage loans in the Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a certain

quality as represented by the sellers in the MLPAs.  The Trusts were assigned all of the rights under the MLPAs pertaining to the mortgage loans, including the right to put back loans that breached the sellers' representations and warranties.

140.    To protect the Trusts and all Certificateholders, the PSAs require Citibank to give prompt written notice to all parties to the PSA upon its discovery of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any loan, and to take such action as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.[3]

### b)    Citibank's Duties Regarding The Servicers

141.    Under the PSAs, Citibank, as Trustee, has certain duties with respect to enforcing the obligations of the servicers, whose authority and responsibilities are delegated by Citibank. In particular, the PSAs set forth Citibank's obligations upon occurrence of an "Event of Default," which is defined as a specified failure of the servicer to perform its servicing duties and cure this failure within a specified time period.  The PSAs identify several types of failures by the servicer that may give rise to an Event of Default.  Such failures include, breach of servicer representations and warranties and failure to observe or perform in any material respect any other covenants or agreements, which continues unremedied for no more than thirty to sixty days after written notice of such failure shall have been given to the servicer by the trustee requiring the

---

[3] With modest variation among the PSAs, this duty typically is expressed in Sections 2.3 and 2.8 of the PSAs.

same to be remedied, or knowledge of such failure by a "Servicing Officer" of the servicer, whichever is earlier.[4]

142.    The remedies for uncured servicer Events of Default include termination of the servicer and reimbursement for trust assets lost as a result of the servicers' violations.   As detailed herein, Citibank did not perform its duties to monitor the servicers and did not initiate any action against the servicers for the benefit of the Trusts and Certificateholders.

### c)    Duties Upon Knowledge Of An Event Of Default

143.    The PSAs impose additional obligations upon Citibank once a responsible officer of Citibank has knowledge of the occurrence of an Event of Default.  ***First***, Citibank must give written notice to the relevant servicer of the occurrence of such an event within the specified time period after Citibank obtains knowledge of the occurrence.  ***Second***, within sixty to ninety days after the occurrence of any Event of Default, Citibank is required to provide written notice to all Certificateholders of the Event of Default, unless the Event of Default has been cured or waived.  ***Third***, and most importantly, the PSAs require Citibank to exercise the rights and powers vested in it by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.[5]

144.    Citibank's failure to give notice to the servicers of an Event of Default does not prevent the triggering of an Event of Default should Citibank's failure result from its own negligence or willful misconduct.

---

[4] These duties are typically expressed in Section 7 of the PSAs.

[5] This duty is typically expressed in Section 8.1 of the PSAs.

2.      **The Servicers' Duties And
Obligations Under The PSAs**

145.    The PSAs also establish the servicers' duties and obligations to the Trusts and all Certificateholders.  In essence, the servicers' contractual role is to manage the mortgage loans for the benefit of the Trust and its Certificateholders.[6]

a)      **Duty To Provide Notice Of
Breaches And To Enforce Putback Rights**

146.    The PSAs require the servicers to notify all parties to the PSAs if the servicers discover a breach of any of the seller's representations and warranties that adversely and materially affects the value of the mortgage loan or the interests of the Trusts.  The PSAs generally require the servicers, on behalf of the Trusts, to enforce the sellers' obligation to repurchase, substitute, or cure such defective mortgage loans or mortgage loan files.

147.    The servicers are greatly disincentivized to enforce these contractual duties related to the sellers' repurchase obligations.  The servicer is selected by the sponsor, and therefore risks losing future business and becoming adverse to the seller if it vigilantly enforces the seller's repurchase obligations.  Additionally, the servicers often are affiliates of the sellers because in connection with the sale of a loan pool, the seller typically retains the loan servicing rights for its own servicing division.  In addition, due to the fact that the servicers' affiliates, in their capacity as sellers, likewise sold loans in breach of specific representations and warranties to other RMBS trusts and face similar repurchase liability, the servicers were disincentivized from enforcing these contractual duties.

148.    Consequently, it is crucial that the trustee monitor the servicer to ensure that the servicer is enforcing the Trusts' repurchase rights against the sellers so that the Trusts hold

---

[6] The servicer duties described below are generally found in Section 3 of the PSAs.

mortgage loans of the same credit quality and characteristics as bargained for.  Moreover, where the servicers fail to enforce the Trusts' repurchase rights, the trustee must step in and exercise the Trusts' rights.

**b)      Duty To Perform Prudent And
Customary Servicing Practices**

149.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Trusts and the Certificateholders (i) in the same manner in which they service and administer similar mortgage loans for their own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to such mortgage loans on a net present value basis; and (iii) without regard to, among other things, the right of the servicers to receive compensation or other fees for its services under the PSA, the obligation of the servicers to make servicing advances under the PSA, and the servicers' ownership, servicing or management for others of any other mortgage loans.

150.    In truth, the servicers' financial interests in managing the Trusts' loans often diverge from those of the Trusts.  Servicers typically pay upfront for mortgage servicing rights. To make a profit, servicers must recoup their outlay based on their net servicing income (i.e., gross servicing income minus servicing costs).  The amount of servicers' compensation in the form of servicing fees, float, and retained interests varies based on factors beyond the servicers' control, particularly mortgage prepayment speeds, which are largely a function of interest rates. Accordingly, a servicer's ability to maximize its net servicing income depends in large part on its ability to levy ancillary fees and to control servicing costs.  For this reason, servicers are incentivized to aggressively pursue ancillary fees and to pursue loss mitigation strategies that

-34-

minimize costs, even if they are inconsistent with – or contrary to – the interests of the Trusts and the Certificateholders.

151.    Accordingly, it is essential that the Trustee takes action where it learns of imprudent servicing activities to ensure that servicers: (i) maintain accurate and adequate loan and collateral files so as not to prejudice the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral; and (ii) avoid incur unnecessary servicing fees to maintain mortgaged property.

### c)    Duty To Perform Prudent Foreclosure Practices

152.    The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing the mortgage loans as they come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

153.    In truth, the servicers' financial interests in managing loans often diverge from those of the Trusts.  For example, to minimize the costs of foreclosures, servicers from 2007 through 2010 pervasively cut corners in the discharge of their servicing duties at the expense of the accuracy, reliability and currency of loan documents and information.

154.    Thus, it is essential that trustees the Trustee takes action where it learns of imprudent foreclosure practices subsequent to borrower defaults to ensure the servicers function in a way that maximizes value for the Trusts and the Certificateholders.

### d)    Duty To Perform Prudent Servicing Advances

155.    The PSAs provide that the servicers may recover servicing advances.  Servicers are required to advance monthly P&I and taxes and insurance payments on delinquent loans. Servicers also advance legal fees, maintenance, and preservation costs on properties that have already been foreclosed and become wholly owned by the Trust (or "REO"), rather than sold to a third party.  Servicers are able to recover these advances from the net proceeds of the property when sold.

156.    Under the PSAs, the servicer's advancing obligations are subject to a deemed non-recoverability standard where the servicer has the right to curtail additional advances based on a reasonable analysis that the servicer could not otherwise recover its advances based on projected, probable net liquidation proceeds.  Thus, if a servicer believes that the P&I advances will exceed the net proceeds of a foreclosure on the mortgaged property, the servicer generally has the right to cease making the P&I advances and to look to the rest of the Trust's loan pool for recovery of any excess paid.  This means that servicers' P&I advances are functionally the most senior claim on the Trusts and the servicers get paid **first** before any certificateholder.  As explained by Ocwen Financial Corporation ("Ocwen"), a major subprime servicer: "Most of our advances have the highest reimbursement priority (*i.e.*, they are on 'top of the waterfall') so that we are entitled to repayment [from loan proceeds] before any interest or principal is paid on the bonds."[7]  In the majority of cases, the servicer may recover advances in excess of loan proceeds from pool-level proceeds.  Additionally, under the PSAs, the servicers are only entitled to recoup customary, reasonable and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations.

---

[7]  Ocwen, Annual Report (Form 10-K) at 40 (Mar. 13, 2008), *available at* http://www.sec.gov/Archives/edgar/data/873860/000101905608000419/ocn_10k07.htm.

157.     In practice, servicers are incentivized to abuse their advancing obligations by incurring unnecessary or inflated expenses related to delinquent loans because those advances are the senior-most claims on the Trusts and will almost always be recoverable.

158.     Thus, it is critical that trustees monitor the servicers and, in particular, servicing advances to ensure servicers do not manipulate the recoverable and "reasonable and necessary" designations to their own advantage and to the Trusts' detriment.

### C.     The Indentures And Sale Servicing Agreements

159.     One of the trusts, AHM 2004-3, has a different structure—it issued notes pursuant to an indenture (collectively, the "Indentures") on which Citibank serves as indenture trustee.  A separate agreement, such as a Sale and Servicing Agreement ("SSA"), governs other terms of this transaction.  As evinced below, although there are some differences between the PSA and Indenture structure, with regard to this Complaint, both the nature of the claims asserted and Citibank's duties and obligations are similar under the two structures.

160.     The Indenture for AHM 2004-3 is a contract between, among others, the Trust, as issuer, and Citibank, as Trustee.  In this agreement, the issuer (i.e. the Trust) pledges the mortgage loan assets of the Trust to Citibank, the Indenture Trustee.  Citibank accepts the pledge of the mortgage loans and holds the assets of the Trust in trust for the Noteholders.  The Trust, in turn, issues the notes to investors.

161.     The Indenture sets forth duties on the part of the Trust as issuer.  Such duties, which must be punctually performed and observed, include taking all action necessary or advisable to cause the Trust or the Indenture Trustee to: (i) enforce any of the rights to the mortgage loans; and (ii) preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

162.    The Indenture sets forth Citibank's contractual duties and obligations, which are substantially similar if not identical to Citibank's contractual duties and obligations in the PSAs. For example, as pledgee of the mortgage loans, Citibank, as Indenture Trustee, has the benefit of the representations and warranties made by the sellers in the MLPAs. If a responsible officer of Citibank has actual knowledge of any breach of representation or warranty made by the Seller in the MLPA, Citibank shall promptly notify the Seller of the breach and the Sellers' obligation to cure such defect or repurchase or substitute for the related mortgage loan.

163.    Like the PSAs, the Indenture imposes similar obligations on the trustee following an "Event of Default." However, pursuant to the Indenture, only the conduct of the issuer, the Trust, can constitute an Event of Default. An Event of Default occurs under the Indenture, when, among other things, a default occurs in the observance or performance of any covenant or agreement of the Trust made in the Indenture, and such default is not cured within a specified period of time after notice is given to the Trust by Citibank or to the Trust and Citibank by a requisite number of Noteholders. The Indenture defines a "default" as "[a]ny occurrence which is or with notice or the lapse of time or both would become an Event of Default."

164.    Once Citibank has actual knowledge of an Event of Default, Citibank must enforce the rights of the Noteholders, whether for the specific performance of any covenant, agreement or right under the Indenture, or to enforce any other proper remedy or legal or equitable right vested by law. In carrying out these post-Event of Default duties, Citibank must exercise its rights and obligations under the Indenture using the same degree of care and skill as a prudent person would, under the circumstances, in the conduct of his or her own affairs.

165.    The SSA is a contract between, among others, the depositor, the trust (a Delaware statutory trust), as issuer, Citibank, as Indenture Trustee, and the master servicer. The SSA

contains substantially similar, if not identical, provisions to the PSAs.  Like the PSAs, the SSA calls for the depositor's conveyance of mortgage loans to the Trust in which the notes participate and establish the rights and obligations of the master servicer for the notes.

166.    Like the PSAs, the SSA for the Trust is substantially similar and provides for nearly identical obligations on the part of master servicer with respect to servicing the mortgage loans, including covenants (i) to provide notice of seller breaches; (ii) to administer the mortgage loans consistently with industry practice; (iii) to use reasonable efforts to collect all payments owed on the mortgage loans, including with respect to foreclosure, and to follow the same collection procedures it follows for servicing mortgage loans in its own portfolio; and (iv) to make proper servicing advances.

167.    The SSA also defines "Master Servicer Events of Default," which includes a failure to observe or perform material covenants and agreements set forth in the SSA to be performed by the master servicer, which materially affects the rights of the Noteholders, and such failure continues unremedied for a specified period after written notice was given.  If a Servicer Event of Default occurs under the SSA which a responsible officer of Citibank, as Indenture Trustee, has received written notice or has actual knowledge of, Citibank must immediately terminate the master servicer and either substitute in as master servicer or find a successor.  Citibank must also give prompt written notice to all Noteholders of Servicer Event of Defaults.

## IX.    THE TRUSTS SUFFERED FROM PERVASIVE BREACHES OF REPRESENTATIONS AND WARRANTIES BY THE SELLERS

168.    Each of the Trusts' loan pools contained high percentage of loans that materially breached the sellers' representations and warranties, which adversely affected the value of those mortgage loans and the Trusts' and Certificateholders' rights in those mortgage loans.

Specifically, the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, LTV and combined loan-to-value ("CLTV") ratios were systemically and pervasively false. The falsity of these representations and omissions is demonstrated by the high default rates of the mortgage loans, the plummeting credit ratings of the RMBS and certificates, the results of investors' forensic reviews and re-underwriting of loans within the Trusts in other litigation, and evidence highlighting the originators' abandonment of underwriting standards.

      **A.**     **High Default Rates Of The Mortgage**
                **Loans And Plummeting Credit Ratings**
                <u>**Are Indicative Of Massive Seller Breaches**</u>

169.    The extremely high default rates of the mortgage loans within the Trusts and the decline in the credit ratings of the RMBS to below investment grade are strong evidence of the originators' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts.

170.    The Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten, and which contained loans that actually had the characteristics originators represented and warranted.  For example, as of January 2009, the Trusts' average delinquency rate was over 13%. Within certain RMBS sponsor labels, such as the WaMu-label Trusts, over 40% of the relevant mortgage loans were delinquent.  Further, five of the Trusts had delinquency rates of above 20%.

171.    Not only have the mortgage loans experienced extraordinary rates of delinquency and default, but the ratings of the RMBS supported by them have significantly deteriorated.  Because of the high delinquency, foreclosure, and default rates of the underlying mortgage loans, more than 80% of all certificates within the Trusts have been downgraded.

172.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools ultimately backing the certificates. Loan pools that were properly underwritten and containing loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies. The significant rating downgrades experienced by the RMBS are also strong evidence that they were improperly underwritten, and that they did not have the credit risk characteristics the sellers represented and warranted.

### B.    The Systemic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period

173.    It is well documented that during the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in RMBS in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

174.    Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards. The Permanent Subcommittee on Investigations in the United States Senate ("PSI") released a report detailing the causes of the financial crisis. Using WaMu as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets. The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans. These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.[8]

---

[8] *Wall Street And The Financial Crisis: Anatomy Of A Financial Collapse*, United States Senate Permanent Subcomm. on Investigations, 112th Cong. 50 (2011).

175.     The FCIC issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.[9] The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics." "Unfortunately – as has been the case in past speculative booms and busts – we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis." *Id*. at xxii. The FCIC found:

> [I]t was the collapse of the housing bubble – fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages – that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

176.     During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii.  Early payment default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards . . ." *Id*.

177.     Recent landmark settlements between the government and major financial institutions have further detailed the systemic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the

---

[9] *Final Report Of The National Commission Of The Causes Of The Financial And Economic Crisis In The United States*, Fin. Crisis Inquiry Comm'n ("FCIC Report") (2011).

Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan − the largest settlement with a single entity in American history − to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of 1,128 RMBS offerings by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009, including seven of the Trusts.[10]  As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations "***that did not comply*** with the originator's underwriting guidelines" and breached the originator's representations and warranties.

178.   On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of 633 RMBS offerings issued prior to January 1, 2009, including one of the Trusts, AHM 2004-3.  The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

179.   On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, BoA, and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of 2,000 RMBS offerings issued prior to January 1, 2009, including three of the Trusts: MASTR

---

[10] These Trusts are WAMU 2004-AR11, WAMU 2004-AR9, WAMU 2004-CB1, WAMU 2004-CB2, WAMU 2004-CB3, WMHE 2007-HE2 and WMHE 2007-HE4.

2004-1, WMHE 2007-HE2 and WMHE 2007-HE4.  The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.

**C.     There Is Evidence Of Widespread Breaches Of Representations And Warranties By The Specific Originators That Sold Loans To The Trusts**

180.     Much like other RMBS Trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures. The originators' systemic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

181.     A summary of testimonial and documentary evidence as to each of the major originators of the mortgage loans to the Trusts is set forth below.

**1.     American Home**

182.     American Home originated approximately $5.8 billion in mortgage collateral included in the Trusts, representing nearly 45% of all of the Trusts' mortgage loan collateral. American Home's lending practices landed it in the 2009 "Worst Ten in the Worst Ten" Report, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California). *See* 2009 "Worst Ten in the Worst Ten" Report.

183.    In April 2009, the SEC filed fraud charges against the former top executives of American Home's parent company, American Home Investment Corp., for their role in misleading investors regarding American Home's systematic disregard of sound underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007. According to Robert Khuzami, Director of the SEC's Division of Enforcement, "'[t]hese senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown - *they were part of the show.'*" American Home's former Chief Executive Officer ("CEO") paid $2.5 million to settle the SEC's fraud charges.

