```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/08/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                         :

FIXED INCOME SHARES: SERIES M, et al.,   :
                         :

             Plaintiffs,     :       14-CV-9373 (JMF)
                         :

        -v-           :     OPINION AND ORDER
                         :

CITIBANK N.A., et al.,         :
                         :

            Defendants.     :
                         :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This case is one of many derivative actions recently brought, in this Court and New York state court, against trustees of trusts containing residential mortgage backed securities.  In this case, Plaintiffs sue Citibank N.A. ("Defendant" or "Citibank") in its capacity as trustee for twenty-seven such trusts, alleging that Citibank breached its contractual duties, committed several state-law torts, and violated the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et. seq.* ("TIA").  Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Citibank now moves to dismiss the Complaint in its entirety.  For the reasons explained below, Citibank's motion is granted in part and denied in part.

## BACKGROUND

       The following facts — which are taken from the Complaint, documents it incorporates, and matters of which the Court may take judicial notice — are construed in the light most favorable to Plaintiffs.  *See, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

Plaintiffs' claims arise out of Citibank's role as trustee for twenty-seven trusts (the "Trusts"), in which Plaintiffs invested.  (Compl. (Docket No. 1) ¶ 1).  The Trusts are of two types: The overwhelming majority are New York common law trusts (the "PSA Trusts"), which are governed by Pooling and Service Agreements ("PSAs"), while the remainder are Delaware statutory trusts (the "Indenture Trusts"), which are governed by Sale and Servicing Agreements ("SSAs") and Indentures (together with the PSAs and SSAs, the "Trust Documents").  (*Id.* ¶ 95).[1]  The Trusts consist entirely of residential mortgage backed securities ("RMBS").  (*Id.* ¶ 97).  RMBS trusts generally operate as follows: First, an investment bank acquires mortgage loans from loan originators, who are often themselves affiliates of, or otherwise beholden to, the acquiring bank.  (*Id.* ¶¶ 2, 117).  These banks are known as the "sponsors" of the RMBS trust.  After acquiring the loans, the sponsor transfers them to a "depositor," which then conveys them to the trust.  (*Id.* ¶¶ 118-19).

The trust holds the loans for the benefit of investors who purchase securities, which give the investors a beneficial interest in the underlying mortgages.  (*Id.* ¶¶ 2, 108, 159).  The trust, also known as the "issuer," appoints a trustee — in this case, Citibank — which is the only independent party to the transaction and which is responsible for ensuring that "each of the mortgage loans was properly conveyed [to the trust]" and for certifying "that the documentation for each loan was accurate and complete."  (*Id.* ¶ 114).  In addition, the sponsor chooses an entity, known as the "servicer," to collect payments on the underlying loans and take any necessary enforcement action against borrowers.  (*Id.* ¶¶ 120-21).  Like the loan originators, the

---

[1]     The precise breakdown is somewhat unclear.  The Complaint states that twenty-six of the Trusts are New York common law trusts (Compl. ¶ 95), but Defendants represent that only twenty-four of them are (Mem. Law Supp. Citibank, N.A.'s Mot. To Dismiss (Docket No. 41) ("Def.'s Mem.") 3).  The discrepancy is immaterial for purposes of this motion.

servicers are often affiliated with the sponsoring bank.  (*Id.* ¶¶ 2, 120).  The principal and interest payments on the underlying loans are ultimately passed through to the investors. (*Id.* ¶ 116).

The Trusts are largely established and governed by contracts, several of which are relevant here.  The contract between the originator and the sponsor — or, alternatively, the sponsor and the depositor — is known as a Mortgage Loan Purchase and Sale Agreement ("MLPA").  (*Id.* ¶ 124).  The MLPA governs the sale of the mortgage loans, and includes representations and warranties made by the seller (either the originator or the sponsor) "concerning the characteristics, quality, and risk profile of the mortgage loans."  (*Id.*). Significantly, upon "discovery or receipt of notice of any breach" of a seller's representations and warranties, the seller is generally required to cure the breach or, if the breach is not cured, to either substitute the defective loan with another loan of adequate quality or repurchase the defective loan at a specified price.  (*Id.* ¶¶ 126-27).

Citibank's duties as trustee are outlined in the Trust documents.  To the extent relevant here, those duties fall into two categories: "pre-default" duties and "post-default" duties.  A trustee's pre-default duties are largely limited to those enumerated in the trust documents.  *See Elliot Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988).  The trustee must, for example, accept on behalf of the Trust all right, title, and interest in and to the mortgage loans (Compl. ¶¶ 131-32, 135-36); certify receipt of complete mortgage loan files from the depositor (*id.* ¶ 136); notify all parties to the Trust documents upon discovering a breach of a representation or warranty made by the seller with respect to any loan (*id.* ¶ 140); and notify a servicer upon discovery of the servicer's failure to comply with its obligations (*id.* ¶ 141).