184.    In May 2009, an economics reporter for *The New York Times* published a news report recounting his experience in obtaining a loan from American Home. The reporter, Edmund Andrews, revealed how American Home actively concealed and omitted negative information on his loan application in order to qualify him for a loan. Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country. One of its specialties was serving people just like me: borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify. In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
> . . .
>
> [The American Home loan officer] called back the next morning. "Your credit scores are almost perfect," he said happily. "Based on your income, you can qualify for a mortgage of about $500,000." What about my alimony and child-support obligations? No need to mention them. What would happen when they saw the automatic withholdings in my paycheck? No need to show them. If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it. His job was to make it happen. "I am here to enable dreams," he explained to me long afterward. [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage – not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46.  Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

185.    On January 14, 2010, American Home settled a class action lawsuit brought by investors for $37.25 million for misrepresenting itself as a conservative lender. *See In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y.).   In the Amended Class Action Complaint, investors in American Home common/preferred stock alleged that the company was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. Based on statements from more than thirty-three confidential witnesses, including former American Home employees, and internal company documents, investors alleged that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud, and that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans. *See* Am. Class Action Compl. ¶¶120-21.

### 2.    WaMu And Long Beach

186.    WaMu, together with its affiliate Long Beach Mortgage Co. ("Long Beach"), originated approximately $4 billion of the loans included in the Trusts.  WaMu was ranked as the third worst mortgage originator by the OCC's "Worst Ten in the Worst Ten" list based on 2005-2007 originations as of March 29, 2009.

187.    WaMu's abandonment of its represented underwriting practices and systemic origination of defective loans during the same time period as the WaMu loans securitized in the Trusts were detailed in the FCIC Report and the U.S. Senate Permanent Subcommittee on Investigations' April 13, 2011 bipartisan report on the financial crisis, "*Wall Street and the*

*Financial Crisis: Anatomy of a Financial Collapse*," issued under Chairman Carl Levin and Ranking Minority Member Tom Coburn ("Senate Report"). The FCIC Report concluded that firms, including WaMu, originated a vast number of "high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and often beyond borrowers' ability to repay." FCIC Report at 418. WaMu also conducted a "post mortem" review of 213 Long Beach loans that experienced first-payment defaults in March, April, and May 2005, which found that many early defaults were not only preventable, but that in some instances "fraud should have been easily detected from the presence of 'White Out' on an application of a borrower having two different signatures." Senate Report at 78.

188.    According to the Senate Report, WaMu and Long Beach turned increasingly to higher-risk loans over a four-year period, increasing their subprime loans from nearly $4.5 billion in 2003, to $29 billion in 2006. *Id.* at 2-3. WaMu and Long Beach violated their own lending standards; allowed excessive loan error and exception rates; exercised weak oversight over the third-party mortgage brokers who supplied half or more of their loans; and tolerated the issuance of loans with fraudulent or erroneous borrower information. *Id.* at 3. Moreover, WaMu and Long Beach securitized not just poor-quality loans, "but also loans that its own personnel had flagged as containing fraudulent information." *Id.* at 125. Finally, in September 2008, WaMu's Corporate Credit Review team released a report which found that internal controls intended to prevent the sale of fraudulent loans to investors were ineffective and that of "the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud." *Id.* In other words, even loans marked with a red flag indicating fraud were being sold to investors.

189.    WaMu's poor underwriting practices and defective loans have been the subject of numerous well-publicized lawsuits brought by government agencies. For example, in March 2011, the FDIC accused WaMu executives of reckless lending before the 2008 collapse of what was the nation's largest savings bank. The FDIC settled the action for $64 million in December 2011. *See Ex-Bank Executives Settle F.D.I.C. Lawsuit*, N.Y. Times (Dec. 13, 2011). Similarly, the FHFA sued JPMorgan, which had acquired WaMu in September 2011, alleging that JPMorgan and WaMu had misled the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") about the quality of nearly 129 securities for which they paid about $33 billion. JPMorgan settled the FHFA case in October 2013 for $4 billion, including approximately $1.2 billion relating to claims against WaMu. *See J.P. Morgan Settles With FHFA*, Wall St. J. (Oct. 25, 2013).

190.    WaMu's acquirer, JPMorgan, also entered into a $13 billion settlement with the National Credit Union Administration ("NCUA") and U.S. Department of Justice ("DOJ") over sales of defective RMBS. As part of the settlement, the NCUA received $1.4 billion for losses incurred by corporate credit unions as a result of purchases of the toxic securities. The NCUA's pre-settlement investigation found that of the 187 loans sampled by WaMu's internal review in late 2007: (i) *31%* had appraisal discrepancies that raised concerns that the value was not supported; (ii) *47%* exceeded program parameters in place at the time of approval; (iii) *70%* were identified with red flags that were not addressed by the business unit; (iv) *71%* were stated-income loans that were identified for lack of reasonableness of income; and (v) *71%* had credit-evaluation or loan-decision errors. *See Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC, et. al.*, No. 13-cv-6736 (S.D.N.Y. Sept. 23, 2013) Compl. ¶204.

191.    WaMu's improper lending practices were also detailed in a highly publicized class action lawsuit brought by RMBS investors. *See In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, No. 08-md-1919 (W.D. Wash. July 23, 2010). In 2011, *The Wall Street Journal* reported that WaMu agreed to settle the class action lawsuit for $208.5 million. *See WaMu Settles Lawsuit, To Pay $208.5 Million*, Wall St. J. (July 2, 2011).

192.    In August 2009, Deutsche Bank, as the trustee for ninety-nine Trusts in which WaMu sold, sponsored, and serviced loans, sued the FDIC (as the receiver for WaMu) on behalf of the Trusts and the investors in the related RMBS seeking to enforce the Trusts' and investors' rights. Deutsche Bank's complaint detailed WaMu's systemically deficient origination practices and pervasive sale of mortgage loans that failed to comply with WaMu's representations and warranties between 2004 and 2008. *See Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-cv-1656 (D.D.C. Aug. 26, 2009).

### 3.    SunTrust

193.    SunTrust Mortgage, Inc. ("SunTrust") originated approximately $596 million of residential mortgage loans sold to the Trusts, representing nearly 5% of all of the Trusts' mortgage loan collateral.

194.    SunTrust is wholly owned subsidiary of SunTrust Bank, and in 2009, it was one of the ten largest lenders in the country, ranking fifth in residential lending and originating $13.4 billion.  However, much of SunTrust's success came as a result of a high loan volumes and an abandonment of its underwriting standards.  In fact, according to the FCIC Report, "during the three years and eight months ending August 31, 2010," Fannie Mae required SunTrust to repurchase $898 million of its loans because of repeated representation and warranty breaches, including the violation of its underwriting guidelines. FCIC Report at 224-25.  In April 2010, SunTrust's Executive Vice President for Capital Markets, Anthony T. Reed, appeared to

-49-

acknowledge such origination failings in an address to the House Financial Services Committee of the U.S. House of Representatives, admitting that the financial crisis resulted from "[l]enders and securitizers relaxing underwriting standards and risk management practices."

195. Further supporting SunTrust's faulty origination practices, in *The Union Central Life Insurance Co., et al. v. Ally Financial, Inc., et al.*, No. 11-cv-02890 (S.D.N.Y. May 4, 2012), a lawsuit filed by investors against various sponsors and underwriters for misrepresenting the quality of loans sold to investors, the plaintiffs allege that SunTrust, who had originated loans in the trust at issue in the litigation, "had abandoned all prudent underwriting practices" in the loans it sold to the defendants. Compl. at ¶312. Similarly, in a suit brought by the Attorney General of the State of New York, Eric T. Schneiderman, against J.P. Morgan, New York state alleged that "[i]n late 2006 . . . Clayton's due diligence review determined that a pool of bad quality SunTrust loans had 'an 86% reject rate due to missing docs.'" *People of the State of New York v. J.P. Morgan Sec. LLC, et al.*,  No. 451556/2012 (N.Y. Sup. Ct. Oct. 12, 2012) Compl. at ¶50.

196. More recently, on June 17, 2014, the DOJ, along with the Department of Housing and Urban Development, the Consumer Financial Protection Bureau, forty-nine state attorneys general, and the District of Columbia's attorney general, reached a $968 million agreement with SunTrust to settle mortgage origination, servicing, and foreclosure abuses. In announcing the settlement, Attorney General Eric Holder commented that "SunTrust's conduct is a prime example of the widespread underwriting failures that helped bring about the financial crisis."

197. Moreover, according to the DOJ's press release, SunTrust admitted that between January 2006 and March 2012, it originated and underwrote FHA-insured mortgages that did not meet FHA requirements, that it failed to carry out an effective quality control program to identify noncompliant loans, and that it failed to self-report to HUD even the defective loans it did

identify. SunTrust also admitted that numerous audits and other documents disseminated to its management between 2009 and 2012 described significant flaws and inadequacies in SunTrust's origination, underwriting, and quality control processes.

### 4.   Wells Fargo

198.    Wells Fargo originated approximately $227 million of residential mortgage loans sold to the Trusts.   Wells Fargo's origination practices have been the subject of numerous governmental investigations and reports and private RMBS lawsuits.   For example, the FCIC Report issued in January 2011 revealed, for the first time, findings in a confidential 2005 "peer group" study of mortgage practices at six companies, including Wells Fargo, conducted by examiners from the Federal Reserve and other agencies.   Notably, the study observed "a very rapid increase in the volume of [] irresponsible loans, very risky loans" by Wells Fargo and the five other lenders, and that a "large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated."   FCIC Report at 172.   The FCIC Report further revealed that Freddie Mac put back $1.2 billion in ineligible mortgage loans to Wells Fargo during 2009 and 2010, while Fannie Mae put back $2.3 billion in ineligible mortgage loans to Wells Fargo from 2007 through 2010.   *Id.* at 225.

199.    Wells Fargo's systemic violations of its representations and warranties regarding the credit quality of the loans it originated have been the subject of several highly publicized RMBS lawsuits.   For instance, in *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust, et al.*, No. 09-cv-1376 (N.D. Cal. filed Mar. 27, 2009), the court found that the private investor plaintiffs had adequately pled that "variance from the stated [underwriting] standards was essentially [Wells Fargo's] norm" and that this conduct "infected the entire underwriting process."   *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971-72 (N.D. Cal. 2010).   In 2011, Wells Fargo agreed to

pay $125 million to settle the litigation.  The FDIC made similar allegations in *FDIC v. Chase Mortgage Finance Corp., et al.*, No. 12-cv-6166 (S.D.N.Y. filed Aug. 10, 2012), contending that Wells Fargo and other originators overstated the values of properties so much that virtually every representation about the LTV ratios of the loans was untrue or misleading.

200.    The results of loan file reviews conducted by investors have further confirmed Wells Fargo's abandonment of its underwriting standards and pervasive and systemic breach of material representations and warranties regarding the quality and characteristics of the loans it originated.  For example, in *FHFA v. Citigroup, et al.*, No. 11-cv-6196 (S.D.N.Y. Sept. 2, 2011), the FHFA reviewed 1,851 loan files in the CMLTI 2006-WF1 and CMLTI 2006-WF2 securitizations.  Wells Fargo originated all of the loans in these two trusts.  The FHFA found that a stunning 79% of the reviewed mortgage loans in these securitizations were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.

201.    In addition, there is ample public evidence of Wells Fargo's failure to originate loans in compliance with federal and state law.  For example, on July 20, 2011, the Federal Reserve announced that it had levied a record $85 million fine against Wells Fargo for pushing borrowers with good credit into expensive subprime mortgages and falsifying loan applications. Similarly, in late 2012, the U.S. Attorney for the Southern District of New York claimed that Wells Fargo engaged in a "longstanding and reckless trifecta of deficient training, deficient underwriting and deficient disclosure, all while relying on the convenient backstop of government insurance." *Manhattan U.S. Attorney Files Mortgage Fraud Lawsuits Against Wells Fargo Bank, N.A. Seeking Hundreds of Millions of Dollars in Damages for Fraudulently Certified* Loans, U.S. Attorney's Office Southern District of New York (Oct. 9, 2012).

**D.     The Systemic Disregard Of**
**Prudent Securitization Standards Was**
**Pervasive During The Relevant Period**

202.    It is equally well documented that between 2004 and 2008, the sponsors that securitized the residential mortgages and transferred them into the RMBS Trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

203.    As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

204.    As made clear in the FCIC Report, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2%-3% of the entire loan pools.  Moreover, when the sponsors' and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  Consequently, by 2011, it was equally apparent to all players in the RMBS industry that the mortgage loans deposited in RMBS Trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

**E.     There Is Evidence Of Widespread
        Breaches Of Representations And
        Warranties By The Specific Sponsors Of The Trusts**

205.    As with other RMBS Trusts of the same vintage, the Trusts have been materially impacted by the sponsors' faulty securitization practices.  The sponsors' systemic and pervasive sale of residential mortgage loans in the Trusts in breach of representations and warranties is confirmed through several federal and state government investigations and published reports, well publicized news reports, and public and private enforcement actions that have described endemic due diligence failures throughout the period in which the Trusts were created and, more specifically failures by the same sponsors whose mortgage loans were deposited into the Trusts.  A summary of testimonial and documentary evidence as to each of the major sponsors of the mortgage loans to the Trusts is set forth below.

### 1.     WaMu

206.    WaMu, through its affiliates Washington Mutual Mortgage Securities Corporation, sponsored approximately $4.6 billion of the mortgage loans in seven of the Trusts, under the WAMU and WMHE shelves.  It was clear that by January 1, 2009, WaMu had dumped large percentages of toxic loans within the WaMu-label Trusts.   By this time, these securitizations were averaging delinquency rates of over 13.2%, with two trusts experiencing delinquency rates in excess of 44%.  As a result of these severe delinquencies, the Wells Fargo-label Trusts' losses began to mount.  For example, between 2009 and 2011 collateral losses among the WaMu-label Trusts jumped from approximately $125.3 million to $503 million, representing a staggering ***300% increase***.  As of November 1, 2014, these trusts have suffered collateral losses of approximately $882 million, meaning that over 18% of these Trusts' loan pools have been written off.

-54-

207.    As stated in the Senate Report, "WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered."  *Wall Street and the Financial Crisis: Hearing before the Permanent Subcomm. on Investigations*, April 13, 2010, ("Subcommittee Hearing"), Hearing Ex. #1a, at p. 6.  Based on a review of WaMu loans from January 2006 through June 2007, Clayton Holdings, Inc. ("Clayton"), rejected 27% of the loans it reviewed for WaMu. Clayton provided its analysis to WaMu, but WaMu overruled Clayton's findings and "waived in" approximately 29% of the loans that Clayton rejected.[11]

208.    WaMu's poor securitization practices were revealed in numerous well-publicized lawsuits, including many involving the WaMu Trusts at issue here.  For example, in *FHFA v. JPMorgan Chase & Co.*, No. 11-cv-06188, the FHFA brought an action to recover losses suffered on 103 securitizations sponsored by JPMorgan and its affiliates, including WaMu. Notably, the FHFA found misstatements and omissions of material fact concerning the quality of the underlying mortgage loans, the creditworthiness of the borrowers, and the practices used to originate such loans for the WaMu-label Trusts at issue here (i.e., WMHE 2007-HE2; WMHE 2007-HE4).  Specifically, the FHFA found that with limited exception, WaMu materially understated owner occupancy in these securitizations by approximately 10 percentage points or more.  The data also revealed that WaMu materially understated LTV ratios.

209.    On October 25, 2013, the FHFA, as conservator of Fannie Mae and Freddie Mac, reached a $5.1 billion settlement with JPMorgan, which purchased WaMu in September 2008,

---

[11]   *See* FCIC Report at 167; Clayton All Trending Report at 9, *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisissacramento#documents.

for its claims against WaMu, among other entities.   Moreover, on November 19, 2013, J.P. Morgan Chase and the Justice Department agreed to a landmark $13 billion settlement, the largest settlement with a single entity in American history, to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of residential mortgage-backed securities (RMBS) by JPMorgan, Bear Stearns and WaMu prior to January 1, 2009.   As part of the settlement, JPMorgan acknowledged it made serious misrepresentations to the public – including the investing public – about numerous RMBS transactions, including numerous WaMu deals at issue here.

## 2. __Lehman__

210.    Lehman sponsored approximately $1.5 billion of mortgage loans securitized in twenty-seven of the Trusts under the SASC shelf.   Lehman acquired the mortgage loans either from Lehman's own loan origination affiliates and subsidiaries, Aurora and BNC Mortgage ("BNC"), whose underwriting abuses are well documented, or in direct purchases (including in auctions) from third-party loan originators.   It is evident that the credit quality of underlying loan collateral for Lehman-label Trusts did not match Lehman's and originators' representations and warranties.   As of November 1, 2014, the Lehman-label Trusts have suffered staggering realized losses of nearly $115.6 million.