A trustee's duties increase following an "Event of Default," as defined in the Trust documents.  For the PSA Trusts, an Event of Default occurs when the servicer fails to perform its duties and — after proper notice from either a particular percentage of the investors or the trustee

3

— fails to cure that breach within a specified period of time.  (*Id.*; *see* Decl. Matthew D. Ingber (Docket No. 40) ("Ingber Decl."), Ex. 1A ("Sample PSA") § 7.01.  For the Indenture Trusts, an Event of Default is slightly different: For those trusts, an Event of Default occurs when the *issuing trust* fails to perform its obligations under the Indenture and — again, after proper notice from a particular number of investors or the trustee — that default is not cured.  (Compl. ¶ 163; Ingber Decl., Ex. 2 ("Sample Indenture"), App. A at 87).  In any case, after an Event of Default, the trustee must "exercise such of the rights and powers vested in it," including the power to terminate or otherwise take action against a servicer, "and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  (Sample PSA § 8.01; *see also* Sample Indenture § 6.01).

In this case, Plaintiffs allege that Citibank breached both its pre- and post-default duties when, between 2009 and 2011, Citibank learned that the Trusts contained large numbers of loans where the seller or servicer had failed to comply with its obligation, and Citibank failed to take appropriate action.  (Compl. ¶¶ 5, 12, 222, 27-76, 281, 285-303).  Because of these deficiencies, Plaintiffs allege, the Trusts have lost more than $2 billion.  (*Id.* ¶ 97).

## LEGAL STANDARDS

As noted, Citibank's motion is brought pursuant to Rules 12(b)(1) and 12(b)(6).  A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to hear the case.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l*

*Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted).  Moreover, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione*, 426 F.3d at 638.

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## DISCUSSION

Citibank argues that Plaintiffs' Complaint should be dismissed because (1) the TIA does not authorize a private right of action (Def.'s Mem. 31-35); (2) the Court lacks supplemental jurisdiction over Plaintiffs' PSA Trust claims (*id.* at 12-20); and (3) Plaintiffs fail to state a claim (*id.* at 20-31, 35-38).  The Court will address each argument in turn.

## A.        Private Right of Action Under the TIA

There is no dispute that federal jurisdiction exists in this case only by virtue of Plaintiffs'

TIA claims with respect to the Indenture Trusts.[2]   The Court therefore begins with Citibank's

argument that the TIA does not provide a private right of action.   If Citibank is correct, then

Plaintiffs' only federal claims must be dismissed, and there would be little or no need to consider

Citibank's other arguments.   *See, e.g.*, *Davis v. Bombardier Transp. Holdings (USA) Inc.*, No.

11-CV-0782 (RRM) (RER), 2013 WL 6816605, at *12 (E.D.N.Y. Dec. 24, 2013) ("Generally,

when a court dismisses a plaintiff's federal claims, it should decline to exercise supplemental

jurisdiction over the remaining state law claims as well." (citing cases)).

Plaintiffs bring claims pursuant to Sections 315(b) and (c) of the TIA.   (Compl. ¶¶ 403-

06; *see also* Pls.' Mem. 33 n.21).   The former provides, in relevant part, that "[t]he indenture

trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee,

within ninety days after the occurrence thereof."   15 U.S.C. § 77ooo(b).   The latter provides that

"[t]he indenture trustee shall exercise in case of default (as such term is defined in such

indenture) such of the rights and powers vested in it by such indenture, and to use the same

degree of skill in their exercise, as a prudent man would exercise or use under the circumstances

in the conduct of his own affairs."   *Id.* § 77ooo(c).   Although neither provision contains an

express private right of action, courts — including those in this Circuit — have consistently

recognized an implied private right of action under both.   *See, e.g.*, *Zeffiro v. First Pa. Banking

& Tr. Co.*, 623 F.2d 290 (3d Cir. 1980); *LNC Inv., Inc. v First Fid. Bank*, 935 F. Supp. 1333

(S.D.N.Y. 1996) (citing cases); *see also Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 85 F.3d

---

[2]        As both parties acknowledge (*see* Def.'s Mem. 10-11; Pls' Opp'n Def. Citibank, N.A.'s
Mot. To Dismiss (Docket No. 43) ("Pls.' Mem.") 33 n.20), the TIA does not apply to the PSA
Trusts.   *See Ret. Bd. Policemen's Annuity & Benefit Fund of Chi.*, 775 F.3d 154, 170 (2d Cir.
2014) ("*Retirement Bd.*").

970, 974 (2d Cir. 1996) (citing *Zeffiro* favorably, and describing it as "establish[ing] a private

cause of action under the [TIA]"); *cf. In re Bankers Tr. Co.*, 450 F.3d 121, 126-27 (2d Cir. 2006)

(analyzing whether a trustee had complied with Section 315(b) without suggesting that there was

no private right of action); *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, No.

14-CV-8175 (SAS), 2015 WL 3466121, at *14-15 (S.D.N.Y. June 1, 2015) (holding that the

plaintiffs stated a claim under Sections 315(b) and (c) of the TIA).