211.    Lehman's faulty due diligence practices with respect to RMBS securitization is well known to Citibank.   Lehman's "due diligence" principally occurred not during the underwriting phase of the offering, but while Lehman was inspecting smaller bulk loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction. Accordingly, at that stage, there was a disincentive for Lehman to reject, or "kick-back," loans as non-compliant with stated guidelines since the originator would be less likely to select Lehman as the winning bidder in future auctions.   Indeed, according to the FCIC Report, in

connection with securitizing loans, Lehman used a third-party due diligence firm, Clayton, to perform due diligence services.  Clayton found that 26% of the total loans underwritten by Lehman failed to meet the underwriting standards, but that Lehman waived its right to reject 37% of these non-conforming loans, and included them in the RMBS it securitized anyway. Further, the motto among Lehman's RMBS origination sales group became "there are no bad loans only badly priced loans" – meaning loans found not to comply with underwriting guidelines were generally not rejected, but simply negotiated to be purchased more cheaply.

212.    Over the past six years, Lehman's securitization practices have been the focus of several, significant RMBS lawsuits.  For example, in their Consolidated Securities Class Action Complaint filed on February 23, 2009, in *In re Lehman Brothers Mortgage-Backed Securities Litigation*, No. 08-cv-6762 (S.D.N.Y.), the class plaintiffs described in detail Lehman's faulty due diligence practices in securitizing loans in in Lehman-label trusts issued under, among other shelves, the SARM shelf.

213.    The results of file reviews conducted by investors further confirmed Lehman's faulty due diligence practices and pervasive and systemic breach of material representations and warranties regarding quality and characteristics of the loans it securitized.  For example, in *In re Countrywide Financial Corp.*, No. 11-ml-02265 (Aug. 20, 2012), AIG's loan level analysis of several Lehman Trusts demonstrated that the originators and Lehman overstated the percentage of owner-occupied properties by over 20%.

214.    In 2008, Lehman filed for bankruptcy protection.  U.S. Bank National Association, Wilmington Trust Company, Wilmington Trust, National Association, Law Debenture Trust Company of New York, and Deutsche Bank National Trust Company, in their capacity as trustee, separate trustee or indenture trustee for 405 Lehman-sponsored trusts that are

not at issue here (collectively, the "Lehman Bankruptcy RMBS Trustees") are pursuing proofs of claims in the Lehman bankruptcy proceedings asserting that Lehman was liable to these trusts for breaches of representations and warranties concerning all one million of the underlying mortgage loans.  In connection with submitting these claims, the Lehman Bankruptcy RMBS Trustees undertook a re-underwriting and a detailed review of a nearly 5,000 loan sample in 255 of the 405 Lehman trusts that suffered a loss.  The Lehman Bankruptcy RMBS Trustees' experts found breaches of representations and warranties in approximately 57% of the sampled loans—a startlingly high number.   Based in part on the 57% breach rate, the Lehman Bankruptcy RMBS Trustees have sought to increase the reserves for these trusts' representation and warranty claims against Lehman by more than double to $12.143 billion.

### 3.    Goldman Sachs

215.    Goldman Sachs, through its affiliate Goldman Sachs Mortgage Company, was among the Trusts' largest sellers.  Goldman Sachs originated approximately $1 billion and sponsored approximately $1.9 billion of mortgage loans deposited into four of the Trusts issued under the GSAA and GSR shelves.  The Goldman-label Trusts have been marked by extremely poor performance.  By January 1, 2009, the Goldman-label Trusts were averaging delinquency rates of approximately 12.1%.  As a result of these significant delinquencies, the Goldman-label Trusts' losses began to mount.  For example, between 2009 and 2011 collateral losses among the Goldman-label Trusts increased over 500% from approximately $18.9 million to $116.5 million.  As of November 1, 2014, these trusts have suffered collateral losses of approximately $156.5 million.

216.    The FCIC Report and the Senate Report are replete with findings that Goldman Sachs routinely securitized defective loan pools and performed little or no due diligence of the loans underlying the Trusts. For example, according to an internal Clayton trending report, an

average of 22.9% of these loans did not comply with the stated underwriting guidelines and did not have compensating factors that would merit approval; yet Goldman Sachs waived in between 30%-40% of these defective loans. While Clayton reviewed only a sample of the Goldman Sachs-securitized loan pools, the FCIC concluded based on its own sample that "one could reasonably expect [the untested loans] to have many of the same deficiencies, and at the same rate, as the sampled loans."

217.    Goldman Sachs' abandonment of its represented mortgage-securitization guidelines has also been the subject of several state and federal government investigations.  For example, in December 2007, Massachusetts Attorney General Martha Coakley commenced an investigation into the role of Goldman Sachs and other banks in: (i) facilitating the origination of illegal or otherwise improper mortgages; (ii) failing to ascertain whether mortgage loans purchased from originators complied with stated underwriting guidelines; (iii) failing to prevent problem mortgage loans from being put into securitization collateral groups; (iv) failing to correct inaccurate information in securitization trustee reports concerning repurchases of bad loans; and (v) failing to disclose to investors the problems with mortgage loans placed into securitization collateral groups. In May 2009, Goldman Sachs entered into a settlement with Massachusetts to resolve the investigation, agreeing to pay approximately $50 million in relief to homeowners and an additional $10 million to the State of Massachusetts. In announcing the settlement, the Massachusetts Attorney General stated that Goldman Sachs did not take "sufficient steps to avoid placing problem loans in securitization pools."

218.    In addition, Goldman Sachs' securitization practices have been investigated by the SEC. In July 2010, the SEC announced that Goldman Sachs had agreed to pay a then-record $550 million to settle SEC charges that Goldman Sachs misled investors in a subprime mortgage

product just as the U.S. housing market was starting to collapse. In agreeing to the SEC's largest-ever penalty paid by a Wall Street firm, Goldman Sachs also acknowledged that its marketing materials for the subprime product contained incomplete information.

219. Over the past five years, Goldman Sachs has also been a defendant in at least twelve significant RMBS investor lawsuits. Forensic investigations and loan level reviews conducted by investors in these actions further confirm the pervasive breaches of representations and warranties in Goldman-label RMBS. For example, in September 2010, the Federal Home Loan Bank of Seattle ("FHLB-Seattle") filed a securities fraud action against Goldman Sachs concerning four Goldman Sachs-sponsored RMBS offerings. In FHLB-Seattle's analysis of the quality of the loans included in these offerings, it found that Goldman Sachs made untrue or misleading statements regarding LTV ratios, owner occupancy, or underwriting guidelines for between *50% and 60%* of the loans. Similarly, in June 2012, the FHFA filed a securities fraud action against Goldman Sachs concerning forty RMBS offerings in which Fannie Mae and Freddie Mac had invested, thirty-six of which were Goldman Sachs-sponsored. The FHFA's review of at least 1,000 randomly selected mortgage loans found that ***99.6%*** of the reviewed loans from GSAMP 2006-FM3 breached representations in the transaction documents or did not comply with underwriting guidelines.

220. Forensic investigations and loan level reviews conducted by bond insurers have reached the same conclusions regarding the poor loan quality of Goldman Sachs' sponsored offerings. For example, in August 2011, CIFG Assurance North America ("CIFG"), a monoline insurer, filed a fraud and breach-of-contract action against Goldman Sachs in connection with an insurance policy CIFG wrote for one Goldman Sachs-sponsored RMBS offering, GSAA 2007-S1. CIFG's review of 491 randomly selected loans found that 393 or approximately 80% of the

loans "did not comply with one or more of [Goldman's] representations and warranties . . . or underwriting guidelines."

221.    Despite finding these severe deficiencies in the Goldman Sachs loan pools described above, Citibank has done nothing to protect Certificateholders against the same deficiencies in Goldman Sachs loan pools underlying the Trusts at issue here.

## X.    CITIBANK KNEW THAT THE TRUSTS WERE FILLED WITH DEFECTIVE LOANS

222.    There is ample evidence that beginning in 2009 and by 2011, Citibank "discovered" that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties regarding their credit quality.   As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systemic underwriting abuses and the sponsors' faulty securitization practices.   However, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving the originators, sponsors, and monoline insurers, as explained below there is a plethora of additional evidence demonstrating Citibank's and its responsible officers' knowledge that the Trusts' loan pools contained high percentages of mortgage loans that materially breached seller representations and warranties.

### A.    The Trusts' Poor Performance

223.    Citibank and its responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of seller representations and warranties by virtue of the Trusts' abject performance.   It was evident by January 2009, that given the extremely high mortgage loan delinquency rates within the Trust loan pools, the mortgage loans sold to the Trusts were not as the sellers had represented and warranted.   For example, in January

2009, the Trusts on average were experiencing delinquency rates of approximately 13% of the entire loan pool.  Six of the Trusts were experiencing delinquency rates of at least 20%. Incredibly, two of the Trusts (WMHE 2007-HE4 and WMHE 2007-HE2) had delinquency rates of over 44%.

224.    As a result of the abundant defaults within the loan pools, the Trusts' collateral losses began to mount.  For instance, in January, 2009, the Trusts had suffered total collateral losses of nearly $389 million, with two of the Trusts having written off at least 7% percent of the original loan balance (WMHE 2007-HE4 and WMHE 2007-HE2).  By January 2011, the Trusts total collateral losses had ballooned to $1.4 billion, an increase of over 250%.  Significantly, ten of the Trusts had delinquency rates exceeding 20%.  Six of the Trusts had suffered losses of more than 10% of their original balance, including WMHE 2007-HE2, which alone had written off over $400 million, over 25% of its original balance.

225.    These high default rates were no surprise to Citibank by January 2009.  Among other things, Citibank, as Trustee, published monthly remittance reports, that were publicly filed with the SEC on Form 10-D, outlining the credit performance of the mortgage loans in the Trusts.  Moreover, the delinquency rates had been steadily rising up to and through 2009.  By about July 2008, the first harbingers of the violations of the representations and warranties regarding the credit quality of the loans started to appear.  The trustees' monthly reports started to show increases in the trends of loan delinquencies, and by January 2009 these trends had become pronounced.



226.   Citibank was also provided regular reports regarding loan modifications granted by the servicers to borrowers that failed to timely make P&I payments on their loans to the Trusts.  In general, loan modifications change the terms of the original mortgage contract agreed to by the lender and borrower, typically to ease the borrower's monthly payment obligation so the borrower may remain current and avoid default.  Loan modifications often include changes to the loan's interest rate, term and/or outstanding principal.  As with delinquency rates, the extent of loan modifications is indicative of breaches of representations and warranties for at least two reasons.   First, escalating loan modifications correlate to misstated borrower income and creditworthiness.   Second, the servicers' decisions to modify rather than foreclose on loans indicates that the underlying collateral is not adequate security to satisfy the outstanding balance because the original LTV ratio (or CLTV ratio) was not as represented because the appraised property value was misstated and additional liens encumbered the mortgaged property.

227.   As indicated below, loan modifications in the Trusts steadily and dramatically increased beginning in early 2009, providing Citibank further information regarding the systemic breaches of representations and warranties in the Trusts:



**Cumulative Loan Modifications in Citibank N.A. Trusts**

Source: Bloomberg

**B.    Credit Rating Downgrades Further
        Demonstrate The Sellers' Problems**

228.   At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."   Bond rating firms, such as Standard & Poor's ("S&P"), use different designations consisting of upper- and lower-case letters 'A' and 'B' to identify a bond's credit quality rating.   "AAA" and "AA" (high credit quality) and "A" and "BBB" (medium credit quality) generally are considered investment grade.   An investment grade rating signifies that the bond has a relatively low risk of default and are judged by the rating agencies as likely to meet payment obligations such that banks and institutional investors are permitted to invest in them. Credit ratings for bonds below investment grade designations (i.e., "BB", "B", "CCC", etc.) are considered low credit quality, and are commonly referred to as "junk bonds."

229.     However, as public disclosures revealed the originators' and sponsors' systemic underwriting and securitization abuses and Citibank began reporting severe collateral losses in the performance of the mortgage loans in the Trusts, the Trusts' certificates' credit ratings were drastically downgraded.  By December 31, 2009, nearly 75% of the senior tranches in the Trusts had been downgraded at least once.  Across all Trusts, nearly 80% of all certificates had been downgraded by at least one ratings agency.  Further, over 30% of the senior certificates had been downgraded to junk bond status.

        **C.**    **Citibank Discovered Widespread
                Seller Breaches Of Representations And
                <u>Warranties In Its Capacity As Servicer</u>**

230.     In addition to acting as a trustee, Citibank was among the largest mortgage loan servicers during the relevant period, servicing a portfolio of approximately 4 million loans. During the recent housing crisis, a large number of residential mortgage loans serviced by Citibank became delinquent and resulted in foreclosure actions. In particular, the Citibank foreclosure inventory grew substantially from January 2009 through December 2010, according to findings by the OCC in a Consent Order issued against Citibank to remedy "deficiencies and unsafe or unsound practices identified by the OCC" in Citibank's residential mortgage servicing and foreclosure process. *See In the Matter of: Citibank N.A.*, AA-EC-11-13, Consent Order.

231.     Many of the mortgage loans serviced by Citibank were originated and sponsored by the same mortgage loan sellers to the Trusts.  In connection with servicing these loans, Citibank was in a front row seat to view the mortgage loan sellers' deficient underwriting and securitization practices.  For example, Citibank prepared monthly reports for the trustees of these other RMBS trusts dealing the similarly poor performance of their loan pools.  Additionally, as servicer, Citibank knew of the credit agencies' similar downgrading of these Trusts as result of the poor credit quality of these same originators' and sponsors' loan pools.  Further, in servicing

and administrating the loans, including during the modification process, Citibank examined the loan files of mortgage loans originated and sponsored by these entities and in the process discovered systemic and pervasive breaches of representations and warranties in the loan pools.

232.    Because the problems Citibank discovered regarding these common originators and sponsors in its capacity as servicer to other RMBS trusts revealed systemic and pervasive violation of underwriting and securitization guidelines, Citibank knew that these same defective underwriting and securitization practices applied to the Trusts.

**D.    Citibank Was Named In RMBS Litigation
Involving Common Loan Sellers' Systemic
Abandonment Of Underwriting Guidelines**

233.    Citibank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by Citibank's involvement in significant RMBS litigation in its capacity as a securitization underwriter.

234.    For example, on September 2, 2011, the FHFA, as conservator for Fannie Mae and Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the period from 2005 to 2007, including Citibank and its affiliates.[12]   Fifteen of the FHFA's actions were concentrated before Southern District of New York Judge Denise L. Cote for coordinated pretrial proceedings, thereby allowing Citibank access to the pleadings and discovery in each of these cases.

_____

[12] Complaints were filed against the following lead defendants, in alphabetical order: Ally Financial Inc. f/k/a GMAC, LLC; Bank of America Corporation; Barclays Bank PLC; Citigroup, Inc.; Countrywide Financial Corporation; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; General Electric Company; Goldman Sachs & Co.; HSBC North America Holdings, Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co. / First Franklin Financial Corp.; Morgan Stanley; Nomura Holding America Inc.; The Royal Bank of Scotland Group PLC; and Société Générale.

235.    Each of the FHFA's complaints alleged that the defendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans and the percentage of loans secured by owner occupied properties.  The FHFA further alleged that defendants materially understated the loan-to-value ratios of the underlying loans.

236.    To support its allegations regarding defendants' misrepresentations regarding the credit quality and characteristics of the underlying loan collateral, the FHFA's complaints highlighted the severe delinquencies, immense collateral losses and staggering credit downgrades suffered by both the securitizations at issue in its cases and all RMBS in general of this vintage.  Significantly, the FHFA's actions involved at least two of Trusts at issue in this action: WMHE 2007-HE2 and WMHE 2007-HE4.

237.    In addition, the FHFA provided highly detailed summaries of the evidence and testimony obtained through federal and state investigations, enforcement actions and reports revealing both industrywide abuses by the mortgage loan originators and sponsors during this period, and widespread breaches of representations and warranties by specific originators and sponsors in connection with RMBS trusts.  These financial institutions included many of the largest mortgage loan sellers to the Trusts, such as Lehman, WaMu, Wells Fargo, and Goldman Sachs.

238.    Moreover, FHFA cited the results of its own forensic review of loan level data for a sampling of hundreds of thousands of mortgage loans and reunderwriting of thousands of loan files from these securitizations, including four of the Trusts.  The data review revealed systemic and pervasive misrepresentations regarding owner occupancy and LTV ratios in each of the

securitizations, including the Trusts at issue here and other securitizations involving the same sponsors to the Trusts, same RMBS labels, same RMBS shelves, same vintage, same loan product type, or the same originators.

239.    Significantly, on May 28, 2013, Citibank and its affiliates agreed to pay $250 million to resolve *FHFA v. Citigroup, et al.*, No. 11-cv-06196 (S.D.N.Y.).

240.    Given the FHFA's detailed allegations and Citibank's active participation in the FHFA actions as a named defendant, Citibank and its responsible officers had actual knowledge that the Trusts' loan pools contained high percentages of loans that materially and adversely affected the Trusts and Certificateholders' interests in those loans.