      In *Zeffiro*, for example, the Third Circuit, relying heavily on the factors articulated by the

Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975), held that Congress intended to create a

private right of action under the TIA because (1) the TIA was enacted for the benefit of a special

class, namely, debenture holders; (2) legislative history revealed Congress's intention "to

nationalize the issues of concern in the Act"; (3) the Securities and Exchange Commission

("SEC") has no power to enforce the terms of an indenture after it has been qualified under the

Act, leaving private lawsuits as the only possible enforcement mechanism; and (4) "[i]t is

unquestionable that Congress intended to legislate over trust indentures and deal with the

problem on a national scale." 623 F.2d at 296-301. Similarly, in *LNC Investments*, a Court in

this District found that "[b]oth text and legislative history support the inference that Congress

intended to permit debenture holders to sue in federal court." 935 F. Supp. at 1339. In so ruling,

the *LNC Investments* Court, like the *Zeffiro* Court, emphasized that the SEC is not entitled to

enforce the terms of indentures covered by the TIA. *Id.* at 1339-40; *see* 15 U.S.C. §77iii(e)

("Nothing in this subchapter shall be construed as empowering the Commission to conduct an

investigation or other proceeding for the purpose of determining whether the provisions of an

indenture which has been qualified under this subchapter are being complied with, or to enforce

such provisions."). The *LNC Investments* Court also focused on the text of Sections 315(d) and

(e), which suggest that an indenture trustee may be held liable for misconduct other than making

7

material misstatements or omissions in a report to the SEC (with respect to which the TIA provides an express right of action, *see* 15 U.S.C. § 77www).  *See LNC Investments*, 935 F. Supp. at 1339.  As the Court noted, both provisions would likely have been written more narrowly if there were no private right of action under Sections 315(b) and (c).  *Id.*

Notably, Citibank cites no authority to the contrary.  (The closest it comes is to note that, in 2014, the Second Circuit "expressly declined to address the scope of any private right of action authorized by the TIA."  (Def.'s Mem. 34 n.2 (citing *Retirement Bd.*, 775 F.3d at 170)).) Instead, Citibank is left to argue, from first principles, that the courts recognizing a private right of action under Sections 315(b) and (c) have all gotten it wrong.  In particular, Citibank argues that neither the TIA's text nor its history suggests that Congress intended to create a private right of action to enforce the provisions at issue here.  (*See* Def.'s Mem. 34-35 & n.12).  With respect to the former, Citibank stresses that another provision of the TIA — concerning false or misleading statements made to the SEC in connection with administration of the TIA — expressly creates a private right of action.  (Def.'s Mem. 32 (citing 15 U.S.C. §77www).  And with respect to the latter, Citibank points to statements by members of Congress at the time of the TIA's enactment to the effect that indentures qualified under the statute would be enforced in the same manner as any other indenture.  Insofar as indentures are contracts, Citibank argues, those statements indicate that Congress expected indentures covered by the TIA to be enforced only through breach of contract actions in state court.  (Def.'s Mem. 33-34).

The Court is unpersuaded.  To be sure, the existence of an express right of action elsewhere in the statute cuts against a finding that Congress also intended to create an implied right of action under the provisions at issue here.  *See, e.g.*, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-72, 574 (1979).  But it is not dispositive.  Indeed, the TIA is not the only statute for which courts have recognized an implied right of action under one provision even though

another provision of the same statute includes an express cause of action.  *See, e.g.*, *Herman v. MacLean v. Huddleston*, 459 US 375, 385 (1983) ("When Congress acted, federal courts had consistently and routinely permitted a plaintiff to proceed under Section 10(b) even where express remedies under Section 11 or other provisions were available.").  Additionally, the legislative history that Citibank cites does not prove its point.  For one thing, given that the SEC has no authority to enforce the terms of an indenture after it is qualified, *see* 15 U.S.C. § 77iii(e), the statements at issue likely referred to the fact that the indentures could be enforced only by private parties.  Further, other legislative history unambiguously contradicts Citibank's interpretation: The Senate Report on the 1990 TIA amendments, for example, expressly stated that the amendment was "intended to codify the holdings of *Zeffiro* . . . finding private rights of action for enforcement of mandatory indenture terms."  (Pls.' Mem. 34 (quoting S. Rep. No. 101-155, at 31 (1989)); Reply Mem. Law Supp. Citibank, N.A.'s Mot. To Dismiss (Docket No. 45) ("Def.'s Reply") 14 (arguing that the Court should disregard the Senate Report)).  Although that statement is not conclusive, it is certainly persuasive evidence of Congress's intent.

That said, the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), does give this Court some pause.  In that case, the Supreme Court held that there was no implied private right of action to enforce disparate impact regulations promulgated to effectuate Title VI that went beyond the conduct prohibited by Title VI itself.  Key to the Court's analysis was the fact that the regulations were enacted pursuant to a provision authorizing federal agencies to "effectuate provisions of [the statute] . . . by issuing rules, regulations, or orders of general applicability."  *Sandoval*, 532 U.S. at 285-89.  The Court reasoned that "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons," and found that the statute at issue was "yet a step further removed" because it "focuse[d] neither on the individuals protected nor even on the

[entities] being regulated, but on the agencies that . . . [did] the regulating." *Id.* at 288-89.  In this case, there is no dispute that the TIA provisions at issue are phrased in terms of the trustee's duties rather than the investors' entitlement.  Nevertheless, their focus "is not solely on the [trustee], but also on the individuals [they] protect[]."  *Zatuchni v. Richman*, No. 07-CV-4600, 2008 WL 3408554, at *9 (E.D. Pa. Aug. 12, 2008) (finding that a provision providing that a "State plan for medical assistance must . . .  provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so" did not focus on the regulated entity, so as to preclude the inference that Congress intended to create a private right of action).  That is, Sections 315(b) and (c) impose specific duties that the trustee must perform to protect investors, and "a statute that imposes fiduciary *duties* necessarily implies corresponding *rights* in the beneficiaries."  *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Ward*, 563 F.3d 276, 286 (7th Cir. 2009) (finding that a statute "articulat[ing] a series of specific fiduciary duties" for union officers created an implied right of action for unions).  Thus, *Sandoval* does not persuade the Court to depart from the longstanding view that a private right of action exists to enforce Sections 315(b) and (c).  *See Touche Ross & Co.*, 442 U.S. at 577 n.19 (noting that in approving a private right of action under Section 10(b) of the Securities Exchange Act of 1934, the Court had "explicitly acquiesced in the 25-year-old acceptance by the lower federal courts" of such an action).  Accordingly, Plaintiffs' TIA claims may go forward.