241.    As described in further detail below, in addition to the FHFA actions, Citibank and its affiliates have been named in several other actions alleging that originators and sponsors industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines.   The evidence and testimony perpetuated in these actions provide further support for Citibank's knowledge of the presence of defective loans in the Trusts.

   E.    **Citibank And Its Responsible Officers
         Received Written Notice From
         Certificateholders And Monoline Insurers
         Of Pervasive And Systemic Seller Breaches**

242.    In its capacity as trustee to other RMBS trusts, Citibank and its responsible officers received written notice from Certificateholders and monoline insurers of breaches of representations and warranties by the very same originators and sponsors that originated and sponsored the loans underlying the Trusts at issue here.   Based on the sheer volume of the defective mortgage loans identified, together with the systemic and pervasive faulty origination and securitization practices complained of in the Certificateholders' breach notices, Citibank and

its responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

243.    For example, large-scale "putback" initiatives led by groups of major institutional mortgage investors have alleged widespread violations of representations and warranties in the PSAs and other governing documents concerning mortgage loans backing approximately 2,500 RMBS securitizations by Citibank and five other leading sponsors of non-agency RMBS from 2004 to 2008, including JP Morgan, Morgan Stanley, Countrywide, Wells Fargo, and ResCap (or their respective affiliates).  These initiatives, several of which have yielded multi-billion dollar settlements, now encompass nearly one-half of all private-label RMBS trusts issued between 2004 and 2008.

244.    These investor-led initiatives identified and sought to "putback" large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including American Home ($5.8 billion of loans sold to the Trusts).  These initiatives additionally identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (original servicer to $8.2 billion of loans sold to the Trusts).  Citibank serviced at least thirty-two RMBS trusts subject to these investor-led putback initiatives, which were securitized by approximately $28 billion of mortgage loans.

245.    In addition, on January 24, 2013, a group of holders of certain certificates in Citigroup Mortgage Loan Trust 2007-AMC3 provided notice to Citibank, as Trust Administrator ("Citi"), of "breaches of representations and warranties in 419 Mortgage Loans" identified in 2007-AMC-3 (the "January 24 Notice").  In the January 24 Notice, the investor group

"demand[ed] that Citi or its successor-in-interest promptly cure these breaches or repurchase each of the noncompliant mortgage loans pursuant to Section 6 of the MLPA."

246.   Despite Citibank's actual notice of widespread loan defaults and breaches by the same originators, sponsors, and servicers that originated, sponsored, and serviced the loans underlying the Trusts at issue here, Citibank failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute, or repurchase defective mortgage loans and the servicers' obligations to follow proper servicing practices.

247.   Citibank also discovered that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the originators' and sponsors' representations and warranties regarding their credit quality through its involvement in monoline (financial guaranty) insurer litigation involving these same originators and sponsors in its capacity as either trustee or master servicer of these RMBS Trusts.

248.   Monoline insurers provided financial guaranty insurance for the RMBS issued from many of the Trusts.   Under the Governing Agreements for these insured RMBS transactions, the mortgage loan sellers to the Trusts made numerous representations and warranties concerning the attributes of the loans and the practices pursuant to which they were originated.   The Governing Agreements for the insured RMBS transactions also create a repurchase protocol pursuant to which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan seller and the parties to the agreement (including the trustee and master servicer) in order to compel the responsible mortgage loan seller to repurchase loans that breach the representations and warranties.

249.    Monoline insurers have initiated litigation against responsible mortgage loan sellers for breach of their representations and warranties in connection with other RMBS trusts to which Citibank served as a trustee.  Prior to filing suit against the originators and/or sponsors, the monoline insurers (unlike Certificateholders) were often able to obtain access to the specific loan files or conducted a forensic loan level review of the loans, which showed systemic and pervasive breaches of the representations and warranties.  Plaintiffs are informed and believe that consistent with the repurchase protocol under the Trusts' governing documents, Citibank was notified by both the responsible mortgage loan sellers and the parties to the PSAs (including Citibank as Trustee) of these sellers' systemic and pervasive breaches of representations and warranties.

250.    The monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits made Citibank and its responsible officers aware of the systemic violation of underwriting and related standards in the mortgage securitization industry between 2004 and 2008 vintage, as well as informed them of specific originators' and sponsors' systemic and pervasive practice of misrepresenting the credit quality and characteristics of the mortgage loans they were selling to keep the RMBS machine running.

251.    For example, in *CIFG v. Bank of America,* Index No. 654028/2012 (N.Y. Sup. Ct. Nov. 20, 2012), the plaintiff CIFG, a New York-based monoline insurer, wrote insurance relating to two structured transactions arranged by Bank of America, which in turn were backed by twenty-two Bank of America securitizations.  CIFG alleged that "Bank of America had these securities in its inventory because it had been unable to sell them when it served as underwriter on the Original RMBS offerings."  CIFG claimed that "Bank of America knew of the poor quality of the Mortgage Loans, and knew the original unsold Original RMBS were a ticking time

bomb on the bank's books."  According to CIFG, Bank of America, unable to sell the securities in pieces, then "hatched a new plan of financial engineering," repackaged the bonds, and induced CIFG to provide more than $150 million in insurance to make them marketable to investors. These repackaged securities were offered in new transactions – BAFC 2006-R1 and BAFC 2006-R2 – for which Citibank served as trustee.  CIFG alleged that Bank of America gave it "garbage data" that made the loans and the certificates they backed appear less risky than they actually were, including with respect to LTV, CLTV and the percentage of the mortgages where the property would be occupied by the borrowers.

252.    To highlight the falsity of the originators' and Bank of America's representations and warranties regarding the underlying loans, CIFG revealed the findings of its loan level analysis of over 31,000 mortgage loans from the twenty-two securitizations showing that a staggering *64.37%* of the mortgage loans contained at least one material defect.  A summary of testimonial and documentary evidence demonstrating widespread breaches of representations and warranties by each of the major originators of the mortgage loans for those Trusts is included in CIFG's complaint.

253.    In addition, several other monoline insurer actions similarly placed Citibank on notice of systemic problems with loan originations and securitizations.  *See, e.g.*, *Ambac Assurance Corp. v. EMC Mortg., LLC, et al.*, Index No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011) (monoline action arising from "Bear Stearns' fraudulent inducement of Ambac and investors to participate in four securitizations . . . the SACO I Trust Series ("SACO") 2005-10, 2006-2, and 2006-8 . . . and the Bear Stearns Second Lien Trust ("BSSLT") 2007-1" for which Citibank serves as trustee) ("Of the sample of 361 randomly selected loans in the BSSLT 2007-1 Transaction, Ambac identified breaches of representations and warranties in 325 loans, or

90%."); *Assured Guaranty Corp. v. EMC Mortg., LLC*, Index No. 650805/2012 (N.Y. Sup. Ct. Mar. 13, 2012); (monoline action arising from "Bear Stearns' malfeasance relating to a mortgage-backed securities transaction known as SACO I Trust 2005-GPl" for which Citibank serves as trustee) (detailing "incredibly high breach rates" of GreenPoint loans that Bear Stearns included in SACO 2005-GP1, including 86% breach rate uncovered during Bear Stearns' post-closing quality review, and 88% breach rate revealed by Assured's independent forensic review in 2009); *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, Index No. 651566/2011 (N.Y. Sup. Ct. Mar. 6, 2011) (monoline action pertaining to "remarkable misconduct by Bear Stearns and its successor JP Morgan pertaining to . . . GreenPoint Mortgage Funding Trust 2007-HE1" for which Citibank serves as trustee) (independent third-party consultant's review and loan level analysis of 1,431 loan sample in GPMF 2007-HE1 revealed a "staggering 92% overall breach rate").

254.    Because these monoline insurers' findings from loan level reviews set forth both in their breach notices and subsequent publicly available lawsuits reflected these mortgage loan sellers' systemic and pervasive violation of underwriting and securitization guidelines, Citibank discovered that these same defective underwriting and securitization practices applied equally to all of the other Trusts containing loans originated and securitized by these same originators and sponsors.

**F.    Citibank Knew Of Pervasive And Systemic Seller Breaches As A Result Of RMBS Litigation Brought By Investors And Government Agencies On Deals In Which It Serves As Trustee**

255.    Beginning in 2009, numerous complaints were filed by private investors, government agencies, and monoline insurers alleging fraud, breach of contract, and other causes of action arising from defective loans issued by the same originators and securitized by the same sponsors as the Trusts.  Citibank was aware of and informed about the allegations of systemic,

pervasive, and blatant breaches of representations and warranties, including with respect to several of the same Trusts here at issue. Indeed, Citibank, as Trustee, and the servicers were responsible for responding to requests for loan files and other documentation necessary for the prosecution of those actions, including the litigants' forensic review of loan files.

256. For example, *Sealink Funding v. Bear Stearns*, Index No. 652681/2011 (N.Y. Sup. Ct. Sept. 29, 2011) asserted claims for common law fraud against WaMu, JPMorgan, and Bear Stearns for knowingly including poor quality loans with a high risk of default into the mortgage pools for thirty-seven RMBS offerings between 2005 and 2007, including WMHE 2007-HE4, one of the trusts at issue, and hiding this course of conduct from investors and credit rating agencies. Rather than being supposedly conservative RMBS, the 146-page complaint asserted that the offering materials grossly misstated key metrics for assessing the quality of the mortgage loans included in the securitization pools, including misrepresentations about borrower credit scores, LTVs, and occupancy rates. The principal originators for the mortgage loans at issue in *Sealink* included American Home and WaMu, which collectively originated nearly $9.8 billion or nearly 75% of the mortgage loans included in the Trusts at issue here.

257. With respect to the WMHE 2007-HE4, the plaintiff's examination in *Sealink* found that the amount of loans with a LTV ratio greater than 100% exceeded **24%** of the pool (compared to the represented 0%), and that the amount of non-owner occupied properties included in the pool had been understated by approximately **125%**. The plaintiff's examination further found that within one, two, and three years of its securitization, approximately 24%, 45%, and 53% of the loans backing WMHE 2007-HE4 were over sixty- or ninety-days delinquent, in foreclosure, bankruptcy, or repossession. The plaintiff's examination further found that by September 2009, WMHE 2007-HE4 certificates had been downgraded from "high grade"

investment securities (Aaa/AAA) to junk levels (Ca/CCC) by both Moody's and S&P, thereby confirming that the loan pool backing WMHE 2007-HE4 included large numbers of exceptionally poor quality loans.

258.    In addition to private actions by institutional investors, Citibank was aware of pervasive and systemic breaches concerning the mortgage loans underlying the Trusts through high-profile actions by government agencies.  For instance, in *FHFA v. JPMorgan*, No. 11-cv-6188 (S.D.N.Y. Sept. 2, 2011), the FHFA brought an action for violation of the federal securities laws, state securities laws, and common law fraud with respect to 103 RMBS offerings sponsored by JPMorgan, EMC, WaMu, and Long Beach between 2005 and 2007, including at least two of the Trusts at issue here (WMHE 2007-HE2, and WMHE 2007-HE4). The FHFA asserted that the "originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses."  The FHFA's forensic review found that the offering materials substantially understated both the number of loans with LTVs greater than 100%, and the number of loans that were not owner-occupied.

259.    With respect to WMHE 2007-HE2, and WMHE 2007-HE4 in particular, the FHFA's forensic review found that the true percentage of loans with LTV ratios greater than 100% was 22.9%, and 26.2% of the respective pools (compared to the represented 0%), and that the amount of non-owner occupied properties included in the pools had been understated by 13.5%, and 12.2%, respectively.  The FHFA's examination further found that by March 2012, approximately 50.5%, and 47.6% of the loans backing WMHE 2007-HE2 and WMHE 2007-HE4 were in default, delinquency, or had been foreclosed upon.  The FHFA's examination further found that by April 2012, WMHE 2007-HE2 and WMHE 2007-HE4 certificates had been

downgraded from "high grade" investment securities (Aaa/AAA/AAA) to junk levels (Caa2/Caa3/C/CC/CCC) by both Moody's Investor Service ("Moody's"), S&P, and Fitch Ratings, Inc. ("Fitch"), thereby confirming that the loan pool backing WMHE 2007-HE4 included large numbers of exceptionally poor quality loans. Citibank, as Trustee for Trusts in the WMHE shelves was aware and informed of the FHFA's analyses.

260. In addition to lawsuits brought by the FHFA, other government lawsuits also provided Citibank with knowledge of systemic and pervasive problems with the mortgage collateral backing the Trusts. For example, in *Federal Home Loan Bank v. Ally Financial Inc.*, No. 11-cv-10952 (D. Mass. May 26, 2011), the Federal Home Loan Bank of Boston ("FHLB Boston") brought an action for securities fraud, common law fraud and negligent misrepresentation against a large number of major RMBS sponsors and mortgage loan originators – including various Citibank entities. The FHLB Boston's voluminous complaint alleged that certain lenders, which included many of the major originators of loans collateralizing the Trusts at issue here (*e.g.*, WaMu, Wells Fargo, and American Home) abandoned stated underlying and appraisal standards and engaged in predatory lending. The FHLB Boston's action further alleged that major sponsors of RMBS securitizations, which included a sponsor of the Trusts at issue here (WaMu), engaged in unsound securitization practices and were plagued by conflicts of interest, and knew from various sources of information that substantial amounts of poor quality loans were included in their securitization pools but securitized the defective loans anyway while misrepresenting their characteristics and credit risk to investors.

261. Numerous other lawsuits have been filed by investors and government agencies alleging fraud, breach of contract, and other causes of action arising from defective loans issued by the same originators and securitized by the same sponsors as the Trusts, and encompassing

Trusts at issue here. Like the actions described above, these lawsuits included highly detailed allegations concerning investigations and analyses of the underlying loan pools which informed Citibank of systemic and pervasive deficiencies in the Trusts. *Dexia SA/NV v. Bear Stearns, et al.*, No. 12-cv-4761 (S.D.N.Y. May 18, 2012) (certificates in WMHE 2007-HE2 downgraded to junk from an initial AAA/Aaa rating by S&P and Moody's, "confirming that Defendants included large numbers of exceptionally poor quality loans [in this] securitization"); *NECA-IBEW Health & Welfare Fund, et al. v. Goldman Sachs,* No. 08-cv-10783 (S.D.N.Y. Mar. 31, 2010) ("The massive foreclosure rate and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above," including with respect to GSAA 2007-10 and GSAA 2007-8).

    **G.**    **Citibank Was Named In RMBS Litigation And Has Agreed To Settle RMBS Claims Involving Common Loan Sellers' Systemic Abandonment Of Underwriting Guidelines**

262. Citibank's knowledge of pervasive breaches of representations and warranties by the originators and sponsors at issue herein is also demonstrated by Citibank's involvement in significant RMBS litigation and settlements in its capacity as securitization sponsor and underwriter, whereby facts were developed showing that originators industrywide during the relevant period, including major originators of loans sold to the Trusts, systematically abandoned their stated underwriting guidelines.

263. For example, in February 2011, Allstate Insurance Company ("Allstate") filed suit against CitiMortgage, Inc. and its affiliates, in its capacity as originator, sponsor, underwriter, and depositor of the trusts in which Allstate invested, alleging that Citigroup had misrepresented its underwriting guidelines and loan quality in connection with the sale of $200 million in Citi-label RMBS. The complaint alleged that the lenders that originated the loans for the

securitizations at issue falsely represented that they had employed careful underwriting guidelines and practices, when in truth "[r]ecent revelations have shown that such originators had actually abandoned any such practices."  Notably, principal originators of these securitizations included WaMu, Wells Fargo, American Home, Countrywide, and National City Mortgage, Inc., which were similarly all significant sellers of loans to the Trusts.

264.     Additionally, in *Deutsche Zentral-Genossenschaftsbank AG, et al. v. Citigroup Inc. et al.*, Index No. 654566/2012 (N.Y Sup. Ct. 2014 July 11, 2013), investors filed suit against Citigroup alleging fraud in the sale of more than $362 million certificates in seventeen RMBS securitizations issued, marketed and/or sold by Citigroup and its affiliates.  The plaintiffs similarly alleged that the originators of these securitizations had systemically "abandoned their underwriting guidelines."  Significantly, the key originators of the securitizations included Wells Fargo and Accredited Home Lenders, Inc. ("Accredited"), which also were originators of numerous mortgage loans sold to the Trusts.

265.     The evidence and testimony perpetuated in these and other RMBS actions against Citibank support the conclusion that Citibank knew that by virtue of the originators' abandonment of their underwriting guidelines they sold defective loans to both the Trusts in which Citibank served as the sponsor and underwriter, as well as the loans sold to the Trusts at issue here, and that Citibank knew that these originators' representations regarding its adherence to the guidelines were false. Additionally, based on Citibank's extensive participation in the mortgage market and due diligence process, Citibank knew the mortgage loan sellers' representations were false.