**B.    Supplemental Jurisdiction**

The next question is whether the Court may (and, if so, should) exercise jurisdiction over Plaintiffs' claims with respect to the PSA Trusts, which are not covered by the TIA.  Plaintiffs invoke the Court's supplemental jurisdiction, which extends to state-law claims that are "so related to claims" within the Court's original jurisdiction (in this case, Plaintiffs' TIA claims) "that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Relying principally

on the Second Circuit's decision in *Retirement Board*, which held that claims against a trustee must be proved "loan-by-loan and trust-by-trust," 775 F.3d at 162, Citibank argues that the Court lacks supplemental jurisdiction over the PSA Trust claims because they will require "loan and trust-specific evidence." (Def.'s Mem. 12-13). Thus, Citibank maintains, "the nucleus of 'operative fact' actually giving rise to the claim relating to any one trust (*e.g.*, an [Indenture] trust) is wholly different from that giving rise to the claims against the others (*e.g.*, each of the PSA trusts)." (*Id.*). Alternatively, Citibank contends that, even if the Court *can* exercise supplemental jurisdiction with respect to the PSA Trust claims, it *should* decline to do so because, among other things, issues of state law would predominate over the federal questions in the case. (*Id.* at 14-20).

As a threshold matter, the Court concludes that it can exercise supplemental jurisdiction over the PSA Trust claims. As Judge Scheindlin recently held in a case substantially similar to this one, the fact that Plaintiffs will have to present loan-specific evidence to prevail at trial or on summary judgement does not mean that there is no common nucleus of operative fact between the PSA Trust claims and the Indenture Trust claims. *See Blackrock Balanced Capital Portfolio v. HSBC Bank USA, Nat'l Assoc.*, No. 14-CV-9366 (SAS), — F. Supp. 3d —, 2015 WL 1501283, at *4-5 (S.D.N.Y. Mar. 31, 2015). *But see Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank Nat'l Ass'n*, No. 14-CV-9401 (KBF), 2015 WL 2359319, at *4 (S.D.N.Y. May 18, 2015) (finding that PSA Trust claims and Indenture Trust claims did not arise from a common nucleus of operative fact). To the contrary, the contractual provisions governing both types of trusts impose similar obligations on the trustee, and Plaintiffs' "allegations arise from the common conduct of [Citibank] in systematically failing to perform its duties as trustee" as required by those contractual provisions. *Blackrock Balanced Capital Portfolio*, 2015 WL 1501283, at *4. Plaintiffs will therefore ultimately be required to "prove their claims under

substantially similar agreements with substantially the same burden of proof." *Id.* at *4. Further, as Plaintiffs point out in their memorandum of law, many of the entities involved with the Indenture Trusts are also involved with the PSA Trusts. American Home, for example, served as an originator for both the Indenture Trusts and the PSA Trusts, and two sponsors for the Indenture Trusts are also sponsors for PSA Trusts. (Decl. Timothy A. Delange Supp. Pls.' Opp'n Def. Citibank, N.A.'s Mot. To Dismiss (Docket No. 44) ("DeLange Decl."), Ex. 1, Chart 1; *id.*, Chart 2). That is sufficient to demonstrate that the claims relating to the PSA Trusts form part of the same case or controversy as those relating to the Indenture Trusts.

*Retirement Board* does not compel a different result. (Def.'s Mem. 13-14). In that case, the Second Circuit held that a named plaintiff does not have class standing to assert, on behalf of absent class members, breach-of-duty claims against the trustee of an RMBS trust in which the plaintiffs did not invest. In so ruling, the Second Circuit did indeed emphasize that the trustee's "alleged misconduct must be proved loan-by-loan and trust-by-trust," preventing the named plaintiffs from having a sufficient personal stake in proving claims arising out of the other trusts. *Ret. Bd.*, 775 F.3d at 162-63. But the Court said nothing about whether the claims formed part of the same case or controversy, and the fact that a plaintiff would have an insufficient personal stake to pursue a particular claim does not necessarily mean that that claim would lack a common nucleus of operative fact with a claim in which the plaintiff does have a sufficient stake. The Court therefore finds that it can exercise jurisdiction over all of Plaintiffs' claims.