266.     Moreover, earlier this year, Citibank announced a ***$1.125 billion*** settlement with a group of eighteen institutional investors to settle mortgage repurchase claims on sixty-eight

private-label RMBS deals sponsored by Citibank's legacy securities and banking business during 2005 to 2008. The cash settlement, which reportedly represents approximately 8% of expected and realized losses by the subject RMBS trusts – which collectively issued $59.4 billion worth of RMBS certificates – is subject to regulatory approval by FHFA and acceptance of the offer by the relevant trustees. The sixty-eight RMBS trusts covered by Citibank's settlement are filled with mortgage loans that were originated by many of the same lenders that also originated large quantities of the loans sold to the Trusts, including Wells Fargo ($226.8 million of loans sold to the Trusts). The action additionally identified and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Trusts, including Wells Fargo (servicer to $8.3 billion of loans sold to the Trusts).

## XI.   THE TRUSTS ALSO SUFFERED FROM PERVASIVE SERVICER VIOLATIONS

267.   In the aftermath of the financial crisis, the mortgage loan servicing industry has received increased scholarly, popular, regulatory, and political attention as a result of rampant servicing abuses in connection with the administration of and foreclosing on mortgage loans backing private-label RMBS.

268.   Much like other private-label RMBS Trusts of the same vintage, each of the Trusts suffers from ongoing Events of Default caused by the servicers' failure to observe and perform, in material respects, the covenants and duties imposed on them by the PSAs. The servicers' breach of their covenants is confirmed through several federal and state government investigations and published reports, well-publicized news reports, and public and private enforcement actions that have described RMBS servicers' systemic and pervasive deviation from usual, customary, and lawful servicing practices in their administration of mortgages and, more

specifically, illegal and illicit servicing activities by the same servicers that service the loans held by the Trusts.

**A.    The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations**

269.    As with the Trustee, the PSAs require the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by a seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any such mortgage loan, upon the servicer's discovery of such breach.   Moreover, the servicers are required under the PSAs to enforce the sellers' obligation to repurchase, substitute, or cure such defective loans.

270.    In many cases, the servicers are affiliates of the sellers because in connection with the sale of a loan pool, the seller secured the retention of servicing rights to loans for its servicing division.   These servicers had actual knowledge of their affiliate mortgage loan sellers' abusive underwriting and securitization practices, and therefore had actual knowledge at the time of the Trusts' purchase of these loans that the sellers included high percentages of defective loans within the loan pools.   These servicers failed to notify parties to the PSAs of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

271.    Additionally, for the benefit of the Trusts, and pursuant to the PSAs, the sponsors acquired primary mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess 80% which served as a "credit enhancement" in order to offer additional security to Certificateholders in the Trusts and to induce rating services to provide a higher credit rating for the Certificates, thereby making the Certificates more attractive to potential purchasers.   In the

-80-

aftermath of the financial crisis, servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans.  The mortgage insurers have denied coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims as a result of misrepresentations regarding the insured mortgage loans, including on the basis that the originator engaged in predatory lending or systemic fraud in the underwriting of the mortgage loans.  After these mortgage insurance claim denials, the servicers failed to observe or perform in a material respect their covenants and/or agreements under in the PSAs by failing to notify parties to the PSAs that the mortgage loan sellers violated representations and warranties at the time they sold loans to the Trusts..  Moreover, the servicers failed to tender the defective, defaulted loans to the sellers for repurchase.  Instead, the servicers charged the over-collateralized accounts for losses, causing damage to the Trusts and their Certificateholders.

272.    Further, as noted above, the servicers have regularly modified mortgage loans held by the Trusts.  Plaintiffs are informed and believe that in the process of modifying these mortgage loans, the servicers have discovered that specific loans breached applicable seller representations and warranties because the loan modification process involves scrutinizing the underlying origination and mortgage loan files, and any supplemental information provided by the borrower to assess the borrower's ability to pay.  Thus, in the process of performing loan modifications, the servicers had to have discovered breaches of representations and warranties regarding the characteristics of the loan, the creditworthiness of the borrower, the adequacy of the collateral and the title status of the mortgages.  Nevertheless, the servicers systemically failed to notify the other parties of these breaches.

273.   As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the servicers aware of material seller breaches representations and warranties within the Trusts loan pools.  Nevertheless, the servicers have not notified the other parties to the PSAs of these seller breaches or enforced the sellers' repurchase obligations.

274.   Further, the servicers have been specifically notified by monoline insurers of pervasive breaches by the sellers.  For instance, Wells Fargo (and its affiliates) is the leading servicer of the Trusts, administrating approximately **$8.3 billion** in original face value of mortgage loans securitized in the Trusts.  Wells Fargo was notified in litigation by MBIA, Ambac, CIFG, Assured Guaranty, and other mortgage and monoline insurers of pervasive, systemic breaches of representations and warranties by Wells Fargo entities in their capacity as originators.

275.   Notwithstanding the servicers' "discovery" of material breaches of representations and warranties, the servicers have not notified the other parties to the PSAs of these breaches. Moreover, although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce the seller's obligation to repurchase, substitute, or cure such defective loans as required under the PSAs.

276.   The servicers' systemic and pervasive failure to give notice of the sellers' material breaches of representations and warranties and to enforce the sellers' repurchase obligations have materially affected the rights of the Trusts and all Certificateholders under the PSAs in that they have deprived the Trusts of mortgage loans of adequate credit quality, or alternatively funds representing the "Repurchase Price" under the PSAs, with respect to each defective mortgage loan.

B.    The Servicers Have Violated
      **Their Prudent Servicing Obligations**

277.    The PSAs require the servicers to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs: (i) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicers' right to receive compensation or other fees for their services under the PSAs, their obligation to make servicing advances under the PSAs, and their ownership, servicing, or management for others of any other mortgage loans.

278.    High-profile class actions against the servicers have revealed violations of prudent servicing practices.  For example, in June 2012, nationwide class actions were brought on behalf of millions of homeowners against Wells Fargo, HSBC Bank Inc., Citibank, JPMorgan, and Bank of America N.A., alleging that mortgage borrowers were overcharged for force-placed insurance.  The borrowers specifically alleged that these servicers imposed force-placed insurance policies that were far more expensive than market rates and received hundreds of millions of dollars in clandestine commissions from the insurance companies writing the policies.  The servicers' practice of imposing expensive force-placed insurance increased the borrowers' monthly payments by a large amount.  As a result, homeowners who were already behind in payments or were facing financial difficulties went into foreclosure.  The plaintiff

borrowers have also entered into several well-publicized settlements with these servicers, including settlements of $110 million with Citibank and $19.3 million with Wells Fargo.[13]

279.    Notably, Wells Fargo services and administrates almost $8.3 billion in mortgage loans held by the Trusts.  Plaintiffs are informed and believe that it and each of the other servicers to the Trusts have engaged in the same violations of their prudent servicing obligations in servicing and administrating the mortgage loans for the Trusts.

280.    Highly publicized government enforcement actions and settlements reached with the servicers demonstrate that the servicers have systemically and pervasively violated these prudent servicing obligations.  For example, in February 2012, forty-nine State attorneys general and the federal government announced a historic $25 billion joint state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single-family residential mortgages (the "National Mortgage Settlement"): (i) Wells Fargo & Company and Wells Fargo Bank, N.A.;  (ii) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (iii) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (iv) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (v) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC.

281.    In their corresponding complaint filed in March 2012, the state attorneys general and the federal government alleged that these servicers had engaged in unfair, deceptive, and unlawful servicing processes, including: (i) failing to timely and accurately apply payments

---

[13] *Fladell v. Wells Fargo Bank N.A.*, 13-60721 (S.D. Fla.); and *Casey, et al. v. Citibank* N.A., 12-00820 (N.D.N.Y.)

made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage; (v) providing borrowers false or misleading information in response to borrower complaints; and (vi) failing to maintain appropriate staffing, training, and quality-control systems.

282.    On October 2, 2013, Attorney General Eric T. Schneiderman ("Schneiderman") announced that he was suing Wells Fargo so that a federal judge would compel the bank to honor its commitments under the 2012 National Mortgage Settlement, which includes 304 servicing standards that participating servicers are required to adhere to, and which include standards that are intended to make it easier for homeowners to seek loan modifications.   The servicing standards were incorporated into the National Mortgage Settlement to address longstanding complaints from consumers and advocates that servicers subject to the settlement, including Wells Fargo, consistently failed to provide fair and timely services to their customers.   Attorney General Schneiderman announced his intention to sue Wells Fargo and Bank of America in May, after documenting hundreds of violations of the servicing standards outlined in the National Mortgage Settlement:

> The national mortgage settlement sets out more than 300 loan-servicing standards with which the banks are to comply.  However, in his warning letters to BofA and Wells Fargo, Schneiderman alleged that he had evidence from homeowners in the state that these servicers had repeatedly and persistently failed to follow basic rules like: providing written acknowledgement of receipt of a loan modification application within 3 business days; notifying the borrower of all missing documents or deficiencies in the application within 5 business days of receipt of the borrower's initial loan modification application; giving the borrower 30 days to submit missing documentation or correct a deficiency; and making a decision on a complete loan modification application within 30 days."

283.     On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring twenty-four loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.   The order was directed at, among others, Aurora, PHH, PNC (and therefore its Servicer National City) and SunTrust, all Master Servicers or servicers to the Covered Trusts.  Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No. F-595S3N10, directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended.  Wells Fargo and Bank of America were two recipients of this show cause order.

284.     The servicers' systemic, pervasive failure to observe their prudent servicing obligations has materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the violations have exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

### C.     The Servicers Have Violated Their Foreclosure Obligations

285.     The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.   Moreover, the PSAs contemplate that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.

286.    Highly publicized government enforcement actions and settlements reached with the servicers similarly have revealed the servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve, the OCC, the FDIC, and the OTS (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, which represented more than two-thirds of the servicing market.   These servicers included Ally Bank/GMAC, Aurora, Bank of America, Citibank, EverBank, HSBC, JPMorgan, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, many of which are servicers to the Trusts.   In April 2011, the Agencies issued a joint report entitled "Interagency Review of Foreclosure Policies and Practices," summarizing the findings of their reviews and providing an overview of the potential impacts associated with instances of foreclosure processing weaknesses that occurred industrywide.   Notably, the Agencies' reviews found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."   Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks.   The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009 and December 31, 2010.

287.    The OCC found in *In the Matter of Aurora Bank FSB*, No. NE-11-16, Consent Order (U.S. Office Thrift Supervision, Apr. 13, 2011), that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, Aurora engaged in the

following unsafe or unsound practices: "(a) filed or caused to be filed in state and federal courts numerous affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; (b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, specifically that were not signed or affirmed in the presence of a notary; (c) litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosure proceedings without always ensuring that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed sufficiently to oversee outside counsel and other third-party providers handling foreclosure-related services." *In the Matter of Aurora Bank FSB*, No. NE-11-16, Consent Order (U.S. Office Thrift Supervision, Apr. 13, 2011).

288.     Similarly, as noted above, in March 2012, following an extensive investigation of Wells Fargo, Bank of America, Citigroup, Countrywide, JPMorgan, Ally Financial, Inc., and GMAC Mortgage, LLC – some of the same servicers that service loans in the Trusts – the DOJ, the Department of Housing and Urban Development ("HUD"), and forty-nine state attorneys

general filed a complaint against these servicers and announced the $25 billion National Mortgage Settlement of the claims set forth in the complaint.  In the complaint, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party, charging improper fees, preparing, executing, notarizing, or presenting false and misleading documents, and engaging in robosigning.

289.   In addition, private litigation has exposed the servicers' wrongful foreclosure practices.  For example, homeowners from Queens and Brooklyn, who were at risk of losing their homes to foreclosure, filed a federal class action lawsuit, charging that Aurora (the second largest servicer of loans in the Trusts) their mortgage servicer, has denied them access to the Obama Administration's Home Affordable Modification Program ("HAMP") for spurious reasons, and failed to provide them with notice so they may contest such denials.  The lawsuit, *Edwards, et al v. Aurora Loan Services, LLC et al.,* No. 09-cv-2100 (D.D.C. Nov. 9, 2009), was one of the first lawsuits to challenge a mortgage servicer for breach of contract by failing to review mortgage loans of eligible homeowners for HAMP and to provide a procedure to contest denial.

290.   Moreover, in a California class action that has survived a motion to dismiss, plaintiffs alleged that Aurora (the largest servicer of loans in the Trusts) foreclosed on homes without any notice that loan modifications were denied and without allowing borrowers access to any cure method despite promises in an agreement to do so. *Mauder, et al. v. Aurora Loan Services, LLC*, No. 10-cv-3383, (N.D. Cal. Aug. 2, 2010) Class Action Compl. ¶2.

291.    The servicers have also routinely kept defaulted mortgages on their books, rather than foreclose or liquidate them.  Indeed, in several states, the average days for delinquent loans in foreclosure in the Trusts have doubled or quadrupled.



Sources: RealtyTrac, Moody's Analytics

292.    The servicers' delay in foreclosing has allowed the servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the servicers' breach of their duties.  For example, in the complaint that led to the National Mortgage Settlement discussed above, the federal government and forty-nine states accused Wells Fargo, Citigroup, Bank of America, JPMorgan, Countrywide, and Ally Financial, Inc. (many of which were servicers of loans in the Trusts) of unfair and deceptive practices in the discharge of their loan servicing activities for, among other things, "*charging excessive or improper fees for default-related services*." *United States, et al. v. Bank of Am., et al.*, No. 12-cv-0361, (D.D.C. Apr. 4, 2012) Compl. ¶51.

293.    The servicers' systemic and pervasive violations of their foreclosure obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that

the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents.  The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the servicers' foreclosure processes.

### D. The Servicers Have Violated Their Modification Obligations

294.    The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.

295.    The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcement of the sellers' obligation to cure predatory mortgages.

296.    The servicers have also breached the PSAs by agreeing to modify loans held in the Trusts to settle claims by various attorneys general related to the servicers' wrongful servicing and foreclosure practices.  For example, in meeting their payment obligations with respect to the National Mortgage Settlement, the settling servicers received credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.

297.    The servicers' violations of their loan modification obligations have materially impaired the rights of the Trusts and all Certificateholders under the PSAs in that the servicers and their parent companies have been unjustly enriched to the detriment of the Trusts and

Certificateholders by using Trust collateral to settle claims that were not, and could never be, made against the Trusts.

### E.    The Servicers Have Abused Their Servicing Advances Obligations

298.    The PSAs provide that the servicers are to advance principal and interest on a loan only if they determine that the advance payment is recoverable.  The PSAs further provide that the servicers may only recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the servicers' performance of their servicing obligations.  The servicers have abused their advancing obligations to enrich themselves to the direct detriment of the Trusts.  In particular, the servicers have manipulated the "recoverable" designation to their advantage.  During low-interest-rate environments, the servicers have designated severely delinquent loans as recoverable so that the loans would be kept in the Trusts' loan pools and the servicers could continue to earn their servicing fees on the loans, which exceed the relatively low cost of financing the advances on these delinquent loans.  When interest rates have increased, however, the servicers have strategically switched the mortgage loans' designation from recoverable to unrecoverable.  The switch in designation enables the servicers to recoup all prior advances as a senior claim of the Trusts.

299.    The Trusts and their Certificateholders are harmed by the servicers' manipulation of the "recoverable" designation because the Trusts incur more interest-rate risk exposure than expected since the servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the PSAs.

300.    The servicers' abuse of their advancing obligations is further illustrated by their increasing use of "unrecognized forbearances."  The servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the

principal amounts of the mortgage loans.  The forbearances allow the servicers to lower their advanced principal payments on the loans.  Nevertheless, the servicers do not formally write down the loan balances or make any recognition on the Trusts' accounts.  Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the servicers having to make any advances.

301.    According a Credit Suisse study, unrecognized forbearances in the Trusts totaled approximately $128 million as of April 2013.[14]  At least twelve Trusts had some amount of unrecognized forbearance, and at least four of these Trusts had unrecognized forbearance amounts exceeding 3% of the Trust's current collateral balance:

**Top 10 Citibank Trusts by Share of Current Balance Forborne**

Data as of April 2013 distributions. 1st lien only

| Offering | Original Face Amount | Then Current Balance | Estimated Unrecognized Forbearance | Unrecognized Forbearance as % of Current Balance |
|---|---|---|---|---|
| WMHE 2007-HE4 | $679,323,511 | $295,082,846 | $27,932,048 | 9.47% |
| WMHE 2007-HE2 | $1,593,665,287 | $607,845,596 | $39,106,033 | 6.43% |
| AHMA 2006-3 | $1,682,386,100 | $619,773,525 | $29,170,847 | 4.71% |
| AHMA 2006-4 | $1,506,967,000 | $548,785,700 | $25,667,721 | 4.68% |
| GSAA 2007-8 | $354,320,400 | $147,242,629 | $1,810,368 | 1.23% |
| GSR 2006-AR2 | $962,506,982 | $334,711,508 | $2,608,236 | 0.78% |
| GSAA 2007-9 | $453,684,061 | $208,885,367 | $679,364 | 0.33% |
| MASTR 2006-1 | $419,235,122 | $110,964,907 | $301,001 | 0.27% |
| GSAA 2007-10 | $170,227,314 | $80,609,136 | $165,145 | 0.20% |
| MALT 2006-1 | $276,059,819 | $106,858,431 | $193,040 | 0.18% |

Source: Credit Suisse, Loan Performance

---

[14] Credit Suisse estimated that, as of April 2013, unrecognized forbearances on non-agency RMBS deals issued after 2000 (first lien only) totaled around $8.3 billion.