That conclusion, however, does not end the Court's inquiry. Under Section 1367, a district court has discretion over whether to exercise jurisdiction over state-law claims, even if they, like the ones at issue here, "are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Under that provision, a court may decline to exercise supplemental

jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). With respect to the second prong, state-law claims may predominate over federal claims "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Dedalus Found. v. Banach*, No. 09-CV-2842 (LAP), 2009 WL 3398595, at *5 (S.D.N.Y. Oct. 16, 2009) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001). Further, even where "at least one of the subsection 1367(c) factors is applicable, a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966): economy, convenience, fairness, and comity." *Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (internal quotation marks omitted).

Here, because Plaintiffs will ultimately have to prove their claims loan-by-loan and trust-by-trust, the Court concludes that the state-law claims do "substantially predominate[]" over the federal claims. It is true that, as Plaintiffs argue, the "relevant issue" for the predominance inquiry is generally "the *type* of claims, not the number of complaints or damages involved." (Pls.' Mem. 20). *See Shahriar*, 659 F.3d at 246 (finding that "the fact that there are more class members in the state law class action than those in the FLSA collective action should not lead a court to the conclusion that a state claim 'substantially predominates' over the FLSA action"). But, despite that general rule, courts have recognized that a "disparity in numbers" between state and federal claims "may be so great that it becomes dispositive by transforming the action to a

substantial degree by causing the federal tail represented by a comparatively small number of plaintiffs to wag what is in substance a state dog." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 311 (3d Cir. 2003); *accord Panam Mgmt. Grp., Inc. v. Pena*, No. 08-CV-2258 (JFB) (ARL), 2010 WL 3708656, at *5 (E.D.N.Y. Sept. 14, 2010) (declining to exercise jurisdiction over state-law claims where the state-law claims involved "25 different investors," and the federal claim involved only a single contract, and where, although all of the claims involved breach of contract, they related to different contracts). That is the case here. Given that only three (if not fewer) of the twenty-seven Trusts at issue here are Indenture Trusts, it is plain that the time and resources spent on the PSA Trust claims, were the Court to retain jurisdiction over them, would far outweigh the time and resources devoted to the Indenture Trust claims.

Further, the traditional "values of judicial economy, convenience, fairness, and comity" that the Court must consider do not counsel in favor of exercising jurisdiction. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). This case is still in its early stages, and an action involving many Trusts — each of which requires individualized proof — would plainly be more complex than an action involving only a few Trusts. There is therefore no indication that either judicial economy or convenience would be advanced by the Court's exercise of supplemental jurisdiction. *See Blackrock Allocation Target Shares*, 2015 WL 2359319, at *4 ("Ultimately, these numbers suggest that state law claims substantially predominate over the TIA claim — and that exercising supplemental jurisdiction would create difficult management issues that would not otherwise arise."). *But see Blackrock Balanced Capital Portfolio*, 2015 WL 1501283, at *4. Further, there is at least some evidence that Plaintiffs may be engaging in forum shopping; Citibank claims that Plaintiffs, who first filed their case in state court, re-filed in federal court "in direct response to the assignment of the case to an experienced New York judge who has been skeptical of claims like those asserted here." Notably, Plaintiffs do not dispute those allegations.

(Def.'s Mem. 19-20; *see also* Def.'s Reply 8 (stating that Plaintiffs do not dispute that their "attempted judge- and forum-shopping strongly support dismissal")).  Courts have recognized that it is "particularly appropriate to decline to exercise supplemental jurisdiction" where a party invokes federal jurisdiction as part of "an effort in forum shopping."  *See Solid State Logic, Inc. v. Terminal Marketing Co., Inc*., No. 02-CV-1378 (DLC), 2002 WL 1586977, at *5 (S.D.N.Y. July 18, 2002).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' PSA Trust claims, and those claims are dismissed.

## C.    Failure To State a Claim

Finally, Citibank argues that Plaintiffs fail to state a plausible claim with respect to the Indenture Trusts.  In particular, Citibank argues that Plaintiffs' breach of contract claim fails because Plaintiffs do not allege that Citibank actually knew about breaches of any parties' representations and warranties or Events of Default; that their TIA claims fail for similar reasons; and that their negligence and fiduciary duty claims fail because they are duplicative of Plaintiffs' contract claims and because Plaintiffs do not adequately plead a conflict of interest.

### 1.  Breach of Contract

Citibank argues first that Plaintiffs' breach of contract claims fail as a matter of law because the Complaint alleges neither that Citibank actually knew about a particular seller's breach of its representations and warranties nor that it actually knew that an Event of Default had occurred, as required by the Trust Documents.  (Def.'s Mem. 20-31).  With respect to the former, Citibank argues that the Complaint falls short because Plaintiffs "do not plead any facts showing that statements regarding any *specific loan in one of the Trusts* breached the seller's representations and warranties — let alone that Citibank had knowledge of such a breach."  (*Id.* at 23).  But, as several courts have recognized, "[a]t the pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual

loans in the specific trusts [as] such information, at this stage, is uniquely in the possession of defendants." *Policemen's Annuity and Ben. Fund of Chi. v. Bank of Am., NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) ("*Policemen's/BofA II*"), *abrogated on other grounds by Retirement Bd.*, 775 F.3d 154; *see also Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat. Ass'n*, 291 F.R.D. 47, 70 (S.D.N.Y. 2013) (same), *abrogated on other grounds by Retirement Bd.*, 775 F.3d 154. Instead, Plaintiffs only have to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  They more than do so here.