302.    The servicers' pervasive use of unrecognized forbearances harms the Trusts and their Certificateholders since the Trusts pay higher servicing fees to the servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

303.    Despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their charges to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement their servicing income.

## XII.    CITIBANK HAS KNOWN OF SERVICER VIOLATIONS PLAGUING THE TRUSTS

304.    There is ample evidence that, beginning in early 2009 and continuing to the present, Citibank and its responsible officers have known of the above described widespread and severe failures on the part of the servicers to observe or perform in material respects their obligations under the PSAs.  Preliminarily, as discussed above, since 2009 and continuing to the present there has been a steady stream of public disclosures regarding the servicers' violations. Nevertheless, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile litigation involving the servicers, as explained below there is a host of additional evidence demonstrating Citibank and its responsible officers' knowledge that the servicers have materially breached their contractual obligations.

### A.    Citibank Itself Was Involved In Government Enforcement Actions And Litigation Stemming From The Servicers' Violations

305.    Citibank and its responsible officers knew of the servicers' improper servicing practices because, as described in greater detail below, Citibank and its affiliates, in their capacity as servicers to other RMBS Trusts, were targets together with many of the servicers for

the Trusts in highly publicized governmental investigations, prosecutions, and settlements.  For example, the Agencies found deficiencies in Citibank's servicing and foreclosure processes and brought a formal enforcement action against Citibank that resulted in a Consent Order, in which Citibank committed to take "all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC."  In connection with the Agencies' resolution of its enforcement action against Citibank, the Agencies entered into settlements (including joint settlements) with other major servicers such as Aurora, Bank of America, Goldman Sachs, U.S. Bank, JPMorgan, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, and Wells Fargo. Citibank's involvement in proceedings like this would have made it acutely aware of the deficiencies of each of the other servicers subject to these actions.

306.   Citibank and its responsible officers also knew of the servicers' improper servicing practices through its involvement in litigation highlighting servicing failures, such as in judicial foreclosure proceedings exposing the servicers' failure to correct irregularities in the chain of title.  For example, in *Brennan v. HSBC Mortgage Corp. (USA)*, No. 14-cv-20753 (S.D. Fla. Feb. 28, 2014). HSBC and CitiMortgage were sued by a class of New York borrowers, alleging the defendants violated New York laws by "routinely" failing to timely file mortgage satisfactions, needlessly clouding title to properties in "thousands, if not tens of thousands," of instances.

307.   Moreover, in *Gordon Casey, Duane Skinner And Celeste Coonan, Individually And On Behalf Of All Others Similarly Situated v. Citigroup Inc.*, No. 12-cv-00820, (N.D.N.Y May 17, 2012). Citigroup was ordered to pay $110 million in a lawsuit to homeowners who were forced to pay expensive property premiums by the bank.  They even agreed to refund 8% each of

force-placed flood or wind insurance premiums even though the bank or its affiliates got no commissions on it.

308.    Finally, in *Goodyk v. CitiMortgage*, No. 11-cv-10372 (C.D. Cal. Dec. 15, 2011), the plaintiff brought a lawsuit challenging Citibank's twin practices of unlawfully seeking to foreclose on residential properties, while at the same time enticing and often entering into modification agreements with struggling homeowners that Citibank did not intend to honor.  The practice allowed the bank to extract improper fees and charges in violation of federal and state law from homeowners who had fallen into arrears on their mortgages.[15]

309.    These and other public enforcement actions and private litigation highlighting the servicers' improper servicing practices were well known throughout the RMBS industry, including by Citibank and the other principal financial crisis-era trustees.  For example, in October 2010 Deutsche Bank – which serves as trustee for more than 1,000 RMBS trusts – issued a notice to all RMBS certificateholders in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  Also in October 2010, Deutsche Bank sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum, Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention" – specifically, the

---

[15] This case was consolidated into *In re CitiMortgage Inc. Home Affordable Modification Program HAMP Contract Litigation*, No. 11-ml-2274-DSF-PLA (C.D. Cal. May 18, 2012).

same "serious . . . defects in foreclosure practices, procedures and/or documentation" discussed in Deutsche Bank's notice to certificateholders.  The memorandum referred to the expansive scope of the reported servicer deficiencies, and admitted that foreclosure abuses such as the execution and filing by servicers or their agents of documents containing untrue assertions of fact "would constitute a breach of that Servicer's obligations under the [PSAs] and applicable law."

**B. Citibank And Its Responsible Officers Received Written Notice From Certificateholders Of Pervasive And Systemic Servicer Breaches**

310.    In addition, in its capacity as Trustee to other RMBS trusts that are not the subject of this action, Citibank and its responsible officers repeatedly received written notice from Certificateholders of the same systemic servicing violations described above perpetrated by the very same servicers for the Trusts.  Based on the systemic, pervasive practices complained of in the Certificateholders' breach notices, Citibank and its responsible officers knew that the servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts.

311.    For example, on December 16, 2011, investors provided notice to Citibank and four other RMBS trustees of, among other things, master-servicer violations by JPMorgan predecessor entities (Bear Stearns and WaMu) in connection with $95 billion of RMBS issued by affiliates of JPMorgan from 243 Trusts issued between 2005 and 2007 under the BALTA, BSABS, BSARM, BSMF, CFLX, CHASE, JPALT, JPMAC, JPMMT, PRIME, SACCO, SAMI, WAMU and WMALT labels (the "December 2011 notice").  The investors demanded that Citibank open an investigation of ineligible mortgage loans and deficient servicing of these loans.  The December 2011 notice put Citibank on notice of systemic deficient servicing practices by JPMorgan and its affiliates, some of the largest servicers for the Trusts.  Indeed, as discussed above, this same investor group reached an agreement with JPMorgan that calls for the

-97-

payment of $4.5 billion in cash to the 330 trusts issued under these JPMorgan RMBS labels to settle mortgage repurchase and servicing claims, as well as for the implementation of substantial servicing changes to mortgage loans in the covered trusts to rectify the pervasive servicing deficiencies by JPMorgan and its affiliates.   On August 1, 2014 and October 2, 2014, all of the trustees involved in the JPMorgan Putback Initiative accepted JPMorgan's $4.5 billion offer for the vast majority of the 330 trusts included in the offer and petitioned the Supreme Court of the State of New York for approval of the settlement.

312.    Despite Citibank's actual notice of widespread loan defaults and breaches, as the examples above illustrate, Citibank failed to act in accordance with its obligations under the Governing Agreements and TIA to enforce the originators' and sponsors' obligations to cure, substitute or repurchase defective mortgage loans.

### C.    Citibank Had Knowledge Of The Servicers' Failures Through The Monthly Servicer And Remittance Reports

313.    Citibank and its responsible officers also knew of the servicers' improper servicing practices through the servicers' servicing reports and the monthly remittance reports Citibank itself published.   These reports detailed the Trusts' increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations.   The reports similarly reflected the servicers' abuse of servicing advances.

### XIII.   CITIBANK FAILED TO DISCHARGE ITS CRITICAL PRE- AND POST-DEFAULT DUTIES

314.    Despite Citibank's knowledge of the Trusts' high default rates and poor performance, breaches of representations and warranties made by the originators, sellers, depositors, and sponsors, and servicer violations, Citibank failed to perform its duties as Trustee to protect the Trusts and Certificateholders.

### A.      Failure To Enforce The Trusts' Repurchase Rights

315.   As set forth above, beginning in 2009, Citibank and its responsible officers discovered deficiencies in mortgage loan files, breaches of the sellers' representations and warranties regarding the mortgage loans' credit quality and characteristics, and the harm that these seller violations caused to the Trusts and their Certificateholders.

316.   Citibank breached its contractual and its statutory duties under the TIA and was negligent by failing to: (i) provide notice to the servicers and the responsible sellers upon its discovery of these breaches, and (ii) take any action to enforce the sellers' obligation to repurchase the defective mortgage loans.

### B.      Failure To Provide Notice
### To The Servicers Of Events Of Default

317.   As set forth above, beginning in 2009, Citibank and its responsible officers knew of failures by the servicers to perform in material respects their covenants in the PSAs, including the servicers': (i) failure to give notice to the other parties of seller breaches of representations and warranties upon discovery of the breaches and to enforce the sellers' repurchase obligations; (ii) violations of prudent servicing obligations; (iii) violations of foreclosure obligations; (iv) violations of loan modification obligations; and (v) improper servicing advances.   These breaches by the servicers constituted "Events of Default" as defined by the PSAs.

318.   Citibank breached its contractual obligations and its statutory duties under the TIA and was negligent by failing to provide notice to the servicers of these Events of Default or terminating the servicers.

### C.      Failure To Act Prudently After The Uncured Events Of Default

319.   As set forth above, the Events of Default occurred, remained uncured for the requisite period of time, and are continuing.   Consequently, under the PSAs, Citibank had and

continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in its exercise of those rights and powers, as a prudent person would exercise or use under the circumstances in the conduct of the person's own affairs.

320.    A prudent person would have taken action to protect the Trusts and their Certificateholders from the known seller breaches of representations and warranties by exercising all of the trustee's rights under the PSAs to enforce the sellers' repurchase obligations, including timely investigating to determine all of the materially breaching mortgage loans and suing the sellers for specific performance to compel their repurchase of those loans.  Citibank breached its contractual, statutory, and fiduciary duties and was negligent by failing to act prudently and not taking these actions.

321.    A prudent person would have also taken action to protect the Trusts and their Certificateholders from the known servicer violations by exercising all of the trustee's rights under the PSAs to enforce the servicers' prudent servicing obligations, including ensuring that all Events of Default were cured, terminating the servicers, substituting itself as the substitute servicer, or replacing the servicers, and enforcing the servicers' obligations to reimburse the Trusts for losses caused as a result of their breaches through suit if necessary.  Citibank breached its contractual, statutory, and fiduciary duties and was negligent by failing to act prudently and not taking these actions.

### D.    Failure To Provide Notice To The Certificateholders Of The Uncured Events Of Default

322.    As set forth above, the Events of Default occurred, remained uncured for the requisite period of time, and are continuing.  Consequently, under the PSAs, Citibank also had and continues to have the obligation to provide all Certificateholders with notice of these Events of Default.

323.    Citibank had no good-faith reason for failing to provide notice of these Events of Default to the Certificateholders.  Consequently, Citibank breached its contractual, statutory, and fiduciary duties and was negligent by failing to provide all Certificateholders with notice of these Events of Default.

## XIV.   CITIBANK FAILED TO PROTECT THE TRUSTS FOLLOWING THE INSOLVENCY OF CERTAIN SPONSORS

324.    Citibank failed to adequately protect the Trusts after the Sponsors of certain Trusts filed for bankruptcy or otherwise became insolvent.  In these instances, Citibank only acted to assert the Trusts' rights when it was in Citibank's interests and only to the extent consistent with Citibank's interests.  In particular, Citibank failed to adequately and comprehensively pursue relief against numerous solvent third parties that were also contractually liable under the PSAs for servicing violations or representation and warranty violations.  Finally, Citibank failed to provide notice of seller defaults, Events of Defaults, and otherwise notify Certificateholders of information known only to Citibank that was necessary for Certificateholders to take action to protect their rights and avoid or mitigate losses.

325.    Citibank has failed to adequately protect the Trusts against pervasive violations in the servicing of loans collateralizing Trusts sponsored by failed entities.  Loans collateralizing these Trusts have been serviced (and continue to be serviced) by third parties unaffiliated with the bankrupt or insolvent sponsors.  As discussed herein, servicers have independent duties and obligations under the PSAs, and their liability for breach of those duties and obligations is untethered to solvency of the sponsor.

326.    For example, Wells Fargo is a major servicer of loans securitizing American Home Mortgage-sponsored RMBS at issue in this action.  While American Home Mortgage filed for bankruptcy in 2007, Wells Fargo continues to service approximately $3.2 billion of loans that

American Home Mortgage sponsored.  There is ample evidence that Wells Fargo engaged in rampant, industry-wide servicing abuses in connection with loans backing private-label RMBS, including these American Home Mortgage Trusts.  Among other things, Wells Fargo was one of the fourteen federally regulated mortgage servicers against whom the Federal Reserve, the OCC, the FDIC, and the OTS initiated formal enforcement actions against, which resulted in a Consent Order against Wells Fargo based on comprehensive interagency findings of serious abuses and "critical weaknesses" in its servicing and foreclosure processes.  Despite Citibank's knowledge of such systemic and pervasive servicing abuses by solvent third party servicers, including Wells Fargo, Citibank failed to adequately protect the rights of American Home Mortgage-sponsored Trusts against solvent servicers.

327.    In addition, Citibank also has not pursued representation and warranty claims against solvent originators for thousands of breaching mortgage loans backing Trusts sponsored by failed entities.  Examples of such solvent third party sellers of loans to bankrupt sponsors include Wells Fargo and SunTrust, which collectively sold over $82 million of loans securitizing Trusts sponsored by Lehman at issue in this action.

328.    Citibank also failed to discharge its contractual and statutory obligations concerning Trusts sponsored by failed entities by neglecting to provide written notice to Certificateholders of Events of Default arising from pervasive breaches of representations and warranties by the sellers and extensive servicer violations, including with respect to deficient loans sold by solvent responsible parties.  Proper notice would have enabled Certificateholders to, among other things, determine whether to take independent or collective action to protect their interests against such breaches of representations and warranties, including against solvent responsible parties and others engaged in abusive securitization practices.

329.    Finally, Citibank has taken certain actions on behalf of the Trusts and Certificateholders in isolated bankruptcies of sponsors or originators by submitting proofs of claim in the bankruptcy proceedings.  However, Citibank did so because such action enabled Citibank to create the appearance of enforcement, but required only minimal effort or expense from Citibank with little legal risk, while simultaneously providing a vehicle for Citibank to seek broad liability releases and exculpation.  Submitting claims also created no business risk to Citibank because the seller's failure meant that Citibank could selectively enforce the Trusts' repurchase rights without fear of losing valuable repeat business, alienating new sources of business, or provoking claims in response against Citibank for its own liability as a seller for other RMBS.

## XV.    CITIBANK FAILED TO PROTECT THE TRUSTS DUE TO ITS CONFLICTS OF INTEREST

330.    Citibank failed and unreasonably refused to discharge its critical pre- and post-default duties owed to the Trusts and all Certificateholders because acting to diligently protect the interests of the Trusts would have conflicted with its own interests.

### A.    Citibank Was Economically Beholden To The Mortgage Loan Sellers

331.    Trustees are selected by the sponsor, which is often an affiliate of the servicer. While Citibank was charged with representing the interests of the Trusts and all Certificateholders, it was economically beholden to the sponsors.  Indeed, Citibank had close, repeat business relationships with most, if not all, of the sponsors for the Trusts.  For example, Citibank received approximately 37% of its private-label residential mortgage securitization trusteeship appointments from just two banks (WaMu and Lehman) based on the cumulative original face value of the offerings.  And, the vast percentage of these banks' servicing business was conducted by their respective affiliates:  Aurora (98.24%) and Long Beach/WaMu (100%).

Accordingly, Citibank was incentivized not to require servicers to take necessary action because these servicers were affiliated with the sponsors that provided valuable trustee appointments.  In short, Citibank failed to protect the Trusts because it did not want to risk losing significant business from these sponsors.

**B.    Citibank Was Engaged In
The Same Wrongful Servicing Activities**

332.    Citibank failed and unreasonably refused to protect the Trusts and Certificateholders against seller breaches and servicer violations because it would have exposed that Citibank itself was engaged in the same servicing misconduct in its role as servicer for other mortgages and RMBS trusts.

333.    As noted above, during the fourth quarter of 2010, the Federal Reserve, the OCC, the FDIC, and the OTS conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at Citibank.  The reviews uncovered significant problems in foreclosure processing at Citibank, including "critical weaknesses in [Citibank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[16]

334.    On April 13, 2011, based on the deficiencies in the review and the risk of additional issues as a result of weak controls and processes, the Federal Reserve initiated formal enforcement actions against Citibank for its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing. According to the Federal Reserve's press release, "[t]hese deficiencies represent significant and pervasive

---

[16] *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_201104 13.pdf.

compliance failures and unsafe and unsound practices at [Citibank]." The enforcement action required Citibank to remediate its residential mortgage loan servicing and foreclosure processing practices.

335.    In the OCC Consent Order with Citibank, *In the Matter of Citibank, N.A. Las Vegas, Nevada* (AA-EC-11-13), the OCC found, among other things, that Citibank was among the largest servicers of residential mortgages in the United States, and serviced a portfolio of 4,000,000 residential mortgage loans, and that during the recent housing crisis, Citibank's foreclosure inventory grew substantially from January 2009 through December 2010.  With respect to its foreclosure practices, among other things, the OCC "identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings."