First, Plaintiffs allege "pervasive breaches of representations and warranties," including that "the representations and warranties regarding the originators' compliance with underwriting standards and practices, owner occupancy statistics, appraisal procedures, [loan-to-value ratios] and combined loan-to-value . . . ratios were systematically and pervasively false."  (Compl. ¶ 168).  According to the Complaint, this falsity was evident from, among other red flags, high default rates, declines in credit ratings, and government and newspaper reports that uncovered the pervasive abandonment of underwriting standards — including reports about the major originators and sponsors of loans in the Trusts.  (*Id.* ¶¶ 169-221).  In light of such allegations, Plaintiffs' claims that the sellers breached their representations and warranties are certainly plausible.  Indeed, "it would be *im*plausible to assume that somehow all of the mortgage loans underlying the [Trusts] miraculously avoided" the pervasive practices of the industry at the time. *Policemen's/BofA II*, 943 F. Supp. 2d at 442; *see also Royal Park Investments*, 2015 WL 3466121, at *6 (finding that Plaintiffs had met their burden of alleging breaches of the sellers' representations and warranties where the complaint described the "routine abandonment of their underwriting guidelines; the routine fabrication of borrower and loan information; massive

breaches of their representations and warranties; and the engagement in predatory and abusive lending").

Plaintiffs' allegations regarding Citibank's knowledge of these breaches and warranties are similarly sufficient.  Plaintiffs support their claims that Citibank knew about the sellers' breaches with allegations that: (1) the Trusts had "extremely high mortgage loan delinquency rates," as well as high rates of loan modification (Compl. ¶¶ 223-27); (2) Citibank learned about widespread breaches of representations and warranties because of its involvement with other RMBS trusts in various capacities, including serving as one of the largest RMBS servicers, being named in RMBS litigation involving similar allegations to those made here, and receiving notice of breaches with respect to other trusts for which it served as trustee (*id.* ¶¶ 230-54); and (3) other high profile litigation and settlements regarding the same originators and sponsors as those involved with the Trusts (*id.* ¶¶ 255-61).  Although none of these allegations demonstrates Citibank's knowledge of deficiencies with respect to any particular loan, they are sufficient to meet Plaintiffs' burden at the motion-to-dismiss stage.  *See Royal Park Investments*, 2015 WL 3466121, at *7 (finding allegations of the high number of defaults, "enormous" trust losses, declining credit ratings, reports and litigation regarding improper underwriting practices, litigation concerning loans in some of the specific trusts, and the trustee's involvement in "putback" efforts involving the same sellers were sufficient to allege the trustee's actual knowledge); *Policemen's/BofA II*, 943 F. Supp. 2d at 442 ("While it is possible that the Trustees merely reported on increasing credit losses but did not actually know that these losses indicated that the loans did not meet the represented credit standards, it is certainly plausible that they actually knew that the representations had been breached.").  *But see Knights of Columbus v. Bank of N.Y. Mellon*, Index No. 651442/2011, slip op. at 6-9 (N.Y. Supp. Ct. July 10, 2015) (dismissing a claim against a trustee because the plaintiffs had not adequately pleaded that the

trustee had notice of an event of default where they had alleged only "widespread knowledge of improper servicing . . . of which [the trustee] had general knowledge through news media reports, investigations and lawsuits").

Citibank's argument with respect to Plaintiffs' allegations that Citibank did not appropriately respond to Events of Default similarly fails.  First, Citibank argues that Plaintiffs do not actually allege that any Event of Default occurred.  (Def.'s Mem. 28-29).  Under the Indentures, an "Event of Default" occurs when the Issuer materially breaches its obligations, is notified of the breach by the Trustee or by a certain percentage of investors, and fails to cure the material breach for a period of thirty days.  (Sample Indenture, App. A at 87).  Citibank argues that Plaintiffs fail to plead that any Issuer in fact received notice of a default.  (Def.'s Mem. 28-29).[3]  But Citibank may not excuse its failure to perform the additional duties required of it after an Event of Default by pointing to its own failure to give notice; that is, Citibank "is not permitted to take advantage of its own wrong."  *In re Bankers Trust Co.*, 450 F.3d at 129 (internal quotation marks and alteration omitted); *see, e.g.*, *Okla. Police Pension & Ret. Sys.*, 291 F.R.D. at 70-71 (holding that "the trustee cannot rely on its own failure to give notice to escape its own liability" even though an event of default could be triggered by notice either from the trustee or from twenty-five percent of the security holders).  This principle holds true even if Citibank was not contractually required to give notice.  (*See* Def.'s Reply 11-12).  Whether or not Citibank had a contractual duty to give notice, it certainly had the power to do so, and it "has been established for over a century that a party may not insist upon performance of a condition

---

[3]     Because Citibank's briefing focused principally on the PSA Trusts, it frames its argument in terms of a lack of notice to the *servicers*, as required under the PSAs, rather than the issuers, as required under the Indentures.  (Def.'s Mem. 28-29).  The same principle, however, applies to both types of Trusts.  Accordingly, the Court construes Citibank's argument to encompass also a lack of notice to the issuers, as required for Indenture Trusts.