336.    In addition, the OCC entered into consent orders with Citibank and several other servicers, including Wells Fargo and Aurora (the "OCC Consent Orders").  The OCC found that Citibank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training for its foreclosure-related services.  The enforcement action required extensive fixes to Citibank's mortgage servicing and foreclosure processes.  The order also required Citibank to retain independent consultants to conduct a comprehensive review of foreclosure activity by these servicers in 2009 and 2010.

337.    On March 12, 2012, the Office of Inspector General ("OIG") of HUD issued a memorandum concerning its review of Citibank's foreclosure and claims processes.  The review was conducted in response to allegations made in the fall of 2010 that national mortgage servicers "were engaged in widespread questionable foreclosure practices involving the use of

foreclosure 'mills' and a practice known as 'robosigning' of sworn documents in thousands of foreclosures throughout the United States."   As part of its conclusions, the OIG found that Citibank "did not establish an effective control environment to ensure the integrity of its foreclosure process" and that this "flawed control environment resulted in CitiMortgage's filing improper legal documents, thereby misrepresenting its claims to HUD."

338.   On January 18, 2013, Citibank settled with the Federal Reserve Board and the OCC and was one of ten major banks that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses.   As for Citibank, it agreed to provide $792 million to end the case-by-case review of past servicing practices.   Citibank agreed to pay $306 million to eligible borrowers who lost their homes to foreclosure in 2009 and 2010 and to provide $486 million in other assistance, including loan modifications and forgiveness, to settle the Federal Reserve and OCC's charges of improper mortgage servicing and foreclosure practices.

339.   Due to the fact that Citibank itself was engaging in the same illicit and improper acts as the servicers for the Trusts, Citibank failed to enforce the servicer violations, or even alert the Certificateholders to the servicers' misconduct.

### C. Citibank Originated And Sponsored Defective Loans

340.   Citibank, as a leading sponsor of private-label mortgage-backed securities, securitized hundreds of millions of dollars of loans that breached applicable representations and warranties.   Citibank's parent, Citigroup, through its affiliates, sponsored 150 RMBS offerings under the CFMSI, CMALT, CMLTI, CMSI, and CRMSI labels that were collateralized by a total of over $99 billion in certificates issued from trusts ("Citi-Sponsored Trusts").   Many of the same entities that acted as sellers through their affiliate companies acted in the capacity as servicer or trustee for the Citi-Sponsored Trusts.

341.     Many of the underlying residential mortgage loans for Citi-Sponsored Trusts were originated and serviced by Citi affiliates.  In addition, Citi acquired loans for its securitizations from mortgage originators that later became known as some of the worst in the industry, including Option One, New Century, WMC, and Countrywide, among others.  As a mortgage loan seller, both as an originator and sponsor, Citibank made representations and warranties to the Citi-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

342.     During the housing boom of the 2000s, Citibank's parent company, Citigroup, including its various subsidiaries, was a leader in the origination and securitization markets for subprime mortgages.  For example, CitiFinancial became a top subprime lender and was consistently ranked among the top twelve subprime lenders in the United States from 2004 to 2007.  Citigroup nearly doubled the share of its mortgage business devoted to subprime loans from 10% in 2005 to 19% in 2007, and it also increased the percentage of subprime loans it originated with high-risk features such as low down payments, "piggyback" second mortgages, "stated income" mortgages with little or no documentation of the borrowers' income, and loans made to investors who intended to "flip" the houses they purchased.

343.     In addition to its origination business, Citigroup was heavily involved in the securitization market for subprime mortgages.  Citigroup provided warehouse lines of credit to leading nonbank subprime lenders, including Ameriquest and New Century.  Citigroup also purchased large volumes of subprime and Alt-A loans originated by those and other nonbank lenders, and Citigroup packaged those loans into nonprime RMBS that were sold to investors.

344.     Many of the underlying residential mortgage loans for Citigroup-Sponsored Trusts were originated and serviced by Citibank affiliates.  In addition, Citigroup acquired loans for its securitizations from mortgage originators who later became notorious for their unsafe

lending practices, including New Century and Ameriquest, among others.  As a mortgage loan seller, both as an originator and sponsor, Citigroup made representations and warranties to the Citigroup-Sponsored Trusts regarding the quality and characteristics of the mortgage loans.

345.    Widespread public evidence demonstrates pervasive violations of seller representations and warranties in the Citigroup-Sponsored Trusts.  Citibank, through its affiliate Citigroup Global Markets Realty Corp. ("CGMR"), sponsored billions in RMBS.  In testimony to the FCIC, Richard Bowen, the Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group at Citibank, testified that although Citibank did not underwrite certain mortgages, "Citi did rep and warrant to the investors that the mortgages were underwritten to Citi credit guidelines," and in mid-2006, Mr. Bowen "discovered that over 60% of these mortgages purchased and sold were defective."  *Written Testimony of Richard M. Bowen, III to the FCIC*, April 7, 2010, at 1.  The FCIC Report further highlighted Mr. Bowen's testimony regarding loan sampling:

> Another part of Bowen's charge was to supervise the purchase of roughly $50 billion annually in prime loan pools, a high percentage of which were sold to Fannie Mae and Freddie Mac for securitization. The sampling provided to Bowen's staff for quality control was supposed to include at least 5% of the loan pool for a given securitization, but "this corporate mandate was usually ignored." Samples of 2% were more likely, and the loan samples that Bowen's group did examine showed extremely high rates of noncompliance. "At the time that I became involved, which was early to mid-2006, we identified that 40 to 60 percent of the files either had a 'disagree' decision, or they were missing critical documents.

FCIC Report at 168.

346.    Citibank also retained third parties, including Clayton, to perform due diligence on the loans included in Citigroup-Sponsored Trusts; however, Citibank would regularly ignore Clayton's findings regarding poor loan quality.  For example, Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 42% of the

mortgage loans Citibank submitted to Clayton to review were rejected as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 31% of the loans were subsequently waived in by Citibank and included in securitizations.[17]

347.   Moreover, in *United States of America ex rel. Sherry A. Hunt v. Citigroup, Inc., et al.*, No. 11-cv-5473 (S.D.N.Y. Aug. 5, 2011), the Department of Justice joined with whistleblower and former-Citi employee Sherry Hunt in filing a complaint against Citibank for knowingly selling and securitizing loans with serious underwriting flaws. The DOJ alleged in its complaint that Citibank "encouraged its business employees to manipulate the reports of its quality control department to conceal the number and severity of deficiencies in Citi's loans" and "failed to implement even the most basic quality control measures that are required by HUD to stop the reckless lending that Citi engaged in." Compl. ¶1. As reported by *Bloomberg* in a prominent news article on this case, Hunt worked in a division that "inspected loans Citi wanted to buy from outside brokers and lenders to see whether they met the bank's standards. The mortgages had to have properly signed paperwork, verifiable borrower income and realistic appraisals. Citi would vouch for the quality of these loans when it sold them to investors. The Citi stamp of approval told investors that the bank would stand behind the mortgages if borrowers quit paying."[18] Citibank paid Hunt $31 million, settled with the DOJ for $158.3 million, and admitted to improper practices, including that it failed to conduct a full review of certain loans that it endorsed for FHA mortgage insurance.

---

[17] *See* Clayton Trending Reports, *available at*
http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-thefinancial-crisis-sacramento#documents; *see FHFA v. Citigroup, et al.,* No. 11-cv-6196 (S.D.N.Y. June 28, 2012) Amended Compl. ¶77.

[18] Bob Ivry, *Woman Who Couldn't Be Intimidated by Citigroup Wins $31 Million, Bloomberg* (May 31, 2012).

348.     Similarly, on September 2, 2011, the FHFA filed suit against CGMR, among other Citibank entities, relating to the purchase of RMBS issued in connection with nine Citi-sponsored securitizations.  The FHFA claimed that CGMR failed to conduct proper due diligence on the loans it securitized and knew that such loans were defective.  For example, the FHFA's "forensic review of over 1800 files in the loan groups backing the GSE Certificates for the CMLTI 2006-WF1 and CMLTI 2006-WF2 Securitizations," which were both sponsored by CMGR, "revealed that, for the vast majority of the loans reviewed in those Securitizations, there were numerous significant violations of the originators' underwriting guidelines, such as a failure to evaluate the reasonableness of the borrower's stated income or to correctly account for the borrower's debt, both key factors bearing on eligibility for a mortgage loan." *FHFA v. Citigroup*, No. 11-cv-6196, Compl. ¶6.  Citibank entered into a confidential settlement with the FHFA in May 2013.

349.     Accordingly, because Citibank itself face enormous repurchase liability for billions of dollars of loans it originated, sponsored, and sold to the Citibank-Sponsored Trusts in breach of representations and warranties, Citibank failed to take any action against the sellers for the Trusts, or even notify the Certificateholders of servicer misconduct.

### D.    Citibank Refused To Discharge Its Duties In Order To Preserve Profits

380.     Citibank was also conflicted because discharging its critical pre- and post-default duties owed to the Trusts and the Certificateholders would have necessarily diminished its profits.  Specifically, such conduct would have directly impaired Citibank's profits by increasing costs and expenses while revenue remained unchanged.  Indeed, rather than act pursuant to its proscribed contractual, statutory, and common law duties, Citibank failed and unreasonably refused to enforce the sellers' repurchase obligations and servicers' prudent servicing

requirements in order to avoid the associated transactional costs of exercising the Trusts' rights against these entities – or provoke the servicers to shine the light on Citibank's own wrongful conduct.

381.  For example, prior to a "default" under the TIA or an "Event of Default" under the PSAs, Citibank had minimal ministerial duties to perform.[19]  Following a default under the TIA or Event of Default under the PSAs, however, Citibank's obligations expand such that it must act as a prudent person.  This requirement carries with it significant and more costly responsibilities, including seeking direction from the certificateholders regarding the appropriate actions it should take on behalf of the trusts.  However, fulfilling these greater duties increases costs while Citibank's compensation under the PSAs – a fixed fee rate based on the unpaid principal balance of the Trust (typically less than one basis point) – would remain unchanged.

382.  Additionally, the occurrence of an Event of Default could lead to the termination of the master servicer, which would have profound financial implications on Citibank.  If the master servicer were terminated, Citibank would have to retain a successor master servicer or substitute itself in as the master servicer.  The compensation that Citibank or the successor master servicer could obtain would be heavily restricted.  For example, typical – and more lucrative – servicing income, such as float, excess spread, and ancillary fees are prohibited for a successor master servicer under the PSAs.  Nevertheless, Citibank or the successor master servicer would be required to hold regulatory capital against the servicing rights.

383.  Further, the occurrence of a default under the TIA or an Event of Default under the PSAs requires Citibank to provide notice of these defaults to the certificateholders.  In

---

[19] New York common law still imposed certain non-waivable duties on Citibank both before and after a "default" under the TIA or an "Event of Default" under the PSAs.

addition to alerting certificateholders to seller and servicer violations, the default notice would expose Citibank's negligence in carrying out its ministerial duties, including its failure to receive, process, maintain and hold all or part of the mortgage loan files as required under the PSAs. Consequently, Citibank's providing notice to the certificateholders of defaults could lead to potential liability or its removal as trustee of the Trusts.

384.   Accordingly, the increased duties, costs, and liability risk associated with enforcing the Trusts' rights against the above-described seller and servicer violations would make Citibank's trusteeships less profitable and possibly unprofitable.   For these reasons, Citibank failed and unreasonably refused to enforce the Trusts' rights against the sellers and servicers.

## XVI.   CAUSATION

385.   Citibank's failure and unreasonable refusal to enforce the Trusts' rights against the sellers and servicers, and its violations of its other contractual, statutory, fiduciary and independence duties, along with its negligence, have directly and proximately caused billions of dollars in Trust assets to waste away.   The mortgage loans conveyed to the Trusts did not comply with seller representations and warranties, but were instead of a lower quality, which increased the risk of defaults in the principal and interest payments owed to the Trusts.   Moreover, servicer violations have exacerbated the Trusts' losses.   Had Citibank performed its duties as Trustee, in particular had it adequately enforced the obligations of the sponsors and originators to cure, substitute, or repurchase mortgage loans that breached the representations and warranties, it would have prevented the Trusts from incurring substantial losses and Trusts assets from wasting away.   Had Citibank enforced the Trusts' rights against servicers for reimbursement of losses caused by their misconduct as required, it would have benefited the Trusts and their Certificateholders.

## XVII.  <u>DAMAGES</u>

386.    The Trusts have incurred substantial damages attributable to Citibank's breaches of its contractual, statutory, fiduciary, and common law duties.  In particular, the Trusts' loan pools are filled with loans of inadequate credit quality, which increased the risk of delinquency. As a result of the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral write-downs, and losses, and have incurred and continued to incur significant losses in connection with servicer violations.  Damages incurred by the Trusts and caused by the Trustee's violation of law will be the subject of expert testimony for proof at trial.

## XVIII. <u>CAUSES OF ACTION</u>

<b><u>FIRST CAUSE OF ACTION</u></b>

<b>BREACH OF CONTRACT</b><br>
<b>(In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)</b>

387.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

388.    The PSAs are valid contracts that memorialize the issuance of certificates of beneficial interests in the Trusts, and establish Citibank's contractual duties and obligations, in its capacity as Trustee, to the Trusts and all their respective Certificateholders.  Each of the relevant contractual provisions is substantively similar, if not identical, in all of the PSAs, and imposes substantially the same, if not identical, duties and obligations on Citibank in its capacity as Trustee.

389.    The Trusts and each of the Plaintiffs have performed all of the conditions, covenants, and promises required in accordance with each of the PSAs.

390.    Under each PSA, Citibank owed a duty to the Trusts and all Certificateholders (i) to give prompt written notice to all parties to the PSA of a breach of a representation or warranty

made by the seller in respect of the mortgage loans that materially and adversely affect the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon Citibank's discovery of the breach; and (ii) to take such action with respect to the breach as may be necessary or appropriate to enforce the rights of the Trusts with respect to the breach.

391.    As set forth above, Citibank materially breached each PSA by (i) failing to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' mortgage loan representations and warranties, upon Citibank's discovery of the breaches; and (ii) failing to enforce the sellers' obligation to repurchase, substitute, or cure the defective mortgage loans.

392.    In addition, the PSAs required Citibank, upon an "Event of Default," to (i) provide written notice to all Certificateholders of the Event of Default within sixty days of its occurrence, unless the Event of Default was cured or waived; and (ii) exercise the rights and powers vested in Citibank by the PSA using the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

393.    The PSAs define an "Event of Default" to include the failure by the servicer to observe or perform in any material respect the covenants or agreements by the servicer set forth in the PSA, which continues unremedied for no more than thirty to sixty days after written notice of the failure has been given to the servicer by the Trustee requiring the failure to be remedied, or actual knowledge of the failure by a "Servicing Officer" of the servicer, whichever is earlier.

394.    Events of Default have occurred, remained uncured for the applicable period of time, and are continuing as a result of the servicers' failure to observe and perform, in material respects, the covenants and agreements imposed on them by the PSAs.

395.    The servicers have failed and refused to do the following, each of which has materially impaired the rights of the Trusts and all Certificateholders:

(a)    <u>Breaches of Representations and Warranties.</u>   As with the Trustee, the PSAs required the servicers to give prompt written notice to all parties to the PSAs of a breach of a representation or warranty made by the seller in respect of the mortgage loans that materially and adversely affects the value of any mortgage loan or the interests of the Certificateholders in any mortgage loan, upon the servicer's discovery of the breach.   The servicers have failed to give notice to the other parties of the following information, which has exacerbated losses experienced by the Trusts:

(i)    although servicers often modify mortgage loans, and in the process of doing so have discovered that specific loans breached applicable representations and warranties, the servicers have not notified the other parties of these breaches;

(ii)    although there has been widespread public evidence of pervasive breaches of applicable representations and warranties, and although the servicers have been specifically notified by insurers and Certificateholders of these pervasive breaches, the servicers have not notified the other parties to the PSAs (including Citibank) of these breaches; and

(iii)    although aware of specific mortgage loans that breach applicable representations and warranties, the servicers have failed to enforce

-115-

the sellers' obligation to repurchase, substitute, or cure the defective loans as required under the PSAs.

(b)     <u>Violation of Prudent Servicing Obligations.</u>  The PSAs require the servicer to service and administer the mortgage loans for and on behalf of the Certificateholders, and, consistent with the PSAs, (i) in the same manner in which it services and administers similar mortgage loans for its own portfolio or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (ii) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (iii) without regard to, among other things, the servicer's right to receive compensation or other fees for its services under the PSA, the servicer's obligation to make servicing advances under the PSA, and the servicer's ownership, servicing, or management for others of any other mortgage loans.  In violation of their prudent-servicing obligations under the PSAs, the servicers have:

(i)      failed to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(ii)     failed to timely and accurately apply payments made by borrowers and maintain accurate account statements;

(iii)    failed to demand that the sellers cure deficiencies in mortgage records when deficient loan files and lien records are discovered;

(iv)    imposed force-placed insurance when the servicers knew or should have known that borrowers already had adequate coverage;

(v)    incurred completely avoidable and unnecessary servicing fees and servicing advances to maintain the mortgaged properties; and

(vi)    prejudiced the interests of the Trusts and the Certificateholders in the mortgages by fostering uncertainty as to the timely recovery of collateral.