precedent when its non-performance has been caused by the party itself." *Royal Park Investments*, 2015 WL 3466121, at *9 (internal quotation marks omitted).

Citibank also argues that Plaintiffs do not adequately plead the existence of an Event of Default because the Indenture Trusts define an Event of Default in terms of the *issuer*'s breach of its duties, while the Complaint alleges only *servicer* misconduct.  (Def.'s Mem. 35-36).[4]  But, as Plaintiffs point out in their memorandum of law, the Indenture requires the Issuer to "take such . . . action necessary or advisable to . . . cause the Issuer or Master Servicer to enforce *any* of the rights of the Mortgage Loans" or to "preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties."  (Sample Indenture 17 (emphasis added); *see* Compl. ¶ 161).  As noted above, each Indenture Trust also entered into an SSA and MLPA with the relevant sellers and servicers.  Those documents required the sellers and servicers to perform certain duties.  (Compl. ¶¶ 162, 165-67).  Thus, if the sellers or servicers violated those warranties or failed to cure or repurchase defective mortgages, "the issuer similarly failed to 'enforce any rights with respect to [the Trust], as the Indenture required it to do."  *Royal Park Investments*, 2015 WL 3455121, at *9; *see also Ret. Bd. of the Policemen's Annuity & Benefit Fund Chi. v. Bank of N.Y. Mellon* ("*Policemen's/BNYM*"), 914 F. Supp. 2d 422, 432 (S.D.N.Y. 2012) (same), *abrogated on other grounds by Ret. Bd.*, 775 F.3d 154 (2d Cir. 2014).  Citibank argues that the Indenture provisions apply only to enforcement of the Trust's ownership rights, but "nothing in the language of that clause limits this obligation to ownership interests — in fact, the language is sweepingly broad

---

[4]     Strictly speaking, Citibank makes this argument only in the section of its memorandum concerning Plaintiffs' TIA allegations.  (Def.'s Mem. 35-36).  Nevertheless, the Court addresses it here because it applies equally to Plaintiff's breach of contract arguments.

and by its plain terms encompasses *any* rights with respect to the Trust." *Royal Park Investments*, 2015 WL 3455121, at *17 n.94.

Further, Plaintiffs adequately plead Citibank's actual knowledge of the Events of Default. At bottom, Citibank makes the same argument with regard to its knowledge (or lack thereof) about the Events of Default as it made with regard to its knowledge of the breaches of the sellers' representations and warranties: "Just as 'actual knowledge' of a seller's breach of representations and warranties must be *loan*-specific, the Trustee's knowledge of a servicer's breach of its obligations under the contracts giving rise to an Event of Default must be *trust*-specific." (Def.'s Mem. 29-30). Again, however, Citibank mistakes the facts that Plaintiffs would have to prove at trial (or on summary judgment) with the allegations that they must include in their Complaint; in the Complaint, Plaintiffs must demonstrate only that it is plausible that Citibank knew that the servicers had breached their obligations to particular trusts. Here, Plaintiffs allege that Citibank had such actual knowledge based on (1) Citibank's involvement in enforcement actions and other litigation stemming from servicers' violations with respect to other trusts (Compl. ¶¶ 304-09); (2) Citibank's receipt of written notice from investors in other trusts, for which it also served as the trustee, of the systemic servicing violations by the same entities that service the Trusts at issue here (*id.* ¶¶ 310-12); and (3) Citibank's publishing of the servicers' servicing reports and monthly remittance reports, which "detailed the Trusts' increasing loan modifications, staggering losses, and write-downs due to the poor credit quality of the loans, but did not reflect the servicers' actions to enforce the sellers' repurchase obligations" (*id.* ¶ 313). Those allegations are sufficient at this stage. *See, e.g.*, *Royal Park Investments*, 2015 WL 3455121, at *10 (finding that the plaintiffs had sufficiently pleaded actually knowledge of Events of Default based on allegations that the trustee "was the target of government investigations, prosecutions and settlements with many of the Servicers to the Trusts for the same alleged improper servicing

practices," and received "written notice from Holders to other RMBS trusts regarding the same servicing violations by the same servicers to the Trusts [at issue]").  Accordingly, Plaintiffs' breach of contract claims with respect to the Indenture Trusts survive.

### 2.  TIA Claims

In light of the foregoing, Citibank's argument for dismissal of Plaintiffs' TIA claims is easily rejected.  As noted, Plaintiffs bring claims pursuant to Sections 315(b) and (c) of the TIA, which impose duties on a trustee that arise after a default.  *See* 15 U.S.C. § 77ooo(b), (c).[5] Citibank argues that "default" under the statute means default as defined in the Indenture and that Plaintiffs fail to state a claim because they do not allege that any default occurred.  (Defs.' Mem. 35).  But even assuming *arguendo* that Sections 315(b) and 315(c) come into play only after a default as defined in the Indenture, Citibank's argument fails because, as discussed above, Plaintiffs adequately allege that such a default occurred.

### 3.  Negligence and Breach of Fiduciary Duties

Lastly, Plaintiffs bring two negligence claims — one for breach of the "pre-default duty of independence" and one for breach of the "duty of care" — and two breach of fiduciary duty claims — one for breach of the "duty of care" and one breach of the "post-default duty of independence."  Citibank argues that they should be dismissed as duplicative of Plaintiffs' contract claims.  (Def.'s Mem. 37).  It is well established that where "the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative."

---

[5]     The Complaint also mentions Section 315(a) (*see* Compl. ¶ 403), but to the extent Plaintiffs ever intended to bring claims pursuant to that provision, such claims have been abandoned.  (*See* Pls.' Mem. 33 n.21 (stating that "Citibank's challenge to Plaintiffs' TIA Section 315(a) claim is misplaced" because Plaintiffs TIA claim "is predicated on . . . violation[s] of 315(b) and (c)").  The Court therefore need not address Citibank's argument that Plaintiffs fail to state a claim under Section 315(a).  (*See* Def.'s Mem. 35).

*Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012); *see also Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013) (dismissing a breach of fiduciary duty claim as duplicative of a contract claim). In this case, that principle compels dismissal of Plaintiffs' second negligence claim and their first fiduciary duty claim — that Citibank breached its "duty of care."  (Compl. ¶¶ 418- 431).  The negligence claim alleges that, after Events of Default occurred, Citibank failed to notify investors of the originators' and sponsors' breaches of their obligations, to enforce sellers' obligation to cure, or to enforce servicers' obligations.  (*Id.* ¶¶ 425-29).  Those alleged deficiencies, however, are essentially the same ones that give rise to Plaintiffs' breach of contract claims.  The fiduciary duty claim is also duplicative; it alleges that Citibank breached its fiduciary duty "to exercise its contractually conferred rights and powers in good faith and to bring all available claims for the benefit of the Trusts and the Certificateholders following an Event of Default."  (*Id.* ¶ 419). Accordingly, those claims must be and are dismissed.

    Plaintiffs' other negligence and fiduciary duty claims, however, allege the violation of extra-contractual duties  — namely, pre- and post-default duties of independence.  (*Id.* ¶¶ 409-17 (negligence); *id.* ¶¶ 432-40 (fiduciary duty)).  "Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct."  *Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 58.  Citibank argues that it did not have any *pre*-default extra-contractual duties (Def.'s Mem. 37), but even it admits that New York courts have recognized an implied, extra-contractual duty "to avoid direct conflicts of interest with notesholders."  (Def.'s Mem. 4 n.3 (citing *Ellington Credit Fund, Ltd. v. Select Portfolio Serv., Inc.*, 837 F. Supp. 2d 162, 191-92 (S.D.N.Y. 2011)).  Citibank argues that the claims also fail because "[i]t is settled that a 'conflict of interest cannot be inferred solely from a relationship between [a securities issuer] and an indenture trustee that is mutually beneficial and

increasingly lucrative." (Def.'s Mem. 37 (quoting *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98-CV-6907 (MBM), 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000)). That may well be true, but Plaintiffs allege more than that. Among other things, they allege that Citibank itself engaged in the type of wrongful conduct alleged here in its capacity as an originator and sponsor with respect to other trusts for which many of the same sellers and servicers at issue here served as trustee. (Compl. ¶¶ 414, 437). Thus, Plaintiffs allege that Citibank was "economically beholden" to those sellers and servicers because it "faced repurchase liability for the sale and securitization of its own loans" if Citibank took action against them. (Compl. ¶¶ 414-15; 437-38). Drawing all inferences in Plaintiffs' favor, as the Court must, Plaintiffs essentially allege that Citibank did not take action against the sellers and servicers who violated their obligations to the Trusts because it feared retaliation from those same servicers and sellers with respect to other loans. That allegation adequately pleads a conflict of interest. *See Royal Park Investments*, 2015 WL 3466121, at *13 (finding that the plaintiffs had adequately pleaded a trustee's conflict of interest when they alleged that the trustee "was involved with the Master Servicers' misconduct, helped facilitate it, or looked the other way in these cases so that the Master Servicers would return the favor when the roles were reversed"). Accordingly, Plaintiffs' duty-of-independence negligence and fiduciary duty claims survive Citibank's motion to dismiss.

## CONCLUSION

For the foregoing reasons, Citibank's motion to dismiss is GRANTED in part and DENIED in part. Specifically, the Court declines to exercise supplemental jurisdiction over Plaintiffs' claims relating to the PSA Trusts. Further, the negligence and fiduciary duty claims alleged in the Complaint's fourth and fifth causes of action — those relating to alleged breaches of the duty of care — are also dismissed, on the ground that they are duplicative of Plaintiff's

breach of contract claims.  (*See* Compl. ¶¶ 418-31).  With respect to the Indenture Trusts, Plaintiffs adequately state a breach of contract claim (*id.* ¶¶ 387-99) and a TIA claim (*id.* ¶¶ 400-408), and the motion to dismiss is denied with respect to those claims.  Similarly, the negligence and fiduciary duty claims alleged in the third and sixth causes of action — those relating to the duty of independence — also survive.  (*See id.* ¶¶ 409-17, 432-40).

The Clerk of Court is directed to terminate Docket No. 39.


SO ORDERED.

Date:   September 8, 2015
        New York, New York

JESSE M. FURMAN
United States District Judge