(c)    <u>Violation of Foreclosure Obligations</u>. The PSAs require the servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  Moreover, each of the PSAs contemplates that foreclosures and liquidations of defaulted mortgages will proceed forthwith and in accordance with applicable law, provided the documentation is in order, as a matter of fairness to all parties.  Despite these covenants, the servicers have:

(i)    continued to keep defaulted mortgage loans on their books, rather than foreclose or liquidate the loans, in order to wrongfully maximize their servicing fees, at the expense of the Trusts' and Certificateholders' best interests, including the right to recover from pool or financial guaranty insurance policies;

-117-

(ii)     failed to maintain records in an accurate, appropriate, and adequate manner, which has impeded the process of foreclosure and liquidation of defaulted mortgages and caused wholly avoidable delays that have injured the Trusts and Certificateholders;

(iii)    continued to charge unearned and unwarranted servicing fees on mortgages that would have been liquidated but for the servicers' breach of their duties, as well as unauthorized fees for default-related services; and

(iv)     failed to place the interests of the Trusts and Certificateholders before their own interests.

(d)      <u>Violation of Modification Obligations</u>. The PSAs provide that the servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy predatory lending violations, the PSAs require the seller – not the Trusts or the Certificateholders – to bear the costs to cure the violations.  The servicers have breached the PSAs by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcing the sellers' obligation to cure predatory mortgages. The servicers have also unjustly enriched their parent companies by using Trust collateral to settle claims that were not, and could never be, made

against the Trusts, in a manner that has materially and adversely affected the interests of the Certificateholders.  The servicers have therefore failed:

(i)     to demand that the originators and sponsors comply with their obligation to cure or repurchase predatory and ineligible loans that the servicers agreed to modify in the attorneys general settlements; and

(ii)    to deliver to the Trustee a certification of a servicing officer that all requirements have been satisfied with respect to the modified mortgage loan.

(e)     <u>Improper Servicing Advances</u>.  The PSAs provide that the servicers may recover servicing advances that are customary, reasonable, and necessary out-of-pocket costs and expenses incurred in the performance by the servicer of its servicing obligations, including but not limited to the cost of the preservation, restoration, and protection of a mortgaged property. Despite the requirement that servicing advances be incurred only for reasonable and necessary out-of-pocket costs, the servicers instead utilized affiliated vendors – which marked up their services to a level 100% or more above the market price – to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement the servicers' servicing income.

396.    Citibank and its responsible officers had knowledge of these and other defaults by the servicers through, among other things, public reports, lawsuits, exception reports, remittance

reports, and the increasing delinquency and loss rates for the Trusts. Nevertheless, Citibank failed to deliver written notices to the servicers of the defaults or terminate the servicers. Similarly, Citibank failed to provide Certificateholders with notice of these Events of Default. By failing to take these actions, Citibank materially breached the PSAs.

397.    These Events of Default occurred, remained uncured for the requisite period of time, and are continuing. Consequently, under the PSAs, Citibank had and continues to have the obligation to exercise the rights and powers vested in it by the PSAs, and to use the same degree of care and skill in their exercise as a prudent person would use under the circumstances in the conduct of the person's own affairs. A prudent person would have exercised all of the trustee's rights to recover for these Events of Default, and would have done so promptly. By failing to take this action, Citibank materially breached the PSAs.

398.    Citibank's material breaches of the PSAs have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away.  For example, had Citibank protected the rights of the Trusts by enforcing the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" with respect to each defective mortgage loan.  The Trustees' inaction with respect to the sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that has increased the severity of the Trusts' losses.   Similarly, had Citibank enforced the servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  The Trustees' inaction with respect to the servicing violations has exacerbated losses experienced by the Trusts.

399.    Citibank's material breaches of the PSAs have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE TRUST INDENTURE ACT OF 1939, 53 STAT. 1171
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)

400.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

401.    Congress enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.

402.    Each of the PSAs is an "indenture," and Citibank is an "indenture trustee," within the meaning of the TIA. 15 U.S.C. § 77ccc(7), (10). As noted above, each of the PSAs is substantially similar and imposes substantially the same duties on Citibank in its capacity as Trustee. Moreover, the TIA applies to and is deemed to be incorporated into each of the PSAs and the related Trusts. 15 U.S.C. § 77ddd(a)(1). Citibank has violated multiple provisions of the TIA.

403.    First, the TIA requires that, before default, the indenture trustee be liable for any duties specifically set out in the indenture. 15 U.S.C. § 77000(a)(1). As set forth above, Citibank has failed to comply, in good faith, with numerous duties specifically assigned to it by each of the PSAs, including the duties:

(a)     to provide prompt written notice to all parties to the PSA and related responsible parties of breaches of the sellers' representations and warranties, upon Citibank's discovery of the breaches;

(b)     to enforce the sellers' obligations to repurchase, substitute, or cure defective mortgage loans; and

(c)     to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers.

404.    By failing to comply with these specific duties, Citibank violated the TIA.

405.    In addition, the TIA requires Citibank to inform Certificateholders of defaults within ninety days after their occurrence. 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)). Here, there were numerous defaults, including (i) the failure of originators and sponsors to repurchase or substitute defective or nonconforming loans in the Trusts; and (ii) the failure on the part of the servicers to observe and perform covenants and agreements set forth in the PSAs, including requiring the originators and sponsors to perform their respective obligations and servicing and administering the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Given the great importance of those defaults to the Certificateholders' interests, Citibank had no good-faith reason for failing to provide notice of those defaults. Accordingly, by failing to provide this notice, Citibank violated the TIA.

406.    Second, in case of default, the TIA requires Citibank to exercise its rights and powers under the PSA as a prudent person would, under those circumstances, in the conduct of the persons' own affairs. 15 U.S.C. § 77000(c).   Again, given the obvious importance of the defaults set forth in the preceding paragraph, which impaired the rights of the Trusts, any prudent person under those circumstances would have exercised all of the trustee's rights to, among other things, enforce the sponsors' and originators' obligation to repurchase, substitute, or cure defective mortgage loans, and a prudent person would have exercised those rights promptly. Indeed, with the number of delinquent and defaulting mortgages in the Trusts increasing, as a result, *inter alia*, of these defects, the Trusts could only have been protected from the resulting losses through the Trustee's prompt exercise of those rights, which were designed precisely to limit the number of delinquent and defaulting mortgages in the Trusts. By failing to exercise its rights in those circumstances, Citibank violated the TIA.

407.    Citibank's violations of the TIA have directly and proximately caused damages to the Trusts in that they have deprived the Trusts of valuable remedies and allowed billions of dollars in Trust assets to waste away. For example, had Citibank protected the rights of the Trusts by enforcing the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of representations and warranties, as it was contractually obligated to do under the PSAs, the Trusts would have received either cured or substitute mortgage loans of adequate credit quality or funds representing the "Repurchase Price" of the defective mortgage loans. Citibank's inaction with respect to the originators and sponsors has allowed the Trusts to be filled with defective mortgage loans of poor credit quality and significant documentation deficiencies that have increased the severity of the Trusts' losses. Similarly, had Citibank enforced the servicers' servicing obligations, the Trusts would have been able to avoid

unnecessary losses. Citibank's inaction with respect to the servicers has exacerbated losses experienced by the Trusts.

408.    Citibank's violations of the TIA have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

### THIRD CAUSE OF ACTION

### NEGLIGENCE - BREACH OF PRE-DEFAULT DUTY OF INDEPENDENCE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)

409.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

410.    Under New York law, Citibank, as Trustee, had extra-contractual, pre-default duties to the Trusts and all Certificateholders. These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest. Trustees like Citibank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their rights. This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

411.    Under each of the PSAs, Citibank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

412.    Under each of the PSAs, Citibank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Citibank held for the benefit of the Trusts and the Certificateholders.

413.    As alleged in detail above, Citibank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

414.    As alleged herein, however, Citibank was economically beholden to the sellers. In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Citibank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

415.    Because Citibank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its representations and warranties, Citibank has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

416.    Citibank's negligent breach of its pre-default duty of independence has directly and proximately caused damages to the Trusts. For example, had Citibank not been conflicted, it would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to the mortgage loans in the Trusts. Citibank's inaction has relieved the sellers of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

417.    Citibank's negligent breaches of its pre-default duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the

certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY – DUTY OF CARE
### (In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)

418.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

419.    Under New York law, after the occurrence of an Event of Default, Citibank's duties expanded to include a fiduciary duty owed to the Trusts and all Certificateholders. This fiduciary duty included the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default. Following the Events of Default described above, Citibank breached its fiduciary duties to the Trusts and all Certificateholders in several respects.

420.    First, Citibank, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements.  At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements. Citibank, however, failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators.  Moreover, Citibank failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

421.    Citibank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, as well as its failure to provide notice to the Certificateholders of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted breaches of Citibank's fiduciary duty to the Trusts and to all Certificateholders.

422.    Second, Citibank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Citibank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, Citibank failed to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. Citibank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in

the PSAs, constituted breaches of Citibank's fiduciary duty to the Trusts and to all Certificateholders.

423.    Citibank's breach of its fiduciary duty has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the sellers and servicers but for Citibank's breach of its fiduciary duty.

424.    Citibank's breaches of its fiduciary duty have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE – DUTY OF CARE
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)**

425.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

426.    Under New York law, after the occurrence of an Event of Default, Citibank owed duties to the Trusts and all Certificateholders, which included the obligation to bring all available claims for the benefit of the Trusts and the Certificateholders. Following the Events of Default described above, Citibank breached its duties to the Trusts and to all Certificateholders in several respects.

427.    First, Citibank, in its capacity as Trustee, had standing to bring claims against the sellers of loans to the Trusts for breach of their representations and warranties under the Governing Agreements. At the time of the Events of Default, meritorious claims existed against the sellers for breach of their representations and warranties under the Governing Agreements.

Citibank, however, negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans that had defective mortgage files or were affected by breaches of the sponsors' and originators' representations and warranties, including by filing suits on behalf of the Trusts against the sponsors and originators. Moreover, Citibank negligently failed to provide notice to the Certificateholders of the breaches or of its intention not to enforce the originators' and sponsors' obligation to cure, repurchase, or substitute the loans with defective mortgage files and breaches of representations and warranties.

428.   Citibank's failure to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, and failure to provide notice to the Certificateholders of the breaches or of its intention not to promptly enforce the originators' and sponsors' obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of the originators' and sponsors' representations and warranties, constituted negligence.

429.   Second, Citibank, in its capacity as Trustee, presently has standing to bring meritorious claims against the servicers to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including to service and administer the mortgage loans in accordance with applicable law and customary and usual standards of practice of mortgage lenders and loan servicers. Citibank, however, has refused and continues to refuse to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, including by filing suits on behalf of the Trusts against the servicers for compensatory and injunctive relief for harm caused to the Trusts as a result of servicing violations. Moreover, Citibank negligently failed to provide notice to the Certificateholders of the servicing violations

or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs. Citibank's failure to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations or of its intention not to enforce the servicers' obligations to observe and perform covenants and agreements set forth in the PSAs, constituted breaches of its duty to the Trusts and all Certificateholders.

430.    Citibank's negligence has directly and proximately caused damages to the Trusts. Specifically, the Trusts' injury includes the loss of verdicts, settlements, or awards, and the interest that the Trusts would have recovered against the originators and sponsors but for Citibank's negligence.

431.    Citibank's negligence has injured all Certificateholders, including Plaintiffs, in that it has diminished the value of the certificates held by the Certificateholders and has prevented the Certificateholders from protecting the rights of the Trusts.

### SIXTH CAUSE OF ACTION

**BREACH OF FIDUCIARY DUTY –**
**BREACH OF POST-DEFAULT DUTY OF INDEPENDENCE**
**(In The Right Of The Trustee And On Behalf Of The Trusts Against Citibank)**

432.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

433.    Under New York law, Citibank, as Trustee, had extra-contractual, post-default duties to the Trusts and all Certificateholders. These duties include the absolute, unwaivable duty to give the Trusts and their Certificateholders undivided loyalty, free from any conflicting self-interest. Trustees like Citibank must discharge their obligations "with absolute singleness of purpose" because of the inability of the Trusts and dispersed Certificateholders to enforce their

rights. This common law duty to avoid conflicts of interest applies notwithstanding the terms of the instrument that purports to define the duties of the trustee.

434.    Under each of the PSAs, Citibank holds the loans for the benefit of the Trusts and all Certificateholders, including Plaintiffs.

435.    Under each of the PSAs, Citibank had the discretion to enforce the sellers' repurchase obligations and to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans that Citibank held for the benefit of the Trusts and the Certificateholders.

436.    As alleged in detail above, after Events of Defaults, Citibank knew of seller breaches of representations and warranties and that the servicers were engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with regard to their servicing and administration of the mortgage loans in the Trusts.

437.    As alleged herein, however, Citibank was economically beholden to the sellers. In addition, in their capacity as originator and sponsor with regard to other mortgage loans and RMBS trusts, Citibank's affiliates had sold loans in breach of specific representations and warranties to RMBS trusts in which many of the same sellers and servicers or their affiliates were serving as servicers or trustees.

438.    Because Citibank was economically beholden to the sellers and faced repurchase liability for the sale and securitization of its own loans in breach of its specific representations and warranties, Citibank has failed to take any action against the servicers, or even notify the Certificateholders that the servicers were engaged in misconduct.

439.    Citibank's breach of its post-default fiduciary duty of independence has directly and proximately caused damages to the Trusts. For example, had Citibank not been conflicted, it

would have enforced the sellers' repurchase obligations and exercised its discretion to prevent the servicers from engaging in activities outside of customary and usual standards of practice of prudent mortgage servicers with respect to any mortgage loans. Citibank's inaction has relieved the sellers' of their repurchase liability, and allowed the servicers to charge improper fees that have been passed along to the Trusts and to delay in foreclosing on mortgage loans, which has increased the costs of foreclosure.

440.   Citibank's breaches of its post-default fiduciary duty of independence have injured all Certificateholders, including Plaintiffs, in that they have diminished the value of the certificates held by the Certificateholders and have prevented the Certificateholders from protecting the rights of the Trusts.

## XIX.   CLASS ACTION ALLEGATIONS

441.   Alternatively, in the event the Court does not permit this action to proceed as a derivative action, Plaintiffs bring this action as a class action on behalf of themselves and a class consisting of all current owners of certificates in the Trusts (the "Class") that have suffered damages as a result of Citibank's misconduct alleged herein.   Excluded from the Class are Defendant Citibank, the Sellers and the Servicers, and, for each of them, their respective officers and directors, legal representatives, successors or assigns, and any entity in which they respectively have or had a controlling interest.

442.   The members of the Class are so numerous that joinder of all members is impractical.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained though appropriate discovery, Plaintiffs believe that there are at least hundreds of members of the proposed Class.   Record beneficial owners and other members of the Class may be identified from records maintained by Citibank or third parties and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

443.    Plaintiffs' claims are typical of the claims of the members of the Class as (i) Plaintiffs and the members of the Class all own certificates in the Trusts and held them at or after the time of Citibank's misconduct; (ii) all the claims are based upon the Governing Agreements, which are substantially in the same form, common law and the TIA; (iii) Citibank's alleged misconduct was substantially the same with respect to all class members; (iv) and all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by Citibank's statutory, contractual, and common law breaches and violations that are alleged of herein.

444.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and asset-backed securities litigation.

445.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether Citibank breached its contractual and common law duties to Plaintiffs and the Class under the Governing Agreements.

- Whether Citibank violated the TIA.

- Whether and to what extent Plaintiffs and members of the Class have suffered damages as a result of Citibank's breaches of its statutory, contractual, and common law duties and the proper measure of damages.

446.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## XX.    RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and that demand is excused;

(b)    Awarding to the Trusts money damages against Citibank for all losses suffered as a result of Citibank's breaches of contractual, statutory, common law, and fiduciary duties, and Citibank's negligence;

(c)    Requiring Citibank to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, and to protect the Trusts and the Certificateholders from a repeat of the damaging events described herein;

(d)    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

(e)    In the event the Court determines that this action is not a proper derivative action, determining that this action is a class action pursuant to Fed. R. Civ. P. Rule 23; and

(f)    Granting any other and further relief that the Court deems just and proper.

XXI.   **JURY DEMAND**

      Plaintiffs demand a trial by jury.


Dated: November 24, 2014

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


JEROEN VAN KWAWEGEN

JEROEN VAN KWAWEGEN (JV 1010)
JAI CHANDRASEKHAR (JC 3789)
1285 Avenue of the Americas, 38th Floor
New York, NY  10019
Tel:   (212) 554-1400
Fax:  (212) 554-1444

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
TIMOTHY A. DELANGE
BENJAMIN GALDSTON
BRETT M. MIDDLETON
DAVID R. KAPLAN
LUCAS E. GILMORE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:  (858) 793-0323

*Counsel for Plaintiffs